**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: MOVEIT CUSTOMER DATA SECURITY BREACH LITIGATION<br><br>This Document Relates To:<br><br>STEVEN CHECCHIA, GILBERT HALE, PATRICE HAUSER, TRICIA HERNANDEZ, PATRICIA MARSHALL, MARGARET PHELAN, RITA PASQUARELLI, JOSE SOTO, STEVEN TEPPLER, AND KATHARINE UHRICH,<br><br>Plaintiffs,<br><br>v.<br><br>LONGEVITY HOLDINGS, INC., ITM TWENTYFIRST, LLC, GENWORTH NORTH AMERICA, CORP., BRIGHTHOUSE FINANCIAL LIFE INSURANCE COMPANY, GENWORTH LIFE INSURANCE COMPANY OF NEW YORK, CMFG LIFE INSURANCE D/B/A TRUSTAGE, TIAA KASPICK, LLC,<br><br>Defendants. | MDL No. 1:23-md-03083-ADB-PGL<br><br>DIRECT FILED COMPLAINT & JURY DEMAND PURSUANT TO MDL ORDER NO. 12<br><br>CIVIL ACTION NO. |

## TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. PARTIES .......... 8

A. PLAINTIFFS .......... 8

1. Plaintiffs Alleging Claims Against GNA, GLICNY. .......... 8

i. Plaintiff Gilbert Hale .......... 8

ii. Plaintiff Patrice Hauser .......... 13

iii. Plaintiff Tricia Hernandez .......... 18

iv. Plaintiff Rita Pasquarelli .......... 22

2. Plaintiff Alleging Claims Against TruStage. .......... 27

i. Plaintiff Jose Soto .......... 27

3. Plaintiffs Alleging Claims Against TIAA Kaspick, LLC. .......... 32

i. Plaintiff Steven Checchia .......... 32

ii. Plaintiff Patricia Marshall .......... 38

iii. Plaintiff Margaret Phelan .......... 42

iv. Plaintiff Steven Teppler .......... 47

v. Plaintiff Katharine Uhrich .......... 51

B. DEFENDANTS .......... 56

1. PBI-Affiliated Defendants .......... 56

i. Longevity Holdings, Inc. (“Longevity”) .......... 56

ii. ITM TwentyFirst, LLC (“TwentyFirst”) .......... 56

2. Genworth-Affiliated Defendants .......... 56

i. Genworth North America, Corp. (“GNA”) .......... 56

ii. Brighthouse Financial Life Insurance Company (“BLIC”) .......... 56

iii. Genworth Life Insurance Company of New York ("GLICNY") .......... 56

3. Milliman-Affiliated Defendant .......... 57

i. CMFG Life Insurance d/b/a TruStage ("TruStage") .......... 57

4. TIAA-Affiliated Defendant .......... 57

i. TIAA Kaspick, LLC .......... 57

III. JURISDICTION AND VENUE .......... 57

IV. FACTUAL ALLEGATIONS CONCERNING DATA BREACH .......... 61

V. FACTUAL ALLEGATIONS AND CAUSES OF ACTION .......... 61

A. Overview of the Defendants .......... 61

B. Nature of PBI's Business .......... 66

C. Defendants used the MOVEit Transfer software to transfer and store the Plaintiffs' and Class members' PII. .......... 68

D. PBI knew it had duties to protect the Plaintiffs' and Class members' PII, and assured them that it would. .......... 69

E. Genworth Defendants knew they had duties to protect the Plaintiffs' and Class members' PII, and assured them that they would. .......... 73

F. Milliman Defendants knew they had duties to protect Plaintiffs' and Class members' PII, and assured them that they would. .......... 78

1. TruStage and MLIC knew it had duties to protect the Plaintiffs' and Class members' PII, and assured them that it would. .......... 80

G. Defendant TIAA Kaspick and TIAA knew it had duties to protect the Plaintiffs' and Class members' PII, and assured them that it would. .......... 82

H. Contrary to their statements touting their data security, Defendants failed to safeguard Plaintiffs' and Class members' PII. .......... 83

I. PBI, Longevity, and TwentyFirst Failed to Secure Plaintiffs' and Class members' PII and, instead, allowed it to be compromised in the Data Breach. .......... 84

J. Genworth Defendants Failed to Secure Plaintiffs' and Class members' Sensitive PII and, instead, allowed it to be compromised in the Data Breach. .......... 87

K. Defendant TruStage, Milliman Inc., and MLIC Failed to Secure Plaintiffs' and Class members' Sensitive PII and, instead, allowed it to be compromised in the Data Breach. .... 90

L. Defendant TIAA Kaspick and TIAA Failed to Secure Plaintiffs' and Class members' Sensitive PII and, instead, allowed it to be compromised in the Data Breach. .... 94

M. Defendants Knew the Risks of Data Breaches and Had Duties to Plaintiffs' and Class members' PII, but Failed to do so. .... 96

1. Defendants knew they needed to protect the Plaintiffs' highly sensitive PII. .... 96

*2.* Defendants knew the risks of transferring and storing sensitive information, including the risk of data breaches. .... 97

3. Longevity, TwentyFirst, and PBI had an obligation to carefully audit Progress's MOVEit Transfer software and cybersecurity practices. .... 100

4. PBI-Contracting Defendants had obligations to carefully vet and audit their third-party vendors, including PBI. .... 102

N. Defendants could have prevented the Data Breach. .... 103

1. Had Longevity, TwentyFirst, and PBI complied with applicable security standards, they would have determined that the MOVEit software was not safe to use and prevented the Data Breach .... 105

i. Auditing Third-Party Software. .... 106

ii. Vetting Vendors. .... 106

iii. Whitelisting. .... 107

iv. Limiting Specific File Types. .... 108

v. Adequate Logging, Monitoring, and Auditing. .... 109

vi. WAFs. .... 111

vii. Supply Chain Security .... 112

viii. Windows Security Feature .... 113

2. Longevity, TwentyFirst, and PBI failed to follow Progress's recommendations regarding secure configuration of the MOVEit software, which further contributed to the Data Breach. .... 115

3. Had PBI-Contracting Defendants complied with applicable security standards, they would have determined that the MOVEit software was not safe to use and prevented the Data Breach. ................ 121

i. Auditing Third-Party Vendors and Software ............................. 122

ii. Vetting Vendors ............................................................... 123

O. Longevity, TwentyFirst, and PBI's failure to comply with laws and industry standards mandating that they act as quickly as possible in response to the Data Breach led to additional losses. ....................................... 125

P. Defendants Failed to Comply with FTC Guidelines......................................... 131

Q. Defendants GNA, GLICNY, BLIC, TruStage, and TIAA Kaspick Failed to Comply with the Gramm-Leach Bliley Act. ................................................. 133

R. Damages Sustained by Plaintiffs and the Class members. ................................ 136

VI. CLASS ALLEGATIONS ................................................................................ 136

VII. CAUSES OF ACTION ................................................................................. 141

FIRST CLAIM FOR RELIEF Negligence ............................................................ 141

SECOND CLAIM FOR RELIEF Negligence Per Se ............................................... 145

THIRD CLAIM FOR RELIEF Breach of Implied Contract .................................... 149

FOURTH CLAIM FOR RELIEF Breach of Third-Party Beneficiary Contract ........................ 152

FIFTH CLAIM FOR RELIEF Violation of Massachusetts General Laws, Chapter 93A .......... 154

SIXTH CLAIM FOR RELIEF Violation of Minnesota Uniform Deceptive Trade Practices Act.............................................................................................. 157

SEVENTH CLAIM FOR RELIEF Violations of the California Unfair Competition Law ("UCL") ......................................................................................... 160

EIGHTH CLAIM FOR RELIEF Declaratory Relief................................................ 163

VIII. PRAYER FOR RELIEF.............................................................................. 164

## I. INTRODUCTION

1. This Complaint is being directly filed into this MDL proceeding pursuant to the Court's MDL Order No. 12.

2. Pension Benefit Information ("PBI") Bellwether Plaintiffs Steven Checchia, Gilbert Hale, Patrice Hauser, Tricia Hernandez, Patricia Marshall, Rita Pasquarelli, Margaret Phelan, Jose Soto, Steven Teppler, and Katharine Uhrich bring this Class Action Complaint against Defendants Longevity Holdings, Inc. ("Longevity") and ITM TwentyFirst LLC ("TwentyFirst") on behalf of themselves and all other similarly situated individuals, stemming from a data breach impacting more than 93 million people,[1] who had their highly sensitive personally identifiable information ("PII" or "Private Information" or "Personal Information")—including, but not limited to, their full names, dates of birth, and Social Security numbers – accessed, compromised, and obtained by malicious, unauthorized third parties from Defendants' systems as early as May 27, 2023[2] (the "Data Breach"). Plaintiffs Gilbert Hale, Patrice Hauser, and Tricia Hernandez bring this Class Action Complaint against Defendants Genworth North America, Corp. ("GNA") and Brighthouse Financial Life Insurance Company ("BLIC"). Plaintiff Gilbert Hale brings this Class Action Complaint against Genworth Life Insurance Company of New York ("GLICNY"). Plaintiff Jose Soto brings this Class Action Complaint against CMFG Life Insurance d/b/a TruStage ("TruStage"). Plaintiffs Steven Checchia Margaret Phelan, Katharine Uhrich, Steven Teppler, and

---

[1] Matt Kapko, *MOVEit liabilities mount for Progress Software*, Cyber Security Drive, https://www.cybersecuritydive.com/news/moveit-liabilities-progress/706015/ (last visited Apr. 27, 2026).

[2] *MOVEit Transfer Critical Vulnerability (May 2023) (CVE-2023-34362)*, Progress: Community (June 16, 2023), https://community.progress.com/s/article/MOVEit-Transfer-Critical-Vulnerability-31May2023; Nader Zaveri et al., *Zero-Day Vulnerability in MOVEit Transfer Exploited for Data Theft*, Mandiant: Blog (Apr. 3, 2024), https://www.mandiant.com/resources/blog/zero-day-moveit-data-theft.

Patricia Marshall bring this Class Action complaint against TIAA Kaspick, LLC, a subsidiary of TIAA. When GNA, BLIC, and GLICNY, are referred to herein together, they are the “Genworth Defendants.” Similarly, when TruStage is referred to herein together with its subsidiaries, they are the “Milliman Defendants.” The Genworth Defendants, Milliman Defendants, and TIAA Kaspick are together “PBI-Contracting Defendants.”

3. Unless otherwise defined herein, all capitalized terms and proper nouns have the same meanings as defined in the operative Bellwether Consolidated Amended Complaint (ECF No. 1543).

4. Defendants tout the safety and security of their services and systems on their websites, particularly their data privacy practices, but failed to adhere to those promises and, instead, allowed the Data Breach to occur.

5. For instance, Progress Software, the source of the MOVEit Transfer software Defendants utilized at issue in the Data Breach, states: “The security of our customers’ environments is paramount. Progress has a comprehensive cybersecurity program in place which includes a zero-trust cybersecurity architecture approach, compliance audits and verifications, source-code scanning, external penetration tests, third-party deep-dive code assessments as well as ongoing coordination with some of the industry’s top cybersecurity researchers.”[3]

6. Likewise, as alleged in greater detail below, all Defendants make similar statements to consumers that the Personal Information that they entrust to Defendants will remain safe and secure.

---

[3] *Progress Trust Center*, Progress: MOVEit, https://www.progress.com/security (last visited Nov. 26, 2024).

7. At the center of the Data Breach, and all Plaintiffs' claims herein, is Progress's on-premises secure file transfer software, MOVEit Transfer, which is represented as providing a "secure environment for your file transfers to help you meet cybersecurity standards, exchange data efficiently, and protect your reputation."[4]

8. MOVEit Transfer is part of Progress's MOVEit suite of products, originally developed by Progress's wholly-owned subsidiary, Ipswitch, Inc. ("Ipswitch"), which Progress acquired in 2019.[5]

9. Progress boasts MOVEit as the "leading secure Managed File Transfer (MFT) software used by thousands of organizations around the world to provide complete visibility and control over file transfer activities. Whether deployed as-a-Service, in the Cloud, or on premises, MOVEit enables your organization to meet compliance standards, easily ensure the reliability of core business processes, and secure the transfer of sensitive data between partners, customers, users and systems."[6]

10. Progress' website further assures MOVEit users that it has substantial data privacy protections and practices in place to keep sensitive Private Information secure. For example:

> Progress MOVEit helps your organization meet cybersecurity compliance standards such as PCI-DSS, HIPAA, GDPR, SOC2 and more. Provide a more secure environment for your most sensitive files, while supporting the reliability of core business processes.

---

[4] *MOVEit: Managed File Transfer Software*, Progress, https://www.progress.com/moveit/moveit-transfer (last visited Dec. 5, 2024).

[5] Larry Dignan, *Progress acquires Ipswitch for $225 million, tops first quarter targets*, ZDNet (Mar. 28, 2019), https://www.zdnet.com/article/progress-acquires-ipswitch-for-225-million-tops-first-quarter-targets/; *Progress Completes Acquisition of Ipswitch, Inc.*, Progress: Press Release (May 1, 2019), https://investors.progress.com/news-releases/news-release-details/progress-completes-acquisition-ipswitch-inc#.

[6] *Managed File Transfer Software*, Progress: MOVEit, https://www.ipswitch.com/moveit (last visited Nov. 26, 2024).

* * *

> The security of our customers' environments is paramount. Progress has a comprehensive cybersecurity program in place which includes a zero-trust cybersecurity architecture approach, compliance audits and verifications, source-code scanning, external penetration tests, third-party deep-dive code assessments as well as ongoing coordination with some of the industry's top cybersecurity researchers
>
> When vulnerabilities are found, we work quickly to mitigate the risk, issue appropriate patches and communicate directly with our customers, so they can take immediate action to harden their environments against those vulnerabilities.[7]

11. MOVEit Transfer is software that is licensed to customers on a subscription basis and installed by customers on their own servers, providing the customers with the ability to store, send, and receive sensitive files.[8] MOVEit Transfer is typically accessed by each customer's users through a public-facing web portal that is run on the customer's servers, not Progress's servers.[9]

12. Progress claims MOVEit Transfer encrypts files both in transit and at rest so they cannot be viewed at any time without the appropriate encryption key.[10]

13. The Defendants in this case are customers who contract directly with Progress to use MOVEit Transfer on their own servers, or other vendors who contract with a third party which in turn uses MOVEit Transfer. A variety of parties—such as direct users or vendors—thus used

---

[7] *Progress Trust Center*, Progress: MOVEit , https://www.progress.com/security (last visited Nov. 26, 2024).
[8] *More Secure Managed File Transfer Software for the Enterprise*, Progress: MOVEit, https://www.progress.com/moveit/moveit-transfer (last visited Nov. 26, 2024).
[9] *Advanced Topics: Systems Internal – URL Crafting, MOVEit Transfer 2023.1 Adm'r Guide*, Progress: Prod. Documentation (Apr. 21, 2022), https://docs.progress.com/bundle/moveit-transfer-web-admin-help-2023/page/System-Internals-URL-Crafting.html.
[10] *Introduction, MOVEit Transfer 2023.1 Adm'r Guide*, Progress: Prod. Documentation (Apr. 21, 2022), https://docs.progress.com/bundle/moveit-transfer-web-admin-help-2023/page/Introduction\.html.

MOVEit software to effectuate file transfers. *See* Exhibit A (Updated Defendant Track Appendix A).

14. Progress's website states that "in some cases, end users of our customers may need to provide Sensitive [Private] Information to our customer in order to make use of an application that uses our Product or SaaS Product and that Sensitive Personal Information may be stored or processed by us as a result. We process such Sensitive [Private] Information in the role of a processor on behalf of a customer (and/or its affiliates) who is the responsible controller of the Sensitive [Private] Information concerned."[11]

15. On or around May 31, 2023, Progress discovered a vulnerability in MOVEit Transfer that "could lead to escalated privileges and potential unauthorized access." On or about that same day, Progress purportedly notified all of its customers that used MOVEit (such as Defendants), and developed and released a security patch for the vulnerability used in the Data Breach.[12] The vulnerability was given a severity rating under the Common Vulnerability Scoring System of 9.8 out of 10, signifying that the vulnerability is near the highest level of severity, or "critical."[13] As described below, Progress continued to find additional security vulnerabilities in the MOVEit Transfer software as well as its other products.

16. On or around May 27, 2023, the Russian cybercriminal ransomware gang Cl0p exploited MOVEit Transfer's vulnerabilities by simultaneously deploying malware to public-

[11] https://www.progress.com/legal/privacy-policy.

[12] *MOVEit Transfer Critical Vulnerability (May 2023) (CVE-2023-34362)*, Progress: Community (June 16, 2023), https://community.progress.com/s/article/MOVEit-Transfer-Critical-Vulnerability-31May2023.

[13] NIST, *Progress MOVEit Transfer SQL Injection Vulnerability (CVE-2023-34362) Detail*, Nat'l Vulnerability Database (June 23, 2023), https://nvd.nist.gov/vuln/detail/CVE-2023-34362.

facing MOVEit Transfer web portals of thousands of MOVEit Transfer customers, decrypting the stored data, and downloading it in bulk.[14]

17. Because the MOVEit Transfer software was not designed to discover or defend against this type of attack, it initially went undetected.[15] Further, because MOVEit Transfer is installed on each customer's servers, there could be no coordinated effort to stop the attack until Progress published a patch.[16]

18. Cl0p's coordinated attack provided it with unfettered access to unencrypted Private Information of millions of individuals.

19. On June 6, 2023, after the Data Breach was publicized and a patch was rolled out, Cl0p claimed credit for the Data Breach and threatened to post stolen data online unless the compromised organizations paid a ransom.[17]

20. When the deadline expired, Cl0p proceeded to publish terabytes of stolen data on the dark web.[18]

21. By December 20, 2023, over 2,600 organizations—accounting for at least 85 million individual victims—had been compromised in the Data Breach.[19]

---

[14] Nader Zaveri et al., *Zero-Day Vulnerability in MOVEit Transfer Exploited for Data Theft*, Mandiant: Blog (Apr. 3, 2024), https://www.mandiant.com/resources/blog/zero-day-moveit-data-theft.
[15] Nader Zaveri et al., *Zero-Day Vulnerability in MOVEit Transfer Exploited for Data Theft*, Mandiant: Blog (Apr. 3, 2024), https://www.mandiant.com/resources/blog/zero-day-moveit-data-theft.
[16] Joe Slowik, *Move It on Over: Reflecting on the MOVEit Exploitation*, Huntress: Blog (Jul. 7, 2023), https://www.huntress.com/blog/move-it-on-over-reflecting-on-the-moveit-exploitation.
[17] Nader Zaveri et al., *Zero-Day Vulnerability in MOVEit Transfer Exploited for Data Theft*, Mandiant: Blog (Apr. 3, 2024), https://www.mandiant.com/resources/blog/zero-day-moveit-data-theft.
[18] Riam Kim-Mcleod, *Clop Leaks: First Wave of Victims Named*, ReliaQuest: Blog (July 28, 2023, 10:00 AM), https://www.reliaquest.com/blog/clop-leaks-first-victims/.
[19] Bert Kondruss, *MOVEit hack victim list*, Kon Briefing, https://konbriefing.com/en-topics/cyber-attacks-moveit-victim-list.html (last updated Dec. 20, 2023).

22. Despite the immediate notification of Progress's customers about the Data Breach, individual victims, including Plaintiffs, were not notified that their Private Information was compromised until months later.

23. The Private Information of millions of individuals compromised in the Data Breach continues to be circulated on the dark web and leveraged by cybercriminals. In one example, a person or group known as Nam3L3ss has sought to download, clean, and organize all data stolen in the Data Breach to make it easily accessible to cybercriminals, and has already done so with millions of records from dozens of organizations so far.[20] Accordingly, Plaintiffs and individual victims of the Data Breach will continue to be victimized as information obtained from the Data Breach will continue to proliferate on the dark web.[21] And as more information continues to be disclosed by cybercriminals, fraud and attempted fraud and identity theft will continue to occur for millions more individuals.

24. Each and every Defendant was responsible for the collection, storage, and protection of Plaintiffs and Class members' Private Information. Defendants owed duties to Plaintiffs and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their Private Information against unauthorized access

---

[20] Ernestas Naprys, *MOVEit fallout: hackers leak employee data from Amazon, MetLife, HSBC, and other major companies*, cybernews (Nov. 11, 2024, 4:09 PM), https://cybernews.com/security/moveit-fallout-hackers-leak-employee-data-from-amazon-metlife/; Ionut Arghire, *760,000 Employee Records from Several Major Firms Leaked Online*, SecurityWeek (Dec. 3, 2024), https://www.securityweek.com/760000-employee-records-from-several-major-firms-leaked-online/.

[21] Alex Scroxton, *More data stolen in 2023 MOVEit attacks comes to light*, ComputerWeekly.com (Nov. 12, 2024, 4:10 PM), https://www.computerweekly.com/news/366615522/More-data-stolen-in-2023-MOVEit-attacks-comes-to-light. ("Kevin Robertson, chief operating officer at Acumen Cyber, said: "This leak shows how data makes its way across the dark web, often reappearing in the news long after breaches took place and often in the hands of other attackers.").

and disclosure. Defendants breached those duties by, among other things, failing to implement and maintain reasonable security procedures and practices to protect the Private Information entrusted to them from unauthorized access and disclosure, failing to ensure that third-party software followed industry standards for data security, and failing to ensure that third-party vendors used software that followed industry standards for data security, thereby allowing the Data Breach to occur.

25. As a result of Defendants' inadequate data security and breach of their duties and obligations, the Data Breach occurred, and Plaintiffs' and Class members' Private Information was accessed by, and disclosed to, unauthorized and malicious third-party actors. This instant action seeks to remedy Defendants' failings and their consequences. Plaintiffs thus bring this Complaint on behalf of themselves, and all similarly situated individuals whose Private Information was exposed as a result of the Data Breach, which Progress publicly disclosed on May 31, 2023.

## II. PARTIES

### A. PLAINTIFFS

#### 1. Plaintiffs Alleging Claims Against GNA, GLICNY.

##### i. Plaintiff Gilbert Hale

26. Plaintiff Gilbert Hale ("Plaintiff Gilbert Hale") is a resident and citizen of the state of New York and resides in Pittsford, New York.

27. Plaintiff Gilbert Hale holds a life insurance policy with Genworth Life Insurance Company of New York ("GLICNY").[22] He purchased the policy and provided his PII to GLICNY from his residence in New York.

---

[22] *See* ECF Doc. 1362-63.

28. Plaintiff Gilbert Hale received a letter directly from GLICNY dated July 31, 2023, which reported that "Genworth was recently notified by [PBI] that your personal information was involved in a data security event that took advantage of a vulnerability in the widely used MOVEit file transfer software that PBI uses." The letter further states:

> PBI is a third-party vendor that Genworth uses to satisfy regulatory obligations to scan various databases to determine whether a customer may have passed and triggered death benefits under a life insurance policy or annuity contract. We also use PBI to identify deaths that have occurred across our other lines of insurance, as well as the deaths of insurance agents to whom we pay commissions.

29. At the time that Progress discovered the data breach—on or around May 31, 2023—Progress, PBI and GLICNY retained Plaintiff Gilbert Hale's PII in their computer systems.

30. Accordingly, the letter states that PBI and GLICNY possessed Plaintiff Gilbert Hale's PII but failed to protect it and, instead, allowed cybercriminals to access it through the Data Breach.

31. According to the letter, Progress, PBI, and GLICNY learned of the Data Breach as early as May 29-31, 2023, but they waited approximately two months before GLICNY notified Plaintiff Gilbert Hale that his highly sensitive PII was compromised in the Data Breach.

32. In addition to their substantial delay in notifying Plaintiff Gilbert Hale of the Data Breach, Progress, PBI and GLICNY also put the burden on Plaintiff Gilbert Hale to prevent any further harm resulting from the Data Breach by stating in the letter: "Please watch for a letter from PBI in an envelope with the PBI logo with [credit monitoring] activation instructions" and "You can visit [Genworth's website] for up-to-date FAQs on the security event and Genworth's response, as well as tips on protecting your identity."

33. According to the letter, Progress, PBI and GLICNY waited two months before they notified Plaintiff Gilbert Hale that his PII was compromised in the Data Breach. To date, critical

details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure that such a breach does not occur again have not been explained to Plaintiff Gilbert Hale, who retains a vested interest in ensuring that his PII remains protected.

34. Moreover, GLICNY's disclosure of the Breach amounts to no real disclosure because it fails to inform, with any degree of specificity, Plaintiff Gilbert Hale of the Data Breach's critical facts.

35. Plaintiff Gilbert Hale's PII compromised in the Data Breach has already been misused by cybercriminals for fraud and identity theft. On March 27, 2024, Plaintiff Gilbert Hale received an email from Capital One, stating that it detected suspicious activity on his wife's Quick Silver Capital One credit card and that it restricted the card from making any further transactions. Additionally, Plaintiff received several Dark Web notifications, reporting that his PII was detected on the Dark Web. As a direct and proximate result of the Data Breach, Plaintiff Gilbert Hale spent time registering for free credit monitoring services. Further, he spent time, approximately 300 to 400 hours, researching the Breach, contacting the card issuer to preemptively get new account numbers issued, monitoring accounts for suspicious activity, investigating fraudulent/suspicious activity, freezing his credit, registering for free credit monitoring services, and contacting banks, credit card companies, or other vendors about fraudulent/suspicious activity.

36. Plaintiff Gilbert Hale greatly values his privacy and PII and takes reasonable steps to maintain the confidentiality of his PII. Plaintiff Gilbert Hale is very careful about sharing his PII and has never knowingly transmitted unencrypted PII over the internet or any other unsecured source. Plaintiff Gilbert Hale stores any and all documents containing PII in a secure location and destroys any documents he receives in the mail that contain any PII or any information that could otherwise be used to compromise his identity and/or credit. Moreover, Plaintiff Gilbert Hale

diligently chooses unique usernames and passwords for his various online accounts, and he takes steps to ensure his online accounts are secure and password-protected.

37. Plaintiff Gilbert Hale is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud, resulting from the Data Breach. The Data Breach has caused Plaintiff Gilbert Hale to suffer fear, anxiety, rage, anger, and stress, which have been compounded by Progress, PBI and GLICNY's two-month delay in informing him of the fact that his PII was acquired by known cybercriminals through the Data Breach.

38. Plaintiff Gilbert Hale anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Gilbert Hale will continue to be at present and continued increased risk of identity theft and fraud for years to come.

39. Plaintiff Gilbert Hale has a continuing interest in ensuring that his PII, which remains in Progress, PBI and GLICNY's possession, is protected and safeguarded from future disclosure and/or data breaches.

40. Moreover, when Plaintiff Gilbert Hale purchased life insurance from GLICNY, he did not receive the benefit of the bargain because, had he known that Progress, PBI and GLICNY were using substandard data security policies, he would not have purchased or would have paid less for the Genworth life insurance policy.

41. As a result of the Data Breach, Plaintiff Gilbert Hale has already suffered—and is at an increased risk of further suffering—injury and/or damages, including, but not limited to, the unauthorized use of his stolen PII, heightened threat of identity theft and general mitigation efforts spent on monitoring his credit and for identity theft; time and expenses spent scrutinizing bank statements, credit card statements, and credit reports for fraudulent transactions/conduct; time and

expenses spent monitoring bank accounts for fraudulent activity; loss in value of his personal data; lost property in the form of his compromised PII; and injury to his privacy. Additionally, as a direct result of the Data Breach, Plaintiff Gilbert Hale now faces a substantial risk that unauthorized third parties will further misuse his PII because (1) the Data Breach involved a single cybercriminal organization, Cl0p, specifically targeting Defendants' systems; (2) the dataset of PII that Cl0p exfiltrated from Defendants' systems has already been actually misused for fraudulent and/or unauthorized conduct; and (3) the type of PII Cl0p exfiltrated in the Data Breach is highly sensitive and can be misused for substantially injurious forms of identity and/or fraud, such as fraudulently applying for and obtaining credit cards, loans, mortgages, bank accounts, or other financial accounts in Plaintiff's name. As a result of the Data Breach, Plaintiff Gilbert Hale has (1) suffered, or is at an increased risk of suffering, unauthorized use of his stolen PII such that he has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of his PII and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by his exposure to the risk of future harm because he lost time that he spent taking protective measures that would have otherwise been put to other productive use and lost opportunity costs associated with the time and effort he expended addressing future consequences of the Data Breach.

42. Plaintiff Gilbert Hale experienced all of the foregoing harm and injury as a direct result of Defendants' actions and inactions that led to the Data Breach. The monetary relief sought herein by Plaintiff Gilbert Hale would compensate him for the foregoing redressable injuries. Further, Plaintiff Gilbert Hale seeks injunctive relief to redress the foregoing injuries and harm, including, but not limited to, requiring Defendants to take steps to monitor for, protect, and/or

prevent misuse of his PII accessed by cybercriminals in the Data Breach, as well as enact adequate data privacy/security practices.

**ii. Plaintiff Patrice Hauser**

43. Plaintiff Patrice Hauser ("Plaintiff Hauser") is a resident and citizen of the state of Florida and resides in Lakewood Ranch, Florida.

44. Plaintiff Hauser is currently a resident and citizen of the state of Florida and holds a life insurance policy with GNA that she purchased from her former residence in North Carolina.

45. Plaintiff Hauser received a letter directly from GNA at her address in Florida dated July 31, 2023, which reported that "Genworth was recently notified by [PBI] that your personal information was involved in a data security event that took advantage of a vulnerability in the widely-used MOVEit file transfer software that PBI uses." The letter further states:

> PBI is a third-party vendor that Genworth uses to satisfy regulatory obligations to scan various databases to determine whether a customer may have passed and triggered death benefits under a life insurance policy or annuity contract. We also use PBI to identify deaths that have occurred across our other lines of insurance, as well as the deaths of insurance agents to whom we pay commissions.

46. 117 days prior, Plaintiff Hauser received a letter from PBI at her address in Florida dated July 14, 2023, which states that PBI "provides audit and address research services for insurance companies, pension funds, and other organizations, including Genworth Life Insurance Company (GLIC), or for a third party acting on their behalf" and experienced the Data Breach, which "affected the security of some of [Plaintiff Hauser's] information." The letter states further as follows:

> **What Happened?** On or around May 31, 2023, Progress Software, the provider of MOVEit Transfer software disclosed a vulnerability in their software that had been exploited by an unauthorized third party. PBI utilizes MOVEit in the regular course of our business operations to securely transfer files. PBI promptly launched an investigation into the nature and scope of the MOVEit vulnerability's impact on our systems. Through the investigation, we learned that the third party accessed one

> of our MOVEit Transfer servers on May 29, 2023 and May 30, 2023 and downloaded your data. We then conducted a manual review of our records to confirm the identities of individuals potentially affected by this event and their contact information to provide notifications. We recently completed this review.
>
> **What Information Was Involved?** Our investigation determined that the following types of information related to you were present in the server at the time of the event: name, Social Security number, date of birth, zip code, state of residence, role in policy/account (e.g., Annuitant, Joint Insured, Owner, etc.), general product type, and policy/account number.

47. At the time that Progress discovered the data breach—on or around May 31, 2023—Progress, PBI, and GNA retained Plaintiff Hauser's PII in their computer systems.

48. Accordingly, the letter states that Progress, PBI, and GNA possessed Plaintiff Hauser's PII, including her name, Social Security number, date of birth, zip code, state of residence, role in policy/account (e.g., Annuitant, Joint Insured, Owner, etc.), general product type, and policy/account number, but failed to protect it and, instead, allowed cybercriminals to access it through the Data Breach.

49. According to the letter, Progress, PBI, and GNA learned of the Data Breach as early as May 29-31, 2023, but they waited approximately two months before PBI and GNA notified Plaintiff Hauser that her highly sensitive PII was compromised in the Data Breach.

50. In addition to their substantial delay in notifying Plaintiff Hauser of the Data Breach, Progress, PBI, and GNA also put the burden on Plaintiff Hauser to prevent any further harm resulting from the Data Breach by stating in the letter: "remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors . . . and to report suspected identity theft incidents to the insurance company."

51. According to the letter, Progress, PBI, and GNA waited approximately two months before they notified Plaintiff Hauser that her PII was compromised in the Data Breach. To date,

critical details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure that such a breach does not occur again have not been explained to Plaintiff Hauser, who retains a vested interest in ensuring that her PII remains protected.

52. Moreover, PBI and GNA's disclosure of the Breach amounts to no real disclosure because it fails to inform, with any degree of specificity, Plaintiff Hauser of the Data Breach's critical facts.

53. Plaintiff Hauser's PII compromised in the Data Breach has already been misused by cybercriminals for fraud and identity theft. Plaintiff Hauser has received notifications from Discover, Experian, and IDNotify, reporting that her PII has been detected on the Dark Web. In November/December 2024, Plaintiff Hauser received two Best Buy e-gift cards, totaling thirty dollars, to her Gmail account. When she attempted to use those gift cards in January 2025, the gift card balances had both already been used. As a direct and proximate result of the Data Breach, Plaintiff Hauser has experienced an increase in spam/phishing emails and phone calls. As a direct and proximate result of the Data Breach, Plaintiff Hauser spent time, approximately 70 hours, registering for Kroll credit monitoring, researching the Breach, contacting card issuers and/or banks to preemptively get new account numbers issued, and monitoring accounts for suspicious activity. She further expended time contacting Spectrum to assist her in trying to block the phone numbers that have repeatedly spammed her and continue to spam her.

54. Plaintiff Hauser greatly values her privacy and PII and takes reasonable steps to maintain the confidentiality of her PII. Plaintiff Hauser is very careful about sharing her PII and has never knowingly transmitted unencrypted PII over the internet or any other unsecured source. Plaintiff Hauser stores any and all documents containing PII in a secure location and destroys any documents she receives in the mail that contain any PII or any information that could otherwise be

used to compromise her identity and/or credit. Moreover, Plaintiff Hauser diligently chooses unique usernames and passwords for her various online accounts, and she takes steps to ensure her online accounts are secure and password-protected.

55. Plaintiff Hauser is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud, resulting from the Data Breach. The Data Breach has caused Plaintiff Hauser to suffer fear, anxiety, and stress, which have been compounded by Progress, PBI, and Genworth's two-month delay in informing her of the fact that her PII, including her Social Security number, was acquired by known cybercriminals through the Data Breach.

56. Plaintiff Hauser anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Hauser will continue to be at present and continued increased risk of identity theft and fraud for years to come.

57. Plaintiff Hauser has a continuing interest in ensuring that her PII, which remains in Progress, PBI, and GNA's possession, is protected and safeguarded from future disclosure and/or data breaches.

58. Moreover, when Plaintiff Hauser purchased life insurance from GNA, she did not receive the benefit of the bargain because, had she known that Progress, PBI, and GNA were using substandard data security policies, she would not have purchased or would have paid less for the GNA life insurance policy.

59. As a result of the Data Breach, Plaintiff Hauser has already suffered—and is at an increased risk of further suffering—injury and/or damages, including, but not limited to, the unauthorized use of her stolen PII, heightened threat of identity theft and general mitigation efforts spent on monitoring her credit and for identity theft; time and expenses spent scrutinizing bank

statements, credit card statements, and credit reports for fraudulent transactions/conduct; time and expenses spent monitoring bank accounts for fraudulent activity; loss in value of her personal data; lost property in the form of her compromised PII; and injury to her privacy. Additionally, as a direct result of the Data Breach, Plaintiff Hauser now faces a substantial risk that unauthorized third parties will further misuse her PII because (1) the Data Breach involved a single cybercriminal organization, Cl0p, specifically targeting Defendants' systems; (2) the dataset of PII that Cl0p exfiltrated from Defendants' systems has already been actually misused for fraudulent and/or unauthorized conduct; and (3) the type of PII Cl0p exfiltrated in the Data Breach is highly sensitive and can be misused for substantially injurious forms of identity and/or fraud, such as fraudulently applying for and obtaining credit cards, loans, mortgages, bank accounts, or other financial accounts in Plaintiff's name. As a result of the Data Breach, Plaintiff Hauser has (1) suffered, or is at an increased risk of suffering, unauthorized use of her stolen PII such that she has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of her PII and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by her exposure to the risk of future harm because she lost time that she spent taking protective measures that would have otherwise been put to other productive use and lost opportunity costs associated with the time and effort she expended addressing future consequences of the Data Breach.

60. Plaintiff Hauser experienced all of the foregoing harm and injury as a direct result of Defendants' actions and inactions that led to the Data Breach. The monetary relief sought herein by Plaintiff Hauser would compensate her for the foregoing redressable injuries. Further, Plaintiff Hauser seeks injunctive relief to redress the foregoing injuries and harm, including, but not limited to, requiring Defendants to take steps to monitor for, protect, and/or prevent misuse of her PII

accessed by cybercriminals in the Data Breach, as well as enact adequate data privacy/security practices.

**iii. Plaintiff Tricia Hernandez**

61. Plaintiff Tricia Hernandez ("Plaintiff Hernandez") is a resident and citizen of the state of Texas and resides in Groves, Texas.

62. Plaintiff Hernandez holds a life insurance policy with GNA.

63. Plaintiff Hernandez received a letter directly from GNA dated July 31, 2023, which reported that "Genworth was recently notified by [PBI] that your personal information was involved in a data security event that took advantage of a vulnerability in the widely used MOVEit file transfer software that PBI uses."

64. Ten days prior, Plaintiff Hernandez received a letter from PBI dated July 21, 2023, which states that PBI "provides audit and address research services for insurance companies, pension funds, and other organizations, including [GLAIC], or for a third party acting on their behalf" and experienced the Data Breach, which "affected the security of some of [Plaintiff Hernandez's] information." The letter states further as follows:

> **What Happened?** On or around May 31, 2023, Progress Software, the provider of MOVEit Transfer software disclosed a vulnerability in their software that had been exploited by an unauthorized third party. PBI utilizes MOVEit in the regular course of our business operations to securely transfer files. PBI promptly launched an investigation into the nature and scope of the MOVEit vulnerability's impact on our systems. Through the investigation, we learned that the third party accessed one of our MOVEit Transfer servers on May 29, 2023 and May 30, 2023 and downloaded your data. We then conducted a manual review of our records to confirm the identities of individuals potentially affected by this event and their contact information to provide notifications. We recently completed this review.
>
> **What Information Was Involved?** Our investigation determined that the following types of information related to you were present in the server at the time of the event: name, Social Security number, date of birth, zip code, state of residence, role in policy/account (e.g., Annuitant, Joint Insured, Owner, etc.), general product type, and policy/account number.

65. At the time that Progress discovered the data breach—on or around May 31, 2023—Progress, PBI, and GNA retained Plaintiff Hernandez's PII in their computer systems.

66. Accordingly, the letter states that Progress, PBI, and GNA possessed Plaintiff Hernandez's PII, including her name, Social Security number, date of birth, zip code, state of residence, role in policy/account (e.g., Annuitant, Joint Insured, Owner, etc.), general product type, and policy/account number, but failed to protect it and, instead, allowed cybercriminals to access it through the Data Breach.

67. According to the letter, Progress, PBI, and GNA learned of the Data Breach as early as May 29-31, 2023, but they waited approximately two months before they notified Plaintiff Hernandez that her highly sensitive PII was compromised in the Data Breach.

68. In addition to their substantial delay in notifying Plaintiff Hernandez of the Data Breach, Progress, PBI, and GNA also put the burden on Plaintiff Hernandez to prevent any further harm resulting from the Data Breach by stating in the letter: "remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors . . . and to report suspected identity theft incidents to the insurance company."

69. According to the letter, Progress, PBI, and GNA waited approximately two months before they notified Plaintiff Hernandez that her PII was compromised in the Data Breach. To date, critical details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure that such a breach does not occur again have not been explained to Plaintiff Hernandez, who retains a vested interest in ensuring that her PII remains protected.

70. Moreover, PBI and GNA's disclosure of the Breach amounts to no real disclosure because it fails to inform, with any degree of specificity, Plaintiff Hernandez of the Data Breach's critical facts.

71. Plaintiff Hernandez's PII compromised in the Data Breach has already been misused by cybercriminals for fraud and identity theft. As a direct and proximate result of the Data Breach, Plaintiff Hernandez received notifications from several identity theft protection services—Experian, FraudArmor, and IDX—including on August 22, 2023, August 2, 2024, and August 22, 2024, reporting that her PII was detected on the Dark Web. As a direct and proximate result of the Data Breach, Plaintiff Hernandez has experienced an increase in spam/phishing emails, such that she has received thousands of them and continues to receive them daily. As a direct and proximate result of the Data Breach, Plaintiff Hernandez spent time, approximately 425 hours, registering for credit and identity monitoring, assessing phishing emails, researching the Data Breach and monitoring her accounts and credit for suspicious activity.

72. Plaintiff Hernandez greatly values her privacy and PII and takes reasonable steps to maintain the confidentiality of her PII. Plaintiff Hernandez is very careful about sharing her PII and has never knowingly transmitted unencrypted PII over the internet or any other unsecured source. Plaintiff Hernandez stores any and all documents containing PII in a secure location and destroys any documents she receives in the mail that contain any PII or any information that could otherwise be used to compromise her identity and/or credit. Moreover, Plaintiff Hernandez diligently chooses unique usernames and passwords for her various online accounts, and she takes steps to ensure her online accounts are secure and password-protected.

73. Plaintiff Hernandez is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud, resulting from the Data Breach. The Data Breach

has caused Plaintiff Hernandez to suffer fear, anxiety, anger, rage, physical pain, and stress, which have been compounded by Progress, PBI, and GNA’s two-month delay in informing her of the fact that her PII, including her name and Social Security number, was acquired by known cybercriminals through the Data Breach.

74. Plaintiff Hernandez anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Hernandez will continue to be at present and continued increased risk of identity theft and fraud for years to come.

75. Plaintiff Hernandez has a continuing interest in ensuring that her PII, which remains in Progress, PBI, and GNA’s possession, is protected and safeguarded from future disclosure and/or data breaches.

76. Moreover, when Plaintiff Hernandez purchased life insurance from GNA, she did not receive the benefit of the bargain because, had she known that Progress, PBI, and GNA were using substandard data security policies, she would not have purchased or would have paid less for the GNA life insurance policy.

77. As a result of the Data Breach, Plaintiff Hernandez has already suffered—and is at an increased risk of further suffering—injury and/or damages, including, but not limited to, the unauthorized use of her stolen PII, heightened threat of identity theft and general mitigation efforts spent on monitoring her credit and for identity theft; time and expenses spent scrutinizing bank statements, credit card statements, and credit reports for fraudulent transactions/conduct; time and expenses spent monitoring bank accounts for fraudulent activity; loss in value of her personal data; lost property in the form of her compromised PII; and injury to her privacy. Additionally, as a direct result of the Data Breach, Plaintiff Hernandez now faces a substantial risk that unauthorized

third parties will further misuse her PII because (1) the Data Breach involved a single cybercriminal organization, Cl0p, specifically targeting Defendants' systems; (2) the dataset of PII that Cl0p exfiltrated from Defendants' systems has already been actually misused for fraudulent and/or unauthorized conduct; and (3) the type of PII Cl0p exfiltrated in the Data Breach is highly sensitive and can be misused for substantially injurious forms of identity and/or fraud, such as fraudulently applying for and obtaining credit cards, loans, mortgages, bank accounts, or other financial accounts in Plaintiff's name. As a result of the Data Breach, Plaintiff Hernandez has (1) suffered, or is at an increased risk of suffering, unauthorized use of her stolen PII such that she has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of her PII and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by her exposure to the risk of future harm because she lost time that she spent taking protective measures that would have otherwise been put to other productive use and lost opportunity costs associated with the time and effort she expended addressing future consequences of the Data Breach.

78. Plaintiff Hernandez experienced all of the foregoing harm and injury as a direct result of Defendants' actions and inactions that led to the Data Breach. The monetary relief sought herein by Plaintiff Hernandez would compensate her for the foregoing redressable injuries. Further, Plaintiff Hernandez seeks injunctive relief to redress the foregoing injuries and harm, including, but not limited to, requiring Defendants to take steps to monitor for, protect, and/or prevent misuse of her PII accessed by cybercriminals in the Data Breach, as well as enact adequate data privacy/security practices.

**iv. Plaintiff Rita Pasquarelli**

79. Plaintiff Rita Pasquarelli ("Plaintiff Pasquarelli") is a resident and citizen of the state of California, and resides in Temecula, California.

80. Plaintiff Pasquarelli holds a life insurance policy with the Genworth Defendants.

81. Plaintiff Pasquarelli received a letter from PBI dated July 21, 2023, which states that PBI "provides audit and address research services for insurance companies, pension funds, and other organizations, including [GLAIC], or for a third party acting on their behalf," and experienced the Data Breach, which "affected the security of some of [Plaintiff Pasquarelli's] information." The letter states further as follows:

> **What Happened?** On or around May 31, 2023, Progress Software, the provider of MOVEit Transfer software disclosed a vulnerability in their software that had been exploited by an unauthorized third party. PBI utilizes MOVEit in the regular course of our business operations to securely transfer files. PBI promptly launched an investigation into the nature and scope of the MOVEit vulnerability's impact on our systems. Through the investigation, we learned that the third party accessed one of our MOVEit Transfer servers on May 29, 2023 and May 30, 2023 and downloaded data. We then conducted a manual review of our records to confirm the identities of individuals potentially affected by this event and their contact information to provide notifications. We recently completed this review.
>
> **What Information Was Involved?** Our investigation determined that the following types of information related to you were present in the server at the time of the event: name, Social Security number, date of birth, zip code, state of residence, role in policy/account (e.g., Annuitant, Joint Insured, Owner, etc.), general product type, and policy/account number.

82. At the time that Progress discovered the data breach—on or around May 31, 2023—Progress, PBI, and Genworth Defendants retained Plaintiff Pasquarelli's PII in their computer systems.

83. Accordingly, the letter states that Progress, PBI, and Genworth Defendants possessed Plaintiff Pasquarelli's PII, including her name, Social Security number, date of birth, zip code, state of residence, role in policy/account, general product type, and policy/account

number, but failed to protect it and, instead, allowed cybercriminals to access it through the Data Breach.

84. According to the letter, Progress, PBI, and Genworth Defendants learned of the Data Breach as early as May 29-31, 2023, but they waited approximately two months before only PBI notified Plaintiff Pasquarelli that her highly sensitive PII was compromised in the Data Breach.

85. In addition to their substantial delay in notifying Plaintiff Pasquarelli of the Data Breach, Progress, PBI, and Genworth Defendants also put the burden on Plaintiff Pasquarelli to prevent any further harm resulting from the Data Breach by stating in the letter: “remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors . . . and to report suspected identity theft incidents to the insurance company.”

86. According to the letter, Progress, PBI, and Genworth Defendants waited two months before they notified Plaintiff Pasquarelli that her PII was compromised in the Data Breach. To date, critical details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure that such a breach does not occur again have not been explained to Plaintiff Pasquarelli, who retains a vested interest in ensuring that her PII remains protected.

87. Moreover, PBI’s disclosure of the Breach amounts to no real disclosure because it fails to inform, with any degree of specificity, Plaintiff Pasquarelli of the Data Breach’s critical facts.

88. Plaintiff Pasquarelli’s PII compromised in the Data Breach has already been misused by cybercriminals for fraud and identity theft. Plaintiff Pasquarelli encountered an

increase in many inappropriate spam/phishing calls, emails, and text messages to her Outlook account. Plaintiff Pasquarelli received a Dark Web notification from Google Dark Web alert on or around June 2023. Plaintiff Pasquarelli received several Dark Web notifications from CreditWise (Capital One) credit monitoring in August 2024, stating that her PII was detected on the Dark Web. As a direct and proximate result of the Data Breach, she spent time, approximately 60 hours, researching the Breach, contacting Genworth about the Breach, contacting major credit bureaus to freeze credit, monitoring accounts for suspicious activity, contacting LexisNexis to suppress public information, contacting National Consumer Telecommunications and Utility Exchange, Inc to place a security freeze, registering for ChexSystems, and investigating fraudulent/suspicious activity.

89. Plaintiff Pasquarelli greatly values her privacy and PII and takes reasonable steps to maintain the confidentiality of her PII. Plaintiff Pasquarelli is very careful about sharing her PII and has never knowingly transmitted unencrypted PII over the internet or any other unsecured source. Plaintiff Pasquarelli stores any and all documents containing PII in a secure location and destroys any documents she receives in the mail that contain any PII or any information that could otherwise be used to compromise her identity and/or credit. Moreover, Plaintiff Pasquarelli diligently chooses unique usernames and passwords for her various online accounts, and she takes steps to ensure her online accounts are secure and password-protected.

90. Plaintiff Pasquarelli is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud, resulting from the Data Breach. The Data Breach has caused Plaintiff Pasquarelli to suffer fear, anxiety, sleep disruption, rage, anger, physical pain, and stress, which have been compounded by Progress, PBI, and Genworth Defendants' two-month

delay in informing her of the fact that her PII, including her Social Security number, was acquired by known cybercriminals through the Data Breach.

91. Plaintiff Pasquarelli anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Pasquarelli will continue to be at present and continued increased risk of identity theft and fraud for years to come.

92. Plaintiff Pasquarelli has a continuing interest in ensuring that her PII, which remains in Progress, PBI, and Genworth Defendants' possession, is protected and safeguarded from future disclosure and/or data breaches.

93. As a result of the Data Breach, Plaintiff Pasquarelli has already suffered—and is at an increased risk of further suffering—injury and/or damages, including, but not limited to, the unauthorized use of her stolen PII, heightened threat of identity theft and general mitigation efforts spent on monitoring her credit and for identity theft; time and expenses spent scrutinizing bank statements, credit card statements, and credit reports for fraudulent transactions/conduct; time and expenses spent monitoring bank accounts for fraudulent activity; loss in value of her personal data; lost property in the form of her compromised PII; and injury to her privacy. Additionally, as a direct result of the Data Breach, Plaintiff Pasquarelli now faces a substantial risk that unauthorized third parties will further misuse her PII because (1) the Data Breach involved a single cybercriminal organization, Cl0p, specifically targeting Defendants' systems; (2) the dataset of PII that Cl0p exfiltrated from Defendants' systems has already been actually misused for fraudulent and/or unauthorized conduct; and (3) the type of PII Cl0p exfiltrated in the Data Breach is highly sensitive and can be misused for substantially injurious forms of identity and/or fraud, such as fraudulently applying for and obtaining credit cards, loans, mortgages, bank accounts, or other

financial accounts in Plaintiff's name. As a result of the Data Breach, Plaintiff Pasquarelli has (1) suffered, or is at an increased risk of suffering, unauthorized use of her stolen PII such that she has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of her PII and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by her exposure to the risk of future harm because she lost time that she spent taking protective measures that would have otherwise been put to other productive use and lost opportunity costs associated with the time and effort she expended addressing future consequences of the Data Breach.

94. Plaintiff Pasquarelli experienced all of the foregoing harm and injury as a direct result of Defendants' actions and inactions that led to the Data Breach. The monetary relief sought herein by Plaintiff Pasquarelli would compensate her for the foregoing redressable injuries. Further, Plaintiff Pasquarelli seeks injunctive relief to redress the foregoing injuries and harm, including, but not limited to, requiring Defendants to take steps to monitor for, protect, and/or prevent misuse of her PII accessed by cybercriminals in the Data Breach, as well as enact adequate data privacy/security practices.

**2. Plaintiff Alleging Claims Against TruStage.**

**i. Plaintiff Jose Soto**

95. Plaintiff Jose Soto ("Plaintiff Soto") is a resident and citizen of the state of Florida and resides in Kissimmee, Florida.

96. Plaintiff Soto received a letter from PBI dated July 21, 2023, which states that PBI "provides audit and address research services for insurance companies, pension funds, and other organizations, including MEMBERS Life Insurance Company ("MLIC")," and experienced the

Data Breach, which "may affect the security of some of [Plaintiff Soto's] information." The letter states further as follows:

> **What Happened?** On or around May 31, 2023, Progress Software, the provider of MOVEit Transfer software disclosed a vulnerability in their software that had been exploited by an unauthorized third party. PBI utilizes MOVEit in the regular course of our business operations to securely transfer files. PBI promptly launched an investigation into the nature and scope of the MOVEit vulnerability's impact on our systems. Through the investigation, we learned that the third party accessed one of our MOVEit Transfer servers on May 29, 2023 and May 30, 2023 and downloaded data. We then conducted a manual review of our records to confirm the identities of individuals potentially affected by this event and their contact information to provide notifications. We recently completed this review on June 16, 2023, and confirmed that information concerning a limited number of MLIC's consumers was among the records involved in this incident.
>
> **What Information Was Involved?** Our investigation determined that the following types of information related to you were present in the server at the time of the event: name, address, date of birth, and Social Security number.

97. MLIC is a subsidiary of CMFG Life Insurance d/b/a TruStage ("TruStage").

98. At the time that Progress discovered the data breach—on or around May 31, 2023—Progress, PBI, TruStage, and MLIC retained Plaintiff Soto's PII in their computer systems.

99. Accordingly, the letter states that Progress, PBI, TruStage, and MLIC possessed Plaintiff Soto's PII, including his name, address, date of birth, and Social Security number, but failed to protect it and, instead, allowed cybercriminals to access it through the Data Breach.

100. According to the letter, Progress, PBI, TruStage, and MLIC learned of the Data Breach as early as May 29-31, 2023, but they waited approximately two months before only PBI notified Plaintiff Soto that his highly sensitive PII was compromised in the Data Breach.

101. In addition to their substantial delay in notifying Plaintiff Soto of the Data Breach, Progress, PBI, TruStage, and MLIC also put the burden on Plaintiff Soto to prevent any further harm resulting from the Data Breach by stating in the letter: "remain vigilant against incidents of

identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors."

102. According to the letter, Progress, PBI, TruStage, and MLIC waited two months before they notified Plaintiff Soto that his PII was compromised in the Data Breach. To date, critical details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure that such a breach does not occur again have not been explained to Plaintiff Soto, who retains a vested interest in ensuring that his PII remains protected.

103. Moreover, PBI's disclosure of the Breach amounts to no real disclosure because it fails to inform, with any degree of specificity, Plaintiff Soto of the Data Breach's critical facts.

104. As a direct and proximate result of the Data Breach, Plaintiff Soto spent time registering for Kroll credit monitoring. As a direct and proximate result of the Data Breach, he spent time researching the Breach, contacting MLIC about the Breach, contacting major credit bureaus to freeze credit, placing fraud alerts on his financial accounts, and contacting banks, credit card companies, or other vendors about fraudulent/suspicious activity.

105. Plaintiff Soto greatly values his privacy and PII and takes reasonable steps to maintain the confidentiality of his PII. Plaintiff Soto is very careful about sharing his PII and has never knowingly transmitted unencrypted PII over the internet or any other unsecured source. Plaintiff Soto stores any and all documents containing PII in a secure location and destroys any documents he receives in the mail that contain any PII or any information that could otherwise be used to compromise his identity and/or credit. Moreover, Plaintiff Soto diligently chooses unique usernames and passwords for his various online accounts, and he takes steps to ensure his online accounts are secure and password-protected.

106. Plaintiff Soto is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud, resulting from the Data Breach. The Data Breach has caused Plaintiff Soto to suffer fear, anxiety, and stress, which have been compounded by Progress, PBI, and MLIC's two-month delay in informing him of the fact that his PII, including his Social Security number, was acquired by known cybercriminals through the Data Breach.

107. Plaintiff Soto anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Soto will continue to be at present and continued increased risk of identity theft and fraud for years to come.

108. Plaintiff Soto has a continuing interest in ensuring that his PII, which remains in Progress, PBI, TruStage, and MLIC's possession, is protected and safeguarded from future disclosure and/or data breaches.

109. Moreover, when Plaintiff Soto purchased life insurance from MLIC, he did not receive the benefit of the bargain because, had he known that Progress, PBI, CMFG Insurance, and MLIC were using substandard data security policies, he would not have purchased or would have paid less for the MLIC life insurance policy.

110. As a result of the Data Breach, Plaintiff Soto has already suffered—and is at an increased risk of further suffering—injury and/or damages, including, but not limited to, the unauthorized use of his stolen PII, heightened threat of identity theft and general mitigation efforts spent on monitoring his credit and for identity theft; time and expenses spent scrutinizing bank statements, credit card statements, and credit reports for fraudulent transactions/conduct; time and expenses spent monitoring bank accounts for fraudulent activity; loss in value of his personal data; lost property in the form of his compromised PII; and injury to his privacy. Additionally, as a direct

result of the Data Breach, Plaintiff Soto now faces a substantial risk that unauthorized third parties will further misuse his PII because (1) the Data Breach involved a single cybercriminal organization, Cl0p, specifically targeting Defendants' systems; (2) the dataset of PII that Cl0p exfiltrated from Defendants' systems has already been actually misused for fraudulent and/or unauthorized conduct; and (3) the type of PII Cl0p exfiltrated in the Data Breach is highly sensitive and can be misused for substantially injurious forms of identity and/or fraud, such as fraudulently applying for and obtaining credit cards, loans, mortgages, bank accounts, or other financial accounts in Plaintiff's name. As a result of the Data Breach, Plaintiff Soto has (1) suffered, or is at an increased risk of suffering, unauthorized use of his stolen PII such that he has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of his PII and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by his exposure to the risk of future harm because he lost time that he spent taking protective measures that would have otherwise been put to other productive use and lost opportunity costs associated with the time and effort he expended addressing future consequences of the Data Breach.

111. Plaintiff Soto experienced all of the foregoing harm and injury as a direct result of Defendants' actions and inactions that led to the Data Breach. The monetary relief sought herein by Plaintiff Soto would compensate him for the foregoing redressable injuries. Further, Plaintiff Soto seeks injunctive relief to redress the foregoing injuries and harm, including, but not limited to, requiring Defendants to take steps to monitor for, protect, and/or prevent misuse of his PII accessed by cybercriminals in the Data Breach, as well as enact adequate data privacy/security practices.

### 3. Plaintiffs Alleging Claims Against TIAA Kaspick, LLC.

#### i. Plaintiff Steven Checchia

112. Plaintiff Steven Checchia ("Plaintiff Checchia") is a resident and citizen of the state of Pennsylvania and resides in Aston, Pennsylvania.

113. Plaintiff Checchia obtained financial services from TIAA and provided his PII to TIAA from his residence in Pennsylvania. He has paid various fees to TIAA for its financial services.

114. Plaintiff Checchia received a letter from PBI dated July 14, 2023, which states that PBI "provides audit and address research services for insurance companies, pension funds, and other organizations, including [TIAA]," and experienced the Data Breach, which "may affect the security of some of [Plaintiff Checchia's] information." The letter states further as follows:

> **What Happened?** On or around May 31, 2023, Progress Software, the provider of MOVEit Transfer software disclosed a vulnerability in their software that had been exploited by an unauthorized third party. PBI utilizes MOVEit in the regular course of our business operations to securely transfer files. PBI promptly launched an investigation into the nature and scope of the MOVEit vulnerability's impact on our systems. Through the investigation, we learned that the third party accessed one of our MOVEit Transfer servers on May 29, 2023 and May 30, 2023 and downloaded data. We then conducted a manual review of our records to confirm the identities of individuals potentially affected by this event and their contact information to provide notifications. We recently completed this review.
>
> **What Information Was Involved?** Our investigation determined that the following types of information related to you were present in the server at the time of the event: name, Social Security number, gender, date of birth, and address.

At the time that Progress discovered the data breach—on or around May 31, 2023—Progress, PBI, and TIAA retained Plaintiff Checchia's PII in their computer systems.

115. Accordingly, the letter states that Progress, PBI, and TIAA possessed Plaintiff Checchia's PII, including his name, Social Security number, gender, date of birth, and address, but failed to protect it and, instead, allowed cybercriminals to access it through the Data Breach.

116. According to the letter, Progress, PBI, and TIAA learned of the Data Breach as early as May 29 31, 2023, but they waited approximately two months before only PBI notified Plaintiff Checchia that his highly sensitive PII was compromised in the Data Breach.

117. In addition to their substantial delay in notifying Plaintiff Checchia of the Data Breach, Progress, PBI, and TIAA also put the burden on Plaintiff Checchia to prevent any further harm resulting from the Data Breach by stating in the letter: "remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect."

118. According to the letter, Progress, PBI, and TIAA waited two months before they notified Plaintiff Checchia that his PII was compromised in the Data Breach. To date, critical details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure that such a breach does not occur again have not been explained to Plaintiff Checchia, who retains a vested interest in ensuring that his PII remains protected.

119. Moreover, PBI's disclosure of the Breach amounts to no real disclosure because it fails to inform, with any degree of specificity, Plaintiff Checchia of the Data Breach's critical facts.

120. Plaintiff Checchia's PII compromised in the Data Breach has already been misused by cybercriminals for fraud and identity theft. On or around January to February 2024, Plaintiff Checchia incurred three fraudulent CashApp charges on a Bank of America account. Plaintiff Checchia called Bank of America and filled out an online form to reverse the charges. On October 9, 2024, Plaintiff Checchia incurred attempted fraudulent CashApp charges on a Chase account. Plaintiff Checchia requested that CashApp stop the payment. On October 10, 2024, Plaintiff Checchia incurred approximately seven fraudulent CashApp charges; four charges were completed, but at least three other charges were attempted. Plaintiff Checchia filled out an online

form to dispute the charges; he also cancelled the account and was issued a new card. On October 13, 2024, Plaintiff Checchia received an email from Chase Bank, stating that someone attempted to access his Chase account through multiple computers. Plaintiff Checchia called Chase, cancelled the account, and was issued a new card. On October 14, 2024, Plaintiff Checchia incurred one fraudulent charged on an Imagine\e credit card; he cancelled the card and was issued a new one. Also on October 14, 2024, Plaintiff Checchia received a text message from Chase Bank, stating that it declined a transaction on his Chase debit card. Plaintiff Checchia responded to Chase Bank and confirmed that it was an unauthorized and fraudulent transaction. On October 18 and 19, 2024, Plaintiff Checchia received a phone call from MoneyLion stating that an unknown party attempted to secure a loan in Plaintiff Checchia's name, and an email stating that an unknown party signed into Plaintiff Checchia's MoneyLion account. Plaintiff Checchia spoke with MoneyLion, and the loan was blocked. Additionally, Plaintiff Checchia received a notification from Aura credit/identity theft protection, reporting that his PII was detected on the Dark Web. And on November 12, 2024, Plaintiff Checchia received another Dark Web notification from Aura credit/identity theft protection, reporting that his Social Security number was detected on the Dark Web. The Dark Web notification stated that the notification alert was from the "Moveit – Tiaa.org" Data Breach. On January 18, 2025, Plaintiff received a notification from Chase Bank, stating that two transactions were denied due to unauthorized activity. On January 21, 2025, Plaintiff received a text message from Chime Bank, stating that two transactions were denied; Plaintiff did not authorize those transactions and the charges were stopped. On May 27, 2025, Plaintiff received notifications that three transactions were denied; Plaintiff did not authorize those transactions and the charges were stopped. On May 29, 2025, Plaintiff received a text message from Cash App, stating that it did not complete at $19 transaction because the card, which Plaintiff had previously

cancelled, was inactive. On September 15, 2025, Plaintiff incurred four separate unauthorized charges on a Bank of America card; these charges were reimbursed after significant bank-and-forth with Bank of America representatives. On December 4, 2025, Plaintiff disputed an unauthorized charge on Plaintiff's Cash App card. Also on December 4, 2025, Plaintiff incurred an unauthorized charge on a Bank of America card; he was reimbursed for this charge after disputing it. On March 24, 2026, Plaintiff incurred an unauthorized charge on a Chase card; he called the bank and disputed the charge. On March 24, 2026, Plaintiff received three text messages from Chime Bank, stating that three separate transactions were denied; Plaintiff did not authorize those transactions. On March 27, 2026, Plaintiff received a text message from Chime Bank, stating that one transaction was denied; Plaintiff did not authorize that transaction.

121. As a direct and proximate result of the Data Breach, Plaintiff Checchia spent time, approximately twelve hours, registering for Aura credit and identity theft monitoring, researching the Breach, contacting TIAA about the Breach, monitoring his accounts for suspicious activity, investigating fraudulent/suspicious activity, and contacting banks about fraudulent/suspicious activity. Furthermore, Plaintiff Checchia has incurred out-of-pocket expenses as a result of the Data Breach, including paying for Aura credit/identity theft monitoring services.

122. Plaintiff Checchia greatly values his privacy and PII and takes reasonable steps to maintain the confidentiality of his PII. Plaintiff Checchia is very careful about sharing his PII and has never knowingly transmitted unencrypted PII over the internet or any other unsecured source. Plaintiff Checchia stores any and all documents containing PII in a secure location and destroys any documents he receives in the mail that contain any PII or any information that could otherwise be used to compromise his identity and/or credit. Moreover, Plaintiff Checchia diligently chooses

unique usernames and passwords for his various online accounts, and he takes steps to ensure his online accounts are secure and password-protected.

123. Plaintiff Checchia is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud, resulting from the Data Breach. The Data Breach has caused Plaintiff Checchia to suffer fear, anxiety, rage, anger, physical pain, and stress, which have been compounded by Progress, PBI, and TIAA's two month delay in informing him of the fact that his PII, including his name and Social Security number, was acquired by known cybercriminals through the Data Breach.

124. Plaintiff Checchia anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Checchia will continue to be at present and continued increased risk of identity theft and fraud for years to come.

125. Plaintiff Checchia has a continuing interest in ensuring that his PII, which remains in Progress, PBI, and TIAA's possession, is protected and safeguarded from future disclosure and/or data breaches.

126. Moreover, when Plaintiff Checchia obtained financial services from TIAA, he did not receive the benefit of the bargain because, had he known that Progress, PBI, and TIAA were using substandard data security policies, he would not have paid or would have paid less for the TIAA financial services.

127. As a result of the Data Breach, Plaintiff Checchia has already suffered—and is at an increased risk of further suffering—injury and/or damages, including, but not limited to, the unauthorized use of his stolen PII, heightened threat of identity theft and general mitigation efforts spent on monitoring his credit and for identity theft; time and expenses spent scrutinizing bank

statements, credit card statements, and credit reports for fraudulent transactions/conduct; time and expenses spent monitoring bank accounts for fraudulent activity; loss in value of his personal data; lost property in the form of his compromised PII; and injury to his privacy. Additionally, as a direct result of the Data Breach, Plaintiff Checchia now faces a substantial risk that unauthorized third parties will further misuse his PII because (1) the Data Breach involved a single cybercriminal organization, Cl0p, specifically targeting Defendants' systems; (2) the dataset of PII that Cl0p exfiltrated from Defendants' systems has already been actually misused for fraudulent and/or unauthorized conduct; and (3) the type of PII Cl0p exfiltrated in the Data Breach is highly sensitive and can be misused for substantially injurious forms of identity and/or fraud, such as fraudulently applying for and obtaining credit cards, loans, mortgages, bank accounts, or other financial accounts in Plaintiff's name. As a result of the Data Breach, Plaintiff Checchia has (1) suffered, or is at an increased risk of suffering, unauthorized use of his stolen PII such that he has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of his PII and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by his exposure to the risk of future harm because he lost time that he spent taking protective measures that would have otherwise been put to other productive use and lost opportunity costs associated with the time and effort he expended addressing future consequences of the Data Breach.

128. Plaintiff Checchia experienced all of the foregoing harm and injury as a direct result of Defendants' actions and inactions that led to the Data Breach. The monetary relief sought herein by Plaintiff Checchia would compensate him for the foregoing redressable injuries. Further, Plaintiff Checchia seeks injunctive relief to redress the foregoing injuries and harm, including, but not limited to, requiring Defendants to take steps to monitor for, protect, and/or prevent misuse of

his PII accessed by cybercriminals in the Data Breach, as well as enact adequate data privacy/security practices.

**ii. Plaintiff Patricia Marshall**

129. Plaintiff Patricia Marshall ("Plaintiff Marshall") is a resident and citizen of the state of Vermont and resides in Burlington, Vermont.

130. Plaintiff Marshall held a retirement account with TIAA. She opened the account, provided her information to TIAA, and paid various fees to TIAA for its financial services from her residence in Vermont.

131. Plaintiff Marshall received a letter from PBI dated August 11, 2023, which states that PBI "provides audit and address research services for insurance companies, pension funds, and other organizations, including [TIAA]," and experienced the Data Breach, which "may affect the security of some of [Plaintiff Marshall's] information." The letter states further as follows:

> **What Happened?** On or around May 31, 2023, Progress Software, the provider of MOVEit Transfer software disclosed a vulnerability in their software that had been exploited by an unauthorized third party. PBI utilizes MOVEit in the regular course of our business operations to securely transfer files. PBI promptly launched an investigation into the nature and scope of the MOVEit vulnerability's impact on our systems. Through the investigation, we learned that the third party accessed one of our MOVEit Transfer servers on May 29, 2023 and May 30, 2023 and downloaded data. We then conducted a manual review of our records to confirm the identities of individuals potentially affected by this event and their contact information to provide notifications. We recently completed this review.
>
> **What Information Was Involved?** Our investigation determined that the following types of information related to you were present in the server at the time of the event: name, Social Security number, gender, date of birth, and address.

132. At the time that Progress discovered the data breach—on or around May 31, 2023—Progress, PBI, and TIAA retained Plaintiff Marshall's PII in their computer systems.

133. Accordingly, the letter states that Progress, PBI, and TIAA possessed Plaintiff Marshall's PII, including her name, Social Security number, gender, date of birth, and address, but failed to protect it and, instead, allowed cybercriminals to access it through the Data Breach.

134. According to the letter, Progress, PBI, and TIAA learned of the Data Breach as early as May 29-31, 2023, but they waited over two months before only PBI notified Plaintiff Marshall that her highly sensitive PII was compromised in the Data Breach.

135. In addition to their substantial delay in notifying Plaintiff Marshall of the Data Breach, Progress, PBI, and TIAA also put the burden on Plaintiff Marshall to prevent any further harm resulting from the Data Breach by stating in the letter: "remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors."

136. According to the letter, Progress, PBI, and TIAA waited over two months before they notified Plaintiff Marshall that her PII was compromised in the Data Breach. To date, critical details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure that such a breach does not occur again have not been explained to Plaintiff Marshall, who retains a vested interest in ensuring that her PII remains protected.

137. Moreover, PBI's disclosure of the Breach amounts to no real disclosure because it fails to inform, with any degree of specificity, Plaintiff Marshall of the Data Breach's critical facts.

138. Plaintiff Marshall's PII compromised in the Data Breach has already been misused by cybercriminals for fraud and identity theft. On or around August 2023, Plaintiff Marshall received unknown charges to her North Country Federal Credit Union checking account and her Union Bank checking account. She contacted the banks, and the charges were stopped. On or around October 16, 2024, Plaintiff Marshall encountered an unknown request for money to be sent

to an unknown party through her Union Bank account. She contacted the bank to report the fraudulent request, requested a new card, and drove to the bank to pick up the new card. Soon after she received a call from an unknown party alleging to be an employee of the North Country Federal Credit Union bank. She ended the call and later spoke with a representative of the North Country Federal Credit Union bank, who confirmed that the call was from an unknown party unaffiliated with the North Country Federal Credit Union bank. She requested a new card and drove to the bank to pick up the card. As a direct and proximate result of the Data Breach, she spent time, approximately 40 to 60 hours, researching the Breach, contacting major credit bureaus to freeze credit, contacting card issuers and/or banks to preemptively get new account numbers issued, monitoring accounts for suspicious activity, investigating fraudulent/suspicious activity, and investigating phishing emails, and saving spam emails and voicemails. Furthermore, Plaintiff Marshall has incurred out-of-pocket expenses as a result of the Data Breach, including taking time off of work to address the fraud and money spent picking up new bank cards.

139. Plaintiff Marshall greatly values her privacy and PII and takes reasonable steps to maintain the confidentiality of her PII. Plaintiff Marshall is very careful about sharing her PII and has never knowingly transmitted unencrypted PII over the internet or any other unsecured source. Plaintiff Marshall stores any and all documents containing PII in a secure location and destroys any documents she receives in the mail that contain any PII or any information that could otherwise be used to compromise her identity and/or credit. Moreover, Plaintiff Marshall diligently chooses unique usernames and passwords for her various online accounts, and she takes steps to ensure her online accounts are secure and password-protected.

140. Plaintiff Marshall is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud, resulting from the Data Breach. The Data Breach

has caused Plaintiff Marshall to suffer fear, anxiety, anger, sleep disruption, physical pain, and stress, which have been compounded by Progress, PBI, and TIAA's two-month delay in informing her of the fact that her PII, including her Social Security number, was acquired by known cybercriminals through the Data Breach.

141. Plaintiff Marshall anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Marshall will continue to be at present and continued increased risk of identity theft and fraud for years to come.

142. Plaintiff Marshall has a continuing interest in ensuring that her PII, which remains in Progress, PBI, and TIAA's possession, is protected and safeguarded from future disclosure and/or data breaches.

143. Moreover, when Plaintiff Marshall obtained financial services from TIAA, she did not receive the benefit of the bargain because, had she known that Progress, PBI, and TIAA were using substandard data security policies, she would not have paid or would have paid less for the TIAA financial services.

144. As a result of the Data Breach, Plaintiff Marshall has already suffered—and is at an increased risk of further suffering—injury and/or damages, including, but not limited to, the unauthorized use of her stolen PII, heightened threat of identity theft and general mitigation efforts spent on monitoring her credit and for identity theft; time and expenses spent scrutinizing bank statements, credit card statements, and credit reports for fraudulent transactions/conduct; time and expenses spent monitoring bank accounts for fraudulent activity; loss in value of her personal data; lost property in the form of her compromised PII; and injury to her privacy. Additionally, as a direct result of the Data Breach, Plaintiff Marshall now faces a substantial risk that unauthorized

third parties will further misuse her PII because (1) the Data Breach involved a single cybercriminal organization, Cl0p, specifically targeting Defendants' systems; (2) the dataset of PII that Cl0p exfiltrated from Defendants' systems has already been actually misused for fraudulent and/or unauthorized conduct; and (3) the type of PII Cl0p exfiltrated in the Data Breach is highly sensitive and can be misused for substantially injurious forms of identity and/or fraud, such as fraudulently applying for and obtaining credit cards, loans, mortgages, bank accounts, or other financial accounts in Plaintiff's name. As a result of the Data Breach, Plaintiff Marshall has (1) suffered, or is at an increased risk of suffering, unauthorized use of her stolen PII such that she has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of her PII and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by her exposure to the risk of future harm because she lost time that she spent taking protective measures that would have otherwise been put to other productive use and lost opportunity costs associated with the time and effort she expended addressing future consequences of the Data Breach.

145. Plaintiff Marshall experienced all of the foregoing harm and injury as a direct result of Defendants' actions and inactions that led to the Data Breach. The monetary relief sought herein by Plaintiff Marshall would compensate her for the foregoing redressable injuries. Further, Plaintiff Marshall seeks injunctive relief to redress the foregoing injuries and harm, including, but not limited to, requiring Defendants to take steps to monitor for, protect, and/or prevent misuse of her PII accessed by cybercriminals in the Data Breach, as well as enact adequate data privacy/security practices.

**iii. Plaintiff Margaret Phelan**

146. Plaintiff Margaret Phelan ("Plaintiff Phelan") is a resident and citizen of the state of New Jersey and resides in Hoboken, New Jersey.

147. Plaintiff Phelan inherited a family member's TIAA account. She provided her PII to TIAA while residing in New Jersey.

148. Plaintiff Phelan received a letter from PBI dated July 14, 2023, which states that PBI "provides audit and address research services for insurance companies, pension funds, and other organizations, including [TIAA]" and experienced the Data Breach, which "may affect the security of some of [Plaintiff Phelan's] information." The letter states further as follows:

> **What Happened?** On or around May 31, 2023, Progress Software, the provider of MOVEit Transfer software disclosed a vulnerability in their software that had been exploited by an unauthorized third party. PBI utilizes MOVEit in the regular course of our business operations to securely transfer files. PBI promptly launched an investigation into the nature and scope of the MOVEit vulnerability's impact on our systems. Through the investigation, we learned that the third party accessed one of our MOVEit Transfer servers on May 29, 2023 and May 30, 2023 and downloaded data. We then conducted a manual review of our records to confirm the identities of individuals potentially affected by this event and their contact information to provide notifications. We recently completed this review.
>
> **What Information Was Involved?** Our investigation determined that the following types of information related to you were present in the server at the time of the event: name, Social Security number, gender, date of birth, and address.

149. At the time that Progress discovered the data breach—on or around May 31, 2023—Progress, PBI, and TIAA retained Plaintiff Phelan's PII in their computer systems.

150. Accordingly, the letter states that Progress, PBI, and TIAA possessed Plaintiff Phelan's PII, including her name, Social Security number, gender, date of birth, and address, but failed to protect it and, instead, allowed cybercriminals to access it through the Data Breach.

151. According to the letter, Progress, PBI, and TIAA learned of the Data Breach as early as May 29 31, 2023, but they waited approximately two months before only PBI notified Plaintiff Phelan that her highly sensitive PII was compromised in the Data Breach.

152. In addition to their substantial delay in notifying Plaintiff Phelan of the Data Breach, Progress, PBI, and TIAA also put the burden on Plaintiff Phelan to prevent any further harm resulting from the Data Breach by stating in the letter: "remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors."

153. According to the letter, Progress, PBI, and TIAA waited approximately two months before they notified Plaintiff Phelan that her PII was compromised in the Data Breach. To date, critical details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure that such a breach does not occur again have not been explained to Plaintiff Phelan, who retains a vested interest in ensuring that her PII remains protected.

154. Moreover, PBI's disclosure of the Breach amounts to no real disclosure because it fails to inform, with any degree of specificity, Plaintiff Phelan of the Data Breach's critical facts.

155. Plaintiff Phelan's PII compromised in the Data Breach has already been misused by cybercriminals for fraud and identity theft. On June 2, 2023, Plaintiff Phelan received a phishing call from an unknown party alleging to be Amazon Security, asserting that people were making fraudulent charges and opening accounts in her name/Social Security number. Because of the phone calls, Plaintiff Phelan made three to four Chase bank wire transfers, using BitCoin (CoinBase), for a total of approximately $215,000.00. As a direct and proximate result of the Data Breach, Plaintiff Phelan spent time, approximately 150 hours, investigating those fraudulent charges, contacting the FBI, Hoboken Police Department, and the FTC to file reports about the phishing call and fraudulent charges, researching the Data Breach, and monitoring her accounts and credit for suspicious activity. Furthermore, Plaintiff Phelan has incurred out-of-pocket

expenses as a result of the Data Breach, including fraudulent charges that have not yet been reimbursed in full.

156. Plaintiff Phelan greatly values her privacy and PII and takes reasonable steps to maintain the confidentiality of her PII. Plaintiff Phelan is very careful about sharing her PII and has never knowingly transmitted unencrypted PII over the internet or any other unsecured source. Plaintiff Phelan stores any and all documents containing PII in a secure location and destroys any documents she receives in the mail that contain any PII or any information that could otherwise be used to compromise her identity and/or credit. Moreover, Plaintiff Phelan diligently chooses unique usernames and passwords for her various online accounts, and she takes steps to ensure her online accounts are secure and password-protected.

157. Plaintiff Phelan is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud, resulting from the Data Breach. The Data Breach has caused Plaintiff Phelan to suffer fear, anxiety, physical pain, and stress, which have been compounded by Progress, PBI, and TIAA's two-month delay in informing her of the fact that her PII, including her name and Social Security number, was acquired by known cybercriminals through the Data Breach.

158. Plaintiff Phelan anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Phelan will continue to be at present and continued increased risk of identity theft and fraud for years to come.

159. Plaintiff Phelan has a continuing interest in ensuring that her PII, which remains in Progress, PBI, and TIAA's possession, is protected and safeguarded from future disclosure and/or data breaches.

160. Moreover, when Plaintiff Phelan obtained financial services from TIAA, she did not receive the benefit of the bargain because, had she known that Progress, PBI, and TIAA were using substandard data security policies, she would not have paid or would have paid less for the TIAA financial services.

161. As a result of the Data Breach, Plaintiff Phelan has already suffered—and is at an increased risk of further suffering—injury and/or damages, including, but not limited to, the unauthorized use of her stolen PII, heightened threat of identity theft and general mitigation efforts spent on monitoring her credit and for identity theft; time and expenses spent scrutinizing bank statements, credit card statements, and credit reports for fraudulent transactions/conduct; time and expenses spent monitoring bank accounts for fraudulent activity; loss in value of her personal data; lost property in the form of her compromised PII; and injury to her privacy. Additionally, as a direct result of the Data Breach, Plaintiff Phelan now faces a substantial risk that unauthorized third parties will further misuse her PII because (1) the Data Breach involved a single cybercriminal organization, Cl0p, specifically targeting Defendants' systems; (2) the dataset of PII that Cl0p exfiltrated from Defendants' systems has already been actually misused for fraudulent and/or unauthorized conduct; and (3) the type of PII Cl0p exfiltrated in the Data Breach is highly sensitive and can be misused for substantially injurious forms of identity and/or fraud, such as fraudulently applying for and obtaining credit cards, loans, mortgages, bank accounts, or other financial accounts in Plaintiff's name. As a result of the Data Breach, Plaintiff Phelan has (1) suffered, or is at an increased risk of suffering, unauthorized use of her stolen PII such that she has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of her PII and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by her exposure to the risk of future harm because she lost time that she spent

taking protective measures that would have otherwise been put to other productive use and lost opportunity costs associated with the time and effort she expended addressing future consequences of the Data Breach.

162. Plaintiff Phelan experienced all of the foregoing harm and injury as a direct result of Defendants' actions and inactions that led to the Data Breach. The monetary relief sought herein by Plaintiff Phelan would compensate her for the foregoing redressable injuries. Further, Plaintiff Phelan seeks injunctive relief to redress the foregoing injuries and harm, including, but not limited to, requiring Defendants to take steps to monitor for, protect, and/or prevent misuse of her PII accessed by cybercriminals in the Data Breach, as well as enact adequate data privacy/security practices.

**iv. Plaintiff Steven Teppler**

163. Plaintiff Steven Teppler ("Plaintiff Teppler") is a resident and citizen of the state of Florida and resides in Jacksonville, Florida.

164. Plaintiff Teppler's employer's retirement plan was administered by TIAA. He has paid various fees to TIAA for its financial services.

165. Plaintiff Teppler received a letter from PBI dated July 14, 2023, which states that PBI "provides audit and address research services for insurance companies, pension funds, and other organizations, including [TIAA]," and experienced the Data Breach, which "may affect the security of some of [Plaintiff Teppler's] information." The letter states further as follows:

> **What Happened?** On or around May 31, 2023, Progress Software, the provider of MOVEit Transfer software disclosed a vulnerability in their software that had been exploited by an unauthorized third party. PBI utilizes MOVEit in the regular course of our business operations to securely transfer files. PBI promptly launched an investigation into the nature and scope of the MOVEit vulnerability's impact on our systems. Through the investigation, we learned that the third party accessed one of our MOVEit Transfer servers on May 29, 2023 and May 30, 2023 and downloaded data. We then conducted a manual review of our records to confirm

> the identities of individuals potentially affected by this event and their contact information to provide notifications. We recently completed this review.
>
> **What Information Was Involved?** Our investigation determined that the following types of information related to you were present in the server at the time of the event: name, Social Security number, gender, date of birth, and address.

166. At the time that Progress discovered the data breach—on or around May 31, 2023—Progress, PBI, and TIAA retained Plaintiff Teppler's PII in their computer systems.

167. Accordingly, the letter states that Progress, PBI, and TIAA possessed Plaintiff Teppler's PII, including his name, Social Security number, gender, date of birth, and address, but failed to protect it and, instead, allowed cybercriminals to access it through the Data Breach.

168. According to the letter, Progress, PBI, and TIAA learned of the Data Breach as early as May 29-31, 2023, but they waited approximately two months before only PBI notified Plaintiff Teppler that his highly sensitive PII was compromised in the Data Breach.

169. In addition to their substantial delay in notifying Plaintiff Teppler of the Data Breach, Progress, PBI, and TIAA also put the burden on Plaintiff Teppler to prevent any further harm resulting from the Data Breach by stating in the letter: "remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors . . . and to report suspected identity theft incidents to the institution."

170. According to the letter, Progress, PBI, and TIAA waited two months before they notified Plaintiff Teppler that his PII was compromised in the Data Breach. To date, critical details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure that such a breach does not occur again have not been explained to Plaintiff Teppler, who retains a vested interest in ensuring that his PII remains protected.

171. Moreover, PBI's disclosure of the Breach amounts to no real disclosure because it fails to inform, with any degree of specificity, Plaintiff Teppler of the Data Breach's critical facts.

172. Plaintiff Teppler's PII compromised in the Data Breach has already been misused by cybercriminals for fraud and identity theft. As a direct and proximate result of the Data Breach, Plaintiff Teppler has encountered an increase in spam/phishing calls, emails, and text messages. Additionally, Plaintiff Teppler has received notifications, reporting that his PII was detected on the Dark Web. As a direct and proximate result of the Data Breach, Plaintiff Teppler spent time, approximately three to four hours, registering for Experian credit monitoring, researching the Breach, and monitoring accounts for suspicious activity.

173. Plaintiff Teppler greatly values his privacy and PII and takes reasonable steps to maintain the confidentiality of his PII. Plaintiff Teppler is very careful about sharing his PII and has never knowingly transmitted unencrypted PII over the internet or any other unsecured source. Plaintiff Teppler stores any and all documents containing PII in a secure location and destroys any documents he receives in the mail that contain any PII or any information that could otherwise be used to compromise his identity and/or credit. Moreover, Plaintiff Teppler diligently chooses unique usernames and passwords for his various online accounts, and he takes steps to ensure his online accounts are secure and password-protected.

174. Plaintiff Teppler is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud, resulting from the Data Breach. The Data Breach has caused Plaintiff Teppler to suffer fear, anxiety, and stress, which have been compounded by Progress, PBI, and TIAA's two-month delay in informing him of the fact that his PII, including his Social Security number, was acquired by known cybercriminals through the Data Breach.

175. Plaintiff Teppler anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Teppler will continue to be at present and continued increased risk of identity theft and fraud for years to come.

176. Plaintiff Teppler has a continuing interest in ensuring that his PII, which remains in Progress, PBI, and TIAA's possession, is protected and safeguarded from future disclosure and/or data breaches.

177. Moreover, when Plaintiff Teppler's employer obtained financial services from TIAA, he did not receive the benefit of the bargain because, had he known that Progress, PBI, and TIAA were using substandard data security policies, he would not have paid or would have paid less for the TIAA financial services.

178. As a result of the Data Breach, Plaintiff Teppler has already suffered—and is at an increased risk of further suffering—injury and/or damages, including, but not limited to, the unauthorized use of his stolen PII, heightened threat of identity theft and general mitigation efforts spent on monitoring his credit and for identity theft; time and expenses spent scrutinizing bank statements, credit card statements, and credit reports for fraudulent transactions/conduct; time and expenses spent monitoring bank accounts for fraudulent activity; loss in value of his personal data; lost property in the form of his compromised PII; and injury to his privacy. Additionally, as a direct result of the Data Breach, Plaintiff Teppler now faces a substantial risk that unauthorized third parties will further misuse his PII because (1) the Data Breach involved a single cybercriminal organization, Cl0p, specifically targeting Defendants' systems; (2) the dataset of PII that Cl0p exfiltrated from Defendants' systems has already been actually misused for fraudulent and/or unauthorized conduct; and (3) the type of PII Cl0p exfiltrated in the Data Breach is highly sensitive

and can be misused for substantially injurious forms of identity and/or fraud, such as fraudulently applying for and obtaining credit cards, loans, mortgages, bank accounts, or other financial accounts in Plaintiff's name. As a result of the Data Breach, Plaintiff Teppler has (1) suffered, or is at an increased risk of suffering, unauthorized use of his stolen PII such that he has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of his PII and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by his exposure to the risk of future harm because he lost time that he spent taking protective measures that would have otherwise been put to other productive use and lost opportunity costs associated with the time and effort he expended addressing future consequences of the Data Breach.

179. Plaintiff Teppler experienced all of the foregoing harm and injury as a direct result of Defendants' actions and inactions that led to the Data Breach. The monetary relief sought herein by Plaintiff Teppler would compensate him for the foregoing redressable injuries. Further, Plaintiff Teppler seeks injunctive relief to redress the foregoing injuries and harm, including, but not limited to, requiring Defendants to take steps to monitor for, protect, and/or prevent misuse of his PII accessed by cybercriminals in the Data Breach, as well as enact adequate data privacy/security practices.

**v. Plaintiff Katharine Uhrich**

180. Plaintiff Katharine Uhrich ("Plaintiff Uhrich") is a resident and citizen of the state of Illinois and resides in Forest Park, Illinois.

181. Plaintiff Uhrich used TIAA as a retirement service provider and provided her private information to TIAA while residing in Illinois. She has paid various fees to TIAA for its financial services.

182. Plaintiff Uhrich received a letter from PBI dated July 25, 2023, which states that PBI "provides audit and address research services for insurance companies, pension funds, and other organizations, including [TIAA]" and experienced the Data Breach, which "may affect the security of some of [Plaintiff Uhrich's] information." The letter states further as follows:

> **What Happened?** On or around May 31, 2023, Progress Software, the provider of MOVEit Transfer software disclosed a vulnerability in their software that had been exploited by an unauthorized third party. PBI utilizes MOVEit in the regular course of our business operations to securely transfer files. PBI promptly launched an investigation into the nature and scope of the MOVEit vulnerability's impact on our systems. Through the investigation, we learned that the third party accessed one of our MOVEit Transfer servers on May 29, 2023 and May 30, 2023 and downloaded data. We then conducted a manual review of our records to confirm the identities of individuals potentially affected by this event and their contact information to provide notifications. We recently completed this review.
>
> **What Information Was Involved?** Our investigation determined that the following types of information related to you were present in the server at the time of the event: name, Social Security number, gender, date of birth, and address.

183. At the time that Progress discovered the data breach—on or around May 31, 2023—Progress, PBI, and TIAA retained Plaintiff Uhrich's PII in their computer systems.

184. Accordingly, the letter states that Progress, PBI, and TIAA possessed Plaintiff Uhrich's PII, including her name, Social Security number, gender, date of birth, and address, but failed to protect it and, instead, allowed cybercriminals to access it through the Data Breach.

185. According to the letter, Progress, PBI, and TIAA learned of the Data Breach as early as May 29-31, 2023, but they waited approximately two months before only PBI notified Plaintiff Uhrich that her highly sensitive PII was compromised in the Data Breach.

186. In addition to their substantial delay in notifying Plaintiff Uhrich of the Data Breach, Progress, PBI, and TIAA also put the burden on Plaintiff Uhrich to prevent any further harm resulting from the Data Breach by stating in the letter: "remain vigilant against incidents of

identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors."

187. According to the letter, Progress, PBI, and TIAA waited two months before they notified Plaintiff Uhrich that her PII was compromised in the Data Breach. To date, critical details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure that such a breach does not occur again have not been explained to Plaintiff Uhrich, who retains a vested interest in ensuring that her PII remains protected.

188. Moreover, PBI's disclosure of the Breach amounts to no real disclosure because it fails to inform, with any degree of specificity, Plaintiff Uhrich of the Data Breach's critical facts.

189. Plaintiff Uhrich's PII compromised in the Data Breach has already been misused by cybercriminals for fraud and identity theft. As a direct and proximate result of the Data Breach, Plaintiff Uhrich encountered an increase in spam/phishing calls. As a direct and proximate result of the Data Breach, she spent time, approximately 40 hours, monitoring accounts for suspicious activity. Moreover, Plaintiff Uhrich received a Discover card email on November 20, 2024, that her PII, including her Social Security number, was found on the Dark Web. She was also informed by Google Pixel that her PII, including her Social Security number, was found on the Dark Web.

190. Plaintiff Uhrich greatly values her privacy and PII and takes reasonable steps to maintain the confidentiality of her PII. Plaintiff Uhrich is very careful about sharing her PII and has never knowingly transmitted unencrypted PII over the internet or any other unsecured source. Plaintiff Uhrich stores any and all documents containing PII in a secure location and destroys any documents she receives in the mail that contain any PII or any information that could otherwise be used to compromise her identity and/or credit. Moreover, Plaintiff Uhrich diligently chooses

unique usernames and passwords for her various online accounts, and she takes steps to ensure her online accounts are secure and password-protected.

191. Plaintiff Uhrich is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud, resulting from the Data Breach. The Data Breach has caused Plaintiff Uhrich to suffer fear, anxiety, anger, and stress, which have been compounded by Progress, PBI, and TIAA's two-month delay in informing her of the fact that her PII, including her Social Security number, was acquired by known cybercriminals through the Data Breach.

192. Plaintiff Uhrich anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Uhrich will continue to be at present and continued increased risk of identity theft and fraud for years to come.

193. Plaintiff Uhrich has a continuing interest in ensuring that her PII, which remains in Progress, PBI, and TIAA's possession, is protected and safeguarded from future disclosure and/or data breaches.

194. Moreover, when Plaintiff Uhrich obtained financial services from TIAA, she did not receive the benefit of the bargain because, had she known that Progress, PBI, and TIAA were using substandard data security policies, she would not have paid or would have paid less for the TIAA financial services.

195. As a result of the Data Breach, Plaintiff Uhrich has already suffered—and is at an increased risk of further suffering—injury and/or damages, including, but not limited to, the unauthorized use of her stolen PII, heightened threat of identity theft and general mitigation efforts spent on monitoring her credit and for identity theft; time and expenses spent scrutinizing bank statements, credit card statements, and credit reports for fraudulent transactions/conduct; time and

expenses spent monitoring bank accounts for fraudulent activity; loss in value of her personal data; lost property in the form of her compromised PII; and injury to her privacy. Additionally, as a direct result of the Data Breach, Plaintiff Uhrich now faces a substantial risk that unauthorized third parties will further misuse her PII because (1) the Data Breach involved a single cybercriminal organization, Cl0p, specifically targeting Defendants' systems; (2) the dataset of PII that Cl0p exfiltrated from Defendants' systems has already been actually misused for fraudulent and/or unauthorized conduct; and (3) the type of PII Cl0p exfiltrated in the Data Breach is highly sensitive and can be misused for substantially injurious forms of identity and/or fraud, such as fraudulently applying for and obtaining credit cards, loans, mortgages, bank accounts, or other financial accounts in Plaintiff's name. As a result of the Data Breach, Plaintiff Uhrich has (1) suffered, or is at an increased risk of suffering, unauthorized use of her stolen PII such that she has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of her PII and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by her exposure to the risk of future harm because she lost time that she spent taking protective measures that would have otherwise been put to other productive use and lost opportunity costs associated with the time and effort she expended addressing future consequences of the Data Breach.

196. Plaintiff Uhrich experienced all of the foregoing harm and injury as a direct result of Defendants' actions and inactions that led to the Data Breach. The monetary relief sought herein by Plaintiff Uhrich would compensate her for the foregoing redressable injuries. Further, Plaintiff Uhrich seeks injunctive relief to redress the foregoing injuries and harm, including, but not limited to, requiring Defendants to take steps to monitor for, protect, and/or prevent misuse of her PII

accessed by cybercriminals in the Data Breach, as well as enact adequate data privacy/security practices.

**B. DEFENDANTS**

1. **PBI-Affiliated Defendants**

**i. Longevity Holdings, Inc. ("Longevity")**

197. Defendant Longevity Holdings, Inc., is a for-profit Minnesota corporation with its principal place of business in Minneapolis, Minnesota. Longevity is PBI's parent company, which uses Progress's MOVEit Transfer service in the regular course of its business acting as a pension plan "sponsor, administrator, or record keeper" "for thousands of organizations" and pension plans.

**ii. ITM TwentyFirst, LLC ("TwentyFirst")**

198. Defendant ITM TwentyFirst, LLC is a for-profit Minnesota corporation with its principal place of business in Minneapolis, Minnesota. Defendant ITM TwentyFirst, LLC is a subsidiary of Defendant Longevity Holdings.

**2. Genworth-Affiliated Defendants**

**i. Genworth North America, Corp. ("GNA")**

199. Defendant Genworth North America Corp. is a for-profit Virginia corporation with its principal place of business in Richmond, Virginia.

**ii. Brighthouse Financial Life Insurance Company ("BLIC")**

200. Defendant Brighthouse Financial Life Insurance Company is a for-profit North Carolina company with its principal place of business in Charlotte, North Carolina.

**iii. Genworth Life Insurance Company of New York ("GLICNY")**

201. Defendant Genworth Life Insurance Company of New York is a subsidiary of Genworth Financial with its principal place of business in New York.

**3. Milliman-Affiliated Defendant**

**i. CMFG Life Insurance d/b/a TruStage ("TruStage")**

202. Defendant CMFG Life Insurance d/b/a TruStage is a for-profit company with its principal place of business in Madison, Wisconsin.

**4. TIAA-Affiliated Defendant**

**i. TIAA Kaspick, LLC**

203. Defendant TIAA Kaspick, LLC is a for-profit company with its principal place of business in Redwood Shores, California. TIAA markets its business as providing comprehensive planned gift and endowment management services to help nonprofits advance their missions.[23] TIAA Kaspick, LLC, is a subsidiary of Defendant TIAA.

## III. JURISDICTION AND VENUE

204. This Court has subject-matter jurisdiction pursuant to Article III of the United States Constitution, as the actions of certain Plaintiffs were removed by certain Defendants to federal courts, which were then centralized as part of this MDL. The Court's subject-matter jurisdiction exists pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, and Defendants are citizens of States different from that of at least one Class member. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

205. Absent the Court's MDL Order No. 12 (Direct Filing Order), Plaintiffs would have otherwise filed their cases against Longevity Holdings, Inc. and ITM TwentyFirst in the United States District Court for the District of Minnesota, which has personal jurisdiction over Plaintiffs'

---

[23] *Our Expertise*, TIAA Kaspick, https://www.kaspick.com/

claims against Defendants because Defendants and their affiliates conduct business in the State of Minnesota that establish sufficient minimum contacts with the District of Minnesota and committed acts therein that give rise to Plaintiffs' claims in this action—including, but not limited to, transferring, storing, or otherwise maintaining Plaintiffs' PII in Minnesota and/or engaging in conduct or failing to take steps in Minnesota to prevent the Data Breach, such that the exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice. The District of Minnesota is the proper venue for Plaintiffs' claims pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to Plaintiffs' claims occurred in that District and Defendants have harmed Class members residing in that District.

206. Plaintiffs Gilbert Hale, Patrice Hauser, and Tricia Hernandez would have otherwise filed their cases against GNA in the United States District Court for the Eastern District of Virginia, which has personal jurisdiction over Plaintiffs' claims against Defendants because Defendants and their affiliates conduct business in the State of Virginia that establish sufficient minimum contacts with the Eastern District of Virginia and committed acts therein that give rise to Plaintiffs' claims in this action—including, but not limited to, transferring, storing, or otherwise maintaining Plaintiffs' PII in Virginia and/or engaging in conduct or failing to take steps in Virginia to prevent the Data Breach, such that the exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice. The Eastern District of Virginia is the proper venue for Plaintiffs' claims pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to Plaintiffs' claims occurred in that District and Defendants have harmed Class members residing in that District.

207. Gilbert Hale, Patrice Hauser, and Tricia Hernandez would have otherwise filed their cases against BLIC in the United States District Court for the Western District of North Carolina,

which has personal jurisdiction over Plaintiffs' claims against Defendants because Defendants and their affiliates conduct business in the State of North Carolina that establish sufficient minimum contacts with the Western District of North Carolina and committed acts therein that give rise to Plaintiffs' claims in this action—including, but not limited to, transferring, storing, or otherwise maintaining Plaintiffs' PII in North Carolina and/or engaging in conduct or failing to take steps in North Carolina to prevent the Data Breach, such that the exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice. The Western District of North Carolina is the proper venue for Plaintiffs' claims pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to Plaintiffs' claims occurred in that District and Defendants have harmed Class members residing in that District.

208. Plaintiff Gilbert Hale would have otherwise filed his case against GNA in the United States District Court for the Southern District of New York, which has personal jurisdiction over Plaintiffs' claims against Defendants because Defendants and their affiliates conduct business in the State of New York that establish sufficient minimum contacts with the Southern District of New York and committed acts therein that give rise to Plaintiffs' claims in this action—including, but not limited to, transferring, storing, or otherwise maintaining Plaintiffs' PII in New York and/or engaging in conduct or failing to take steps in New York to prevent the Data Breach, such that the exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice. The Southern District of New York is the proper venue for Plaintiffs' claims pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to Plaintiffs' claims occurred in that District and Defendants have harmed Class members residing in that District.

209. Plaintiffs Steven Checchia, Margaret Phelan, Katharine Uhrich, Steven Teppler, and Patricia Marshall would have otherwise filed their cases against TIAA Kaspick, LLC in the United States District Court for the Northern District of California, which has personal jurisdiction over Plaintiffs' claims against Defendant because Defendant and its affiliates conduct business in the State of California that establish sufficient minimum contacts with the Northern District of California and committed acts therein that give rise to Plaintiffs' claims in this action—including, but not limited to, transferring, storing, or otherwise maintaining Plaintiffs' PII in California and/or engaging in conduct or failing to take steps in California to prevent the Data Breach, such that the exercise of jurisdiction over Defendant would not offend traditional notions of fair play and substantial justice. The Northern District of California is the proper venue for Plaintiffs' claims pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to Plaintiffs' claims occurred in that District and Defendants have harmed Class members residing in that District.

210. Plaintiff Jose Soto would have otherwise filed his case against TruStage in the United States District Court for the Western District of Wisconsin, which has personal jurisdiction over Plaintiff's claims against Defendant because Defendant and its affiliates conduct business in the State of Wisconsin that establish sufficient minimum contacts with the Western District of Wisconsin and committed acts therein that give rise to Plaintiff's claims in this action—including, but not limited to, transferring, storing, or otherwise maintaining Plaintiff's PII in Wisconsin and/or engaging in conduct or failing to take steps in Wisconsin to prevent the Data Breach, such that the exercise of jurisdiction over Defendant would not offend traditional notions of fair play and substantial justice. The Western District of Wisconsin is the proper venue for Plaintiff's claims

pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to Plaintiff's claims occurred in that District and Defendant has harmed Class members residing in that District.

211. Venue is proper in this District for pretrial purposes as the Judicial Panel on Multidistrict Litigation determined that "centralization of these actions in the District of Massachusetts will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation." *In re MOVEit Customer Data Sec. Breach Litig.*, 699 F. Supp. 3d 1402, 1405 (J.P.M.L. 2023).

## IV. FACTUAL ALLEGATIONS CONCERNING DATA BREACH

212. Plaintiffs hereby incorporate by reference the factual allegations contained in the Bellwether Consolidated Amended Complaint (ECF 1543) and the Omnibus Common Allegations (ECF 908).

## V. FACTUAL ALLEGATIONS AND CAUSES OF ACTION

### A. Overview of the Defendants

213. The MOVEit Transfer software is owned and operated by Progress and used by more than 1,700 companies and 3.5 million users worldwide, including by PBI and the Defendants in the ordinary course of their businesses, either directly or indirectly.[24]

214. PBI is a for-profit Delaware corporation with its principal place of business in Minneapolis, Minnesota. PBI is a pension plan "sponsor, administrator, or record keeper" "for thousands of organizations" and pension plans.[25]

215. PBI is a subsidiary of Defendant Longevity Holdings, Inc. Defendant Longevity Holdings, Inc.'s principal place of business is in Minneapolis, Minnesota. It markets itself as "a

---

[24] Refer to ECF ___for an overview relating to PBI Bellwether Defendants.
[25] PBI, *Homepage,* https://www.pbinfo.com/ (last accessed Nov. 27, 2024).

leading data and analytics company that measurably and materially benefits our clients through our industry expertise, technology, and data."[26]

216. Defendant ITM TwentyFirst, LLC is a subsidiary of Defendant Longevity Holdings, and it helps "banks, trust companies, and other fiduciaries manage . . . . and mitigate regulatory risk and fiduciary liability."[27] It states that it "recognizes the importance of protecting personal information," and claims that it "use[s] a variety of administrative, physical and technical security measures intended to safeguard your personal information."[28]

217. In the ordinary course of its business, PBI uses Progress's MOVEit service to store large amounts of data provided (or otherwise possessed/maintained) by its customers, including Defendants GLICNY, GNA, BLIC, TruStage, and TIAA Kaspick (collectively, "PBI-Contracting Defendants").[29]

218. Specifically, in documents filed with this Court, PBI characterizes itself as a "vendor" of the MOVEit Transfer service. *See* ECF No. 1161-1 at 4. Defendants GLICNY, GNA, BLIC, TruStage, TIAA Kaspick, characterize themselves as "vendor contracting entities" that use PBI's vendor services. *See id*. at 5-6. MLIC characterizes itself as a "vendor contracting entity customer," that uses services provided by Milliman, which is utilizing PBI as its vendor. *See id*. at 5. MLIC is a subsidiary of Defendant TruStage. Below is a chart showing this interplay:

---

[26] Longevity Holdings, https://longevity.inc/ (last accessed Jan. 29, 2026).
[27] ITM, TwentyFirst, LexServe, *Comprehensive Solutions*, https://itm21st.com/Solutions/ (last accessed Jan. 28, 2026).
[28] TwentyFirst, https://21stle.com/privacy-policy/ (last accessed Jan. 29, 2026).
[29] PBI, *Global MOVEit Transfer Cyberattack*, https://www.pbinfo.com/faq-communication/ (last accessed Oct. 21, 2024).




219. Thus, through these relationships, all PBI-Contracting Defendants used PBI as their vendor, either directly or indirectly, and in the ordinary course of their business shared, transmitted, or otherwise maintained their customers' highly sensitive information with PBI or otherwise made it accessible to PBI through MOVEit (including, but not limited to, customers' Social Security numbers, first and last names, dates of birth, addresses, genders, and/or life insurance policy numbers (collectively referred to hereinafter as "PII")).

220. Genworth Financial is a publicly traded, Fortune 500 company, Delaware corporation, with its principal place of business in Richmond, Virginia. Genworth Financial markets mortgages, long-term care insurance, life insurance, and other insurance and financial products, primarily to individual consumers.[30]

221. Defendant GLICNY is a subsidiary of Genworth Financial with its principal place of business in New York, New York.

222. Defendant GNA is a subsidiary of Genworth Financial, Inc. with its principal place of business in Richmond, Viriginia.

223. Defendant BLIC "specialize[s] in annuity and life insurance products."[31]

---

[30] Genworth Financial, Inc., Annual Report (Form 10-K) *SEC Form 10-K* (Feb. 28, 2023).
[31] Brighthouse Financial, *About Us*, https://www.brighthousefinancial.com/about-us/our-story/ (last accessed January 28, 2026).

"Genworth administers a block of long-term care insurance policies for BLIC."[32] Genworth Defendants contract with PBI "to satisfy regulatory obligations to scan social security data to determine whether a policyholder may have passed and triggered death benefits under a life insurance policy or annuity contract."[33] Genworth Defendants "also use[s] PBI to identify deaths that have occurred across [Genworth's] other lines of insurance, as well as the deaths of insurance agents to whom [Genworth] pay[s] commissions."[34]

224. Milliman Inc. is a Washington corporation with its principal place of business in Seattle, Washington. Milliman Inc. provides administrative services to employee benefit and pension plan sponsors.[35]

225. Milliman provides administrative and risk assessment services to a global customer base – including "insurers, healthcare organizations, governments, and employers "As part of those services, [Milliman] utilizes . . . [PBI] to conduct research on whether consumers have passed

---

[32] *Brighthouse Life Insurance Company Discovers Data Security Event*, Security Magazine, https://www.securitymagazine.com/articles/99788-brighthouse-life-insurance-company-discovers-data-security-event (Aug. 22, 2023) (last accessed January 28, 2026).
[33] *MOVEit Security Event*, Genworth (last updated Aug. 31, 2023), https://www.genworth.com/moveit#backgroundinfo.
[34] *See, e.g.*, Genworth, *Data Breach Notice Letter to Impacted Living Residents of Rhode Island* (July 31, 2023), https://a-us.storyblok.com/f/1008916/0db43daf1b/genworth-consumer-notice_ri.pdf; *MOVEit Security Event*, Genworth (last updated Aug. 31, 2023), https://www.genworth.com/moveit#backgroundinfo.; *see also* Genworth, *Genworth Financial Inc. SEC Form 8-K*, June 16, 2023, https://www.sec.gov/Archives/edgar/data/1276520/000119312523172549/d463993d8k.htm ("[Genworth's] life insurance businesses use PBI to, among other things, satisfy applicable regulatory obligations to search various databases to identify the deaths of insured persons under life insurance policies, and to identify the deaths of insured persons under long-term care insurance, and annuity policies which can impact premium payment obligations and benefit eligibility. For life insurance policies and annuity contracts, this helps identify the possible eligibility of beneficiaries for death benefits even prior to the submission of claims, or for policies that beneficiaries may not know exist.").
[35] *Data Breach Notifications – Milliman Solutions LLC*, Office of the Maine Attorney General (July 17, 2023), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/a98d9ae9-b898-4aaa-8dde-de04551aaedb.shtml.

away. For that purpose, [Milliman] transferred data regarding its clients' consumers to PBI utilizing a secure and encrypted file transfer protocol."[36]

226. MLIC is an Iowa corporation with its principal place of business in Madison, Wisconsin, that operates as an insurance company offering life, accidental, and health insurance throughout the United States.[37] In the ordinary course of its business, MLIC pays to utilize services offered by Milliman.

227. MLIC is a subsidiary of Defendant TruStage. Defendant TruStage provides a variety of services, including consumer insurance, annuities, preplanning, lending, retirement, and business protection.[38]

228. TIAA is a New York based stock insurance company with its principal place of business in New York, New York. TIAA provides services to over 5 million clients from more than 15,000 institutions and manages nearly $1 trillion in assets with holdings in more than 50 countries. In the ordinary course of its business, "TIAA utilizes [PBI] to assist with death claim and beneficiary processes."[39]

229. Defendant TIAA Kaspick provides "[c]omprehensive planned gift and endowment management services to help nonprofits advance their missions."[40] In its ordinary course of

[36] *Data Breach Notifications – Milliman Solutions LLC*, Office of the Maine Attorney General (July 17, 2023), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/a98d9ae9-b898-4aaa-8dde-de04551aaedb.shtml.
[37] MEMBERS Life Insurance Co., Bloomberg, https://www.bloomberg.com/profile/company/11789Z:US?embedded-checkout=true (last accessed Nov. 27, 2024).
[38] TruStage, *About Us*, https://www.trustage.com/about-us (last accessed Jan. 28, 2026).
[39] *Notice of Data Security Incident*, TIAA (July 21, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/ed67df63-aced-4ecb-91ce-602c7e34c83a/573351f0-74fc-4e19-9a62-a51fb837a3bb/Regulator%20Notice%20-%20TIAA%20ME%20AG.pdf.
[40] TIAA Kaspick, https://www.kaspick.com/ (last accessed Jan. 28, 2026).

business, PBI provides audit and address research services for organizations, including TIAA Kaspick.

230. Defendants owed duties to Plaintiffs and Class members (defined below) to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII against unauthorized access and disclosure. Defendants breached those duties by, among other things, failing to implement and maintain reasonable security procedures and practices to protect the PII entrusted to them from unauthorized access and disclosure.

231. As a result of Defendants' inadequate security and breach of their duties and obligations, the Data Breach occurred and Plaintiffs' and Class members' PII was accessed by, and disclosed to, an unauthorized third-party actor. Plaintiffs thus bring this complaint on behalf of themselves, and all similarly situated individuals whose PII was exposed as a result of the Data Breach, which Defendants learned of on or about May 27, 2023, but PBI[41], Genworth Defendants[42], Milliman Defendants[43], and TIAA[44] did not publicly disclose until approximately July 2023.

### B. Nature of PBI's Business

[41] *Data Breach Notifications – Pension Benefit Information, LLC*, Office of the Maine Attorney General (July 12, 2023), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/14efac97-4a7c-4322-98eb-2e953884eb58.shtml.

[42] *MOVEit Security Event*, Genworth (last updated Aug. 9, 2023), https://www.genworth.com/moveit.

[43] *Data Breach Notifications – Milliman Solutions LLC*, Office of the Maine Attorney General (July 17, 2023), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/a98d9ae9-b898-4aaa-8dde-de04551aaedb.shtml.

[44] *Data Breach Notifications – TIAA*, Office of the Maine Attorney General (July 14, 2023), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/ed67df63-aced-4ecb-91ce-602c7e34c83a.shtml.

232. PBI performs various data verification, death audit, and participant location services for insurance companies, pension funds, financial institutions, government entities, and other businesses, including the Defendants.[45]

233. PBI claims it "provides thousands of organizations with the best population management solutions in the industry."[46]

234. PBI's services and products require that its business clients—including the Defendants—provide PBI with their customers' and policyholders' sensitive PII.[47]

235. According to PBI, "[p]ersonal information is provided to PBI from or on behalf of [its business clients], and PBI is a service provider, contractor, or data processor/collector to such organizations."[48]

236. PBI solicits and collects sensitive consumer data from its business clients—including the Defendants—and then stores, validates, and updates that data to help them "locate people who may be eligible for benefits[,]" and "prevent[] fraud or avoid[] overpayment of benefits to deceased individuals."[49]

237. For example, PBI conducts Social Security Death Master Index searches for its insurance company and pension fund clients.[50] In order to perform these searches, which are

---

[45] PBI, *Privacy Policy*, https://www.pbinfo.com/privacy-policy/ (last accessed Oct. 18, 2024).
[46] PBI, *We Find the Hardest to Find People*, https://www.pbinfo.com/ (last accessed Oct. 18, 2024).
[47] Resource for PBI / MOVEit Transfer Breach, Ullico, https://www.ullico.com/resource-for-pbi-moveit-transfer-breach/ (last accessed Oct. 21, 2024); see also PBI, Beyond the Numbers Part 1: Putting Participants First in Retirement Planning featuring MEA, YouTube (June 27, 2023), https://www.youtube.com/watch?v=wTC2Ers4AJM.
[48] PBI, *Privacy Policy*, https://www.pbinfo.com/privacy-policy/ (last accessed Oct. 18, 2024) ("Where personal information is provided to PBI by those organizations, PBI is a data processor, service provider or contractor to such organizations, as those terms are used in applicable privacy laws.").
[49] PBI, *Privacy Policy*, https://www.pbinfo.com/privacy-policy/ (last accessed Oct. 18, 2024).
[50] PBI, *CertiDeath*, https://www.pbinfo.com/death-audit/ (last accessed Oct. 26, 2024).

required by state law, companies must share their policyholders' sensitive PII, including Social Security numbers, with PBI.[51]

238. PBI boasts that its services "have uncovered over $1 billion in overpayments, releasing billions in unnecessary funding liability[.]"[52]

239. In addition to helping its business clients save money by reducing financial losses, PBI promises clients and potential clients that, by using PBI's services, "[a]s a plan sponsor, administrator, or record keeper you can be confident you're doing what's best for your plan, participants, beneficiaries and policy holders."[53]

**C. Defendants used the MOVEit Transfer software to transfer and store the Plaintiffs' and Class members' PII.**

240. PBI uses the MOVEit Transfer software to facilitate the transfer and storage of its business clients' sensitive consumer data[54], including that of the PBI-Contracting Defendants (Genworth Defendants, Milliman, Defendant TIAA Kaspick, MLIC, and Defendant TruStage ).

---

[51] *Resource for PBI / MOVEit Transfer Breach*, Ullico, https://www.ullico.com/resource-for-pbi-moveit-transfer-breach/ (last accessed Oct. 21, 2024); *see also* PBI, *CertiDeath*, https://www.pbinfo.com/death-audit/ (last accessed Oct. 26, 2024).

[52] PBI, *We Find the Hardest to Find People*, https://www.pbinfo.com/ (last accessed Oct. 18, 2024).

[53] PBI, *We Find the Hardest to Find People*, https://www.pbinfo.com/ (last accessed Oct. 18, 2024).

[54] *See* PBI, *Global MOVEit Transfer Cyberattack*, https://www.pbinfo.com/faq-communication/ (last accessed Oct. 21, 2024) ("PBI Research Services uses Progress Software's MOVEit file transfer application with some of our clients. At the end of May, Progress Software identified a cyberattack in their MOVEit software that did impact a small percentage of our clients who use the MOVEit administrative portal software resulting in access to private records."); *see also* Jill McKeon, *MOVEit Transfer Cyberattack Impacts 1.2M at Pension Benefit Information*, TechTarget (July 18, 2023), https://www.techtarget.com/healthtechsecurity/news/366594250/MOVEit-Transfer-Cyberattack-Impacts-12M-at-Pension-Benefit-Information.

241. The PBI-Contracting Defendants provided the Plaintiffs' and Class members' highly sensitive PII to PBI.[55] PBI's website states that the Data Breach impacted PBI's clients "who use the MOVEit administrative portal software."[56]

242. PBI claims that "[p]rotecting and securing the information of [its] clients and [the] company is of critical importance to PBI. We recognize that all relationships with current and prospective clients are based upon integrity and trust, and we take our role as custodians of confidential information very seriously."[57]

**D. PBI knew it had duties to protect the Plaintiffs' and Class members' PII, and assured them that it would.**

243. Similar to the various statements on Progress's website assuring consumers that Progress will protect their sensitive PII, PBI's website also claims that it has robust systems and processes in place to protect and secure the highly sensitive PII that it solicits, collects, stores, and maintains.

244. In a set of "Privacy Principles"[58] published on PBI's website, PBI professes its "commit[ment] to the responsible use of information and protection of individual privacy

---

[55] PBI, Resources – Recently Recorded Webinars: Beyond the Numbers Part 1: Putting Participants First in Retirement Planning Featuring MEA, YouTube (June 27, 2023), https://www.youtube.com/watch?v=wTC2Ers4AJM at 32:10 (Jeff Anderson, Business Development Manager at PBI Research Services: to use PBI's CertiDeath product, PBI's business clients "upload a file with [PBI], and [PBI] continuously monitor[s] that file and provid[es] [the client] with a weekly [report]. And [PBI] [does] that until [the client] upload[s] a new file to [PBI].").

[56] PBI, *Global MOVEit Transfer Cyberattack*, https://www.pbinfo.com/faq-communication/ (last accessed Oct. 21, 2024).

[57] PBI, *Data Security*, https://www.pbinfo.com/data-security/ (last accessed Oct. 18, 2024).

[58] PBI, *Privacy Principles*, https://www.pbinfo.com/privacy-principles/ (last accessed Oct. 18, 2024) ("PBI's Privacy Principles (the 'Principles') speak to personally identifiable information, including sensitive personally identifiable information, collected, maintained, used, disclosed, or processed in connection with products and services offered by PBI.").

rights[]"[59] and claims: "Data security is a company imperative. PBI strives to protect personally identifiable information that [it] collect[s], maintain[s], process[es], or disclose[s], including by using appropriate administrative, physical, and technical safeguards."[60]

245. PBI's website specifically recognizes the importance of having systems and processes in place to protect and secure sensitive PII it obtains and/or transfers via the Internet:

> **ONLINE PRIVACY**
>
> PBI strives to protect the privacy of personally identifiable information obtained over the Internet and strives to apply the Principles and evolving standards to the online environment.[61]
>
> **IDENTITY THEFT**
>
> PBI strives to prevent the acquisition of information from our products and services for improper purposes, such as identity theft. PBI believes in the importance of notifying individuals who may have had their sensitive personally identifiable information acquired by an unauthorized individual, as appropriate.[62]

246. PBI also acknowledges the importance of ensuring that its data security systems and processes are compliant with legal regulations and industry standards:

> **ACCOUNTABILITY**
>
> PBI supports the accountability of information security standards and practices, responsible and effective federal regulation of the data industry, and legislation governing the practices of all data providers. PBI also supports industry oversight and active engagement with the privacy community. PBI believes that strong privacy and information security protections are vital for an effective and trusted data industry.[63]

---

[59] PBI, *Privacy Principles*, https://www.pbinfo.com/privacy-principles/ (last accessed Oct. 18, 2024).
[60] PBI, *Privacy Principles*, https://www.pbinfo.com/privacy-principles/ (last accessed Oct. 18, 2024).
[61] PBI, *Privacy Principles*, https://www.pbinfo.com/privacy-principles/ (last accessed Oct. 18, 2024).
[62] PBI, *Privacy Principles*, https://www.pbinfo.com/privacy-principles/ (last accessed Oct. 18, 2024).
[63] PBI, *Privacy Principles*, https://www.pbinfo.com/privacy-principles/ (last accessed Oct. 18, 2024).

> [ . . . ]
>
> **COMPLIANCE**
>
> PBI will obtain assessments from an independent auditor, who uses procedures and standards generally accepted in the profession to assess PBI's controls relevant to security, availability, and confidentiality, as appropriate.[64]

247. PBI claims to have "the largest team of data scientists, product developers, security and IT, and subject matter experts in the industry[]"[65] and "aspire[s] to protect individuals' privacy through the design of [its] products and services, by credentialing, monitoring, and auditing [its] business clients as appropriate, and through other information security safeguards."[66]

248. PBI promises its business clients, including the Defendants, that "[p]rotecting and securing [their] information is [PBI's] highest priority."[67]

249. PBI makes the same promises to consumers: "PBI recognizes the importance of protecting personal information. We use a variety of administrative, physical and technical security measures intended to safeguard your personal information."[68]

250. According to PBI's website, "PBI uses a multi-layered approach to protect data securely that includes, but is not limited to the following: implementing secure development practices, including annual training for our IT team, real time scanning of code changes for vulnerabilities, web application firewalls, n-tier application architecture, required security

---

[64] PBI, *Privacy Principles*, https://www.pbinfo.com/privacy-principles/ (last accessed Oct. 18, 2024).
[65] PBI, We Find the Hardest to Find People – Access to a Team of Experts, https://www.pbinfo.com/ (last accessed Oct. 18, 2024).
[66] PBI, *Privacy Principles*, https://www.pbinfo.com/privacy-principles/ (last accessed Oct. 18, 2024).
[67] PBI, We Find the Hardest to Find People – Confidence Your Data is Secure, https://www.pbinfo.com/ (last accessed Oct. 18, 2024).
[68] PBI, *Privacy Policy*, https://www.pbinfo.com/privacy-policy/ (last accessed Oct. 18, 2024).

awareness training program for all employees at onboarding and on a regular basis, data loss prevention tools to alert and block transfers of sensitive data, and a consolidated SIEM solution that correlates alerts and events across multiple environments.[69]

251. PBI claims that its "data security team manages this multi-layered security architecture by performing over 30 security reviews of quarterly audit checks to test compliance against security policies."[70]

252. PBI also claims that its "formalized security program follows industry-recognized security frameworks" and "undergoes an annual SSAE 18 SOC2, Type II audit by an independent third-party[.]"[71] According to PBI's website:

> PBI regularly uses third parties to test and audit our security controls. We conduct monthly and quarterly vulnerability assessments and penetration tests of PBI's internal and external network and application security, and conduct annual application penetration tests.[72]

253. With respect to "Network Security," PBI's website states:

> PBI's network incorporates several layers of protection to harden both corporate and production environments including 24/7 monitoring and alerts for critical events and failures, disabling unnecessary connections and services, regular OS and software patching, next generation firewalls with intrusion prevention and intrusion detection software, anti-virus scanning, and dedicated security event management system with 24/7 alerting.
>
> PBI implements the security principle of least privilege access. Access to client information and PBI technology is based upon PBI employees job function, restricted by a valid need-to-know basis, and only used as is necessary to provide the authorized services. Additional access controls include multi-factor authentication and intrusion detection protection program. User accounts and permissions are audited on a quarterly basis.

---

[69] PBI, *Data Security*, https://www.pbinfo.com/data-security/ (last accessed Oct. 18, 2024).
[70] PBI, *Data Security*, https://www.pbinfo.com/data-security/ (last accessed Oct. 18, 2024).
[71] PBI, We Find the Hardest to Find People – Confidence Your Data is Secure, https://www.pbinfo.com/ (last accessed Oct. 18, 2024).
[72] PBI, *Data Security*, https://www.pbinfo.com/data-security/ (last accessed Oct. 18, 2024).

> Data in-transit across our network and data at-rest stored in our databases are encrypted using advanced encryption standards. The security of our databases is tested on a quarterly basis.[73]

254. According to its website, PBI "provides products and services . . . that help reduce and prevent fraud, mitigate risk, and fulfill fiduciary responsibilities in ways that protect individual's privacy."[74]

255. Contrary to these outward assurances, however, PBI failed to adequately secure and safeguard the highly sensitive PII that it solicited and collected from the Defendants. PBI did not have adequate data security measures in place to protect and maintain the highly sensitive PII entrusted to it, nor did it ensure its vendors and business associates reasonably and adequately secured, safeguarded, and otherwise protected consumers' PII, which PBI shared with third-party vendors, such as Progress, through PBI's use of the MOVEit Transfer software. Instead, PBI's website wholly fails to disclose the truth: that PBI lacks sufficient processes to protect the PII that is entrusted to it.

**E. Genworth Defendants knew they had duties to protect the Plaintiffs' and Class members' PII, and assured them that they would.**

256. In the ordinary course of their business, Genworth Defendants collect highly sensitive PII from customers and potential customers, including demographic information, contact information (including address, phone number, and email), Social Security numbers, financial and banking information, medical information, and information about customers' beneficiaries.[75]

---

[73] PBI, *Data Security*, https://www.pbinfo.com/data-security/ (last accessed Oct. 18, 2024).
[74] PBI, *Privacy Principles*, https://www.pbinfo.com/privacy-principles/ (last accessed Oct. 18, 2024).
[75] *See "Did You Know*," Genworth, https://www.genworth.com/customer-service (last accessed Nov. 27, 2024).

257. Defendant GLICNY is a subsidiary of Genworth Financial. Defendant BLIC is a subsidiary of Genworth Financial. Defendant GNA maintains the Death Audit Contract for Service between PBI and Genworth Financial.

258. As a condition of receiving life insurance services through Genworth Financial, Plaintiffs and Class members were required to provide their highly sensitive PII to Genworth Financial.

259. Genworth Financial directs customers and potential customers to use "MyGenworth, [their] secure customer website."[76]

260. "To access information about [their] existing insurance policies or accounts and for some other purposes, [customers] must register an account. When [they] register, [Genworth] [ ] ask[s] for more personal information. That may include [the customer's] policy or account number, [their] date of birth and [their] [S]ocial [S]ecurity number."[77]

261. Statements on Genworth Financial's websites indicate that Genworth Financial understands their obligations to protect customers' PII:

> Federal and state laws require that we tell you how we collect, use, share, and protect your personal information. Those laws also limit how we may use your personal information and how we may share it with others. Protecting the privacy and security of your personal information is very important to us.[78]

---

[76] *Login to Manage Your Genworth Account*, Genworth (May 5, 2023), https://www.genworth.com/login.

[77] *Online Privacy Policy – Personal Information*, Genworth, https://www.genworth.com/online-privacy-policy (last updated April 10, 2024).

[78] *Online Privacy Policy – Scope*, Genworth, https://www.genworth.com/online-privacy-policy (last updated April 10, 2024); *see also Genworth Privacy Notice*, Genworth (Jan. 1, 2018), https://pro.genworth.com/riiproweb/productinfo/pdf/45242.pdf; *Genworth Privacy Notice – Frequently Asked Questions*, Genworth (June 18, 2013), https://pro.genworth.com/riiproweb/productinfo/pdf/106681.pdf; *Genworth HIPAA Privacy Policy (Health Information)*, Genworth (Oct. 30, 2013), https://a-us.storyblok.com/f/1008916/8c37f805f5/157407_103013.pdf; *Genworth Disclosure – Confidentiality for Victims of Domestic Violence*, Genworth (Nov. 3, 2015), https://www.genworth.com/dam/Americas/US/PDFs/Consumer/Confidentiality_Protocol_Notice

262. Genworth Financial claims that "[w]orking to protect [its customers'] personal information is one of [the] promises that enables [Genworth] to help millions of policyholders secure their financial lives, families, and futures."[79]

263. Genworth Financial's websites warrant to consumers that:

> Once we receive your information, we use procedures and technologies designed to prevent unauthorized access to your personal information and to protect against the loss, misuse, and alteration of information under our control. We maintain physical, electronic, and procedural protections to protect personal information in accordance with applicable standards.[80]

264. Genworth Financial explicitly promises customers:

> We require that service providers who have access to your personal information implement similar standards. We require service providers to agree to keep your personal information confidential. Service providers who violate our privacy terms are subject to having their contract terminated.[81]

265. Genworth Financial promises customers that Genworth Financial has "implemented technical, physical, and process safeguards to maintain the confidentiality of your information."[82]

266. Genworth Financial also promises customers:

> We restrict access to personal information to employees and service providers who have a legitimate business need in providing products or services to you. Employees

---

.pdf; *Additional Privacy Information for California Residents*, Genworth, https://www.genworth.com/online-privacy-policy/ccpa (last updated March 27, 2024).

[79] *Fraud & Information Protection*, Genworth (May 4, 2023), https://www.genworth.com/fraud-and-information-protection.

[80] *Online Privacy Policy*, Genworth, https://www.genworth.com/online-privacy-policy.html (last updated April 10, 2024).

[81] *Online Privacy Policy*, Genworth, https://www.genworth.com/online-privacy-policy.html (last updated April 10, 2024).

[82] *USLI Policyholder Fraud/Scam Information*, Genworth (May 18, 2020), https://www.genworth.com/fraud-and-information-protection/policyholder-fraud-information.

> who violate these terms are subject to disciplinary action. Service providers who violate these terms are subject to having their contract terminated.[83]

267. Genworth Financial and GNA, GLICNY, and BLIC provided Plaintiffs' and Class members' PII to PBI by uploading files containing that data to PBI's MOVEit Transfer server via PBI's "MOVEit administrative portal software."[84]

268. Genworth Defendants understood that the PII they solicited and collected from Plaintiffs and Class members was highly sensitive.

269. Death records have long been known to be valuable to cybercriminals because they facilitate identity fraud. In November 2011, due to privacy and identity theft concerns, the Social Security Administration redacted and no longer included death data derived from State sources.[85]

270. Genworth Financial specifically recognizes that "[f]raudsters may read obituaries, learn the family's details, and use this opportunity to take advantage of a grieving spouse. They may ask the spouse to settle the deceased's fake debt."[86]

271. Accordingly, Genworth Financial recognizes that customers are especially vulnerable to fraud and scams.

272. On its website, Genworth Financial provides a litany of resources and articles to warn its customers:

---

[83] *Online Privacy Policy – How We Protect Your Personal Information*, Genworth, https://www.genworth.com/online-privacy-policy (last updated Apr. 10, 2024).
[84] PBI, *Global MOVEit Transfer Cyberattack*, https://www.pbinfo.com/faq-communication/ (last accessed Oct. 21, 2024).
[85] *See, e.g.*, Kevin Sack, *Researchers Wring Hands as U.S. Clamps Down on Death Record Access*, The New York Times (Oct. 8, 2012), https://www.nytimes.com/2012/10/09/us/social-security-death-record-limits-hinder-researchers.html (in November 2011, "the Social Security Administration [started] to limit access to its death records amid concerns about identity theft"); Nancy Amons, *Government Still Declares Living Woman Dead*, WSMV News (Feb. 20, 2008), https://web.archive.org/web/20080222151141/http://www.wsmv.com/news/15357541/detail.html
[86] *The Most Common Financial Scams Taking Advantage of Older Americans*, Genworth (Apr. 11, 2023), https://www.genworth.com/aging-and-you/resources/avoiding-senior-citizen-scams.

> Every year, 5 million older Americans are targeted by financial scammers. [ . . . ] Why do con artists prey on older people? Because they are easy targets likely to have a nest egg that's ripe for the picking. Additionally, they're more susceptible to scams that promise longer, healthier lives. Finally, they're among the least likely to report the crimes. The lack of reporting may be for a variety of reason[s] including that it can take longer to realize they've been scammed, they may not know how to report it, they may feel embarrassed, or they may worry that their family will think they can no longer manage their financial affairs.[87]

273. Genworth Financial also knows that the Genworth Financial customer population is especially susceptible to email/phishing scams.[88] Genworth Financial explains that "[s]eniors make twice as many phone purchases as any other demographic group. Telemarketing scams are hard to trace and can often lead to repeat offenders who prey on easy targets."[89] Additionally, "[o]lder people generally aren't as internet savvy as their younger counterparts and may not recognize online scams."[90]

274. Genworth Financial specifically advises customers to "be careful about the information that [they] share online" because "[c]riminals often seek to commit fraud by piecing together information about the victim's life from social media and other online outlets. This information may allow them to guess passwords, reset [ ] passwords, or create fake online accounts in your name but with their address. Remember that even if you have strong privacy settings on your social media content, if one of your connection's accounts is hacked, your information may be accessible to the criminal as well."[91]

---

[87] *Id.*
[88] *Id.* ("Email/phishing scams: A scammer posing as the IRS, a bank, or another seemingly legitimate organization sends an email to your parents asking them to update or verify their personal information. Alternatively, the scammer may mimic a relative or friend's email address and [ask] for money to be wired for various reasons.").
[89] *Id.*
[90] *Id.*
[91] *USLI Policyholder Fraud/Scam Information*, Genworth (May 18, 2020), https://www.genworth.com/fraud-and-information-protection/policyholder-fraud-information.

275. BLIC's Online Privacy Statement states that it will "seek to maintain physical, electronic, and procedural safeguards to protect your personal information in a manner that complies with Bright Financial policies and applicable laws."[92] The Genworth Defendants understood their obligations to protect the highly sensitive PII they solicited and collected from their customers, but broke their promises to "implement[] technical, physical, and process safeguards to maintain the confidentiality of [their customers'] information."[93]

**F. Milliman Defendants knew they had duties to protect Plaintiffs' and Class members' PII, and assured them that they would.**

276. Milliman Defendants collect, store, and transfer consumers' PII to third-party vendors, including PBI, in connection with the services Milliman Defendants provide to clients, which include life and health insurance companies. Milliman Defendants relies on PBI's data verification, death audit, and participant location services in the regular course of business.

277. As explained by an article published on Milliman, Inc.'s website:

> Defined Benefit plans face daily administrative struggles, including growing structural complexity, administrative changes, digital maintenance, possible outdated software, bad plan data, and a host of other challenges. Bad participant addresses and contact information are among the less exciting and hard-to-fix items of plan data, yet without regular maintenance, they could render all other aspects of pension administration irrelevant. It is imperative that defined benefit plans keep good participant address information on file as several notices are required to be mailed out regularly.
>
> * * *
>
> To locate participants, individual address searches can be conducted as returned mail is received using an industry-recognized vendor such as PBI [ ]. When working with a larger population, these vendors may also be able to perform bulk address

---

[92] *Online Privacy Statement*, Brighthouse Financial, https://www.brighthousefinancial.com/privacy-policy/ (last accessed Jan. 29, 2026).
[93] *Fraud & Information Protection*, Genworth (May 4, 2023), https://www.genworth.com/fraud-and-information-protection.

> searches, which typically require a spreadsheet containing participant names, SSNs, and birth dates, (file formats and turnaround times differ by vendor).[94]

278. Milliman Inc.'s website proclaims that "[d]ata security is one of Milliman's top priorities. It is vital that we provide appropriate security to ensure the services we provide to our clients are of the highest standards."[95]

279. Milliman Inc.'s Data Privacy Policy claims that Milliman Inc. "take[s] data privacy very seriously."[96] According to Milliman's Data Privacy Policy:

> Milliman [] may share Personal Data with authorized third-party agents or contractors that perform services for Milliman. If Milliman shares Personal Data with a third party, Milliman requires that those third parties agree to process Personal Data based on Milliman's instructions and in compliance with this Privacy Policy. Any transfers of Personal Data are subject to appropriate safeguards that are compliant with jurisdiction-specific privacy laws.[97]

280. Milliman Inc. claims that Milliman Inc. "stores Personal Data on a secure server that is password protected and shielded from unauthorized access by a firewall. Milliman has in place security policies that are intended to ensure the security and integrity of all Personal Data. Milliman has appropriate technical and organizational measures in place to protect against unauthorized or unlawful processing of Personal Data and against accidental loss or destruction

---

[94] Kristina Pizano and Haydee Scheel, *Address maintenance – One good address is one less headache*, Milliman (Nov. 17, 2020), https://www.milliman.com/en/insight/address-maintenance-one-good-address-is-one-less-headache.
[95] *Milliman data breach disclosures – PBI/MOVEit data breach*, Milliman, https://www.milliman.com/en/data-breach-disclosure (last accessed Oct. 24, 2024).
[96] *Millman Global Data Privacy Policy*, Milliman (last updated Aug. 2024), https://www.milliman.com/en/privacy-policy ("This Privacy Policy sets out the principles governing Milliman's use and protection of personal information that individuals and clients share with us ('Personal Data') as well as describing the rights of individuals regarding their Personal Data. This Privacy Policy applies to Milliman's data collection and use through its website and through its business operations.").
[97] *Millman Global Data Privacy Policy – Affiliates and Authorized Third-Party Agents*, Milliman (last updated Aug. 2024), https://www.milliman.com/en/privacy-policy.

of, damage to, Personal Data held or processed by Milliman. If Milliman forwards Personal Data to any third party, Milliman requires that those third parties have appropriate technical and organizational measures in place to comply with this Privacy Policy and applicable laws."[98]

281. The Milliman Defendants market themselves as "experts" in cybersecurity, claiming that they can "quantify the potential financial impacts of cyber risk and can produce cost-benefit analyses and model a variety of possible risk scenarios to find gaps."[99]

282. On its website, Milliman, Inc. explicitly recognizes that "cyber risk is an ever shifting landscape. New vectors and new attacks pose major challenges to businesses trying to keep data systems and people safe."[100]

283. Milliman Defendants claim that they offer "a next-generation cyber risk solution that incorporates a forward-looking approach to modeling how cyber risks occur and propagate[,] provides organizational decision makers and risk managers with a more accurate understanding of current vulnerabilities[, and] helps identify emerging threat vectors before they cause damage[.]"[101]

**1. TruStage and MLIC knew it had duties to protect the Plaintiffs' and Class members' PII, and assured them that it would.**

284. MLIC is the subsidiary of Defendant TruStage.

---

[98] *Millman Global Data Privacy Policy – Security*, Milliman (last updated Aug. 2024), https://www.milliman.com/en/privacy-policy.
[99] *Risk Solutions – Cyber risk*, Milliman, https://www.milliman.com/en/risk/cyber-risk (last accessed Nov. 27, 2024).
[100] Milliman, Inc., "CRisALIS for cyber" (video), https://www.milliman.com/en/products/complexriskanalysis (last accessed Aug. 9, 2023).
[101] *Complex Risk - Milliman Complex Risk Analysis (CRisALIS)*, Milliman, https://www.milliman.com/en/products/complexriskanalysis (last accessed Nov. 24, 2024).

285. TruStage's website repeatedly states that it is aware of data privacy risks and has adequate procedures in place to prevent them, including its statements that:

> "Our policies and procedures are designed to protect personal information about you."[102]
>
> "We maintain physical, technological and administrative safeguards to protect your personal information and prevent unauthorized or accidental use, access, or loss. We limit access to personal information about you to those who have a business need for such access. Individuals who process personal information on our Business Partner's behalf generally may do so only in an authorized manner and are required to keep your information confidential . . . . We limit access to our premises and to our computer networks and take steps to safeguard against unauthorized access to such premises and networks. We have procedures in place to manage any suspected data security incident and will notify you consistent with applicable legal requirements."[103]

286. Additionally, MLIC's website also repeatedly states that it is keenly cognizant of data privacy risks and has adequate procedures and processes in place to prevent them, including its statements that:

> "We are working with some of the industry's best minds to deploy sophisticated technology such as machine learning, building rapid response solutions that help identify tomorrow's threats, and implementing new approaches to managing risk that actually help people work more efficiently."[104]
>
> "Any organization that deals with sensitive data faces increasing challenges in keeping that data safe. From guarding against sophisticated cyber criminals to preventing accidental data loss, staying safe means keeping one step ahead."[105]
>
> "It is essential for any business to rethink how to best model its cyber risk, with the goal of illuminating blind spots instead of missing them."[106]

---

[102] *Privacy Policy*, TruStage, https://www.trustage.com/legal/privacy (last accessed Jan. 29, 2026).
[103] *Id.*
[104] *Cyber risk – Growing threats demand a smart response*, Milliman, https://www.milliman.com/en/insurance/cyber (last accessed Nov. 27, 2024).
[105] *Cyber risk – Growing threats demand a smart response*, Milliman, https://us.milliman.com/en/risk/cyber (last accessed Nov. 27, 2024).
[106] Chris Harner, et al., *Know your cyber blind spots: The importance of modeling cyber risk for businesses* (March 19, 2021), https://www.milliman.com/en/insight/Know-your-cyber-blind-spots.

> "[C]yber risk needs to be analyzed in a way that allows companies to examine the appropriate controls and mitigation techniques, and how causal-based models are a proven way to account for the decisions of both the company and the attacker."[107]
>
> "From guarding against sophisticated cyber criminals to preventing accidental data loss, staying safe means keeping one step ahead."[108]
>
> "Cyber risk is evolving fast. You've got to evolve faster."[109]

287. MLIC and Defendant TruStage provided Plaintiffs' and Class members' PII to the Milliman Defendants, which then provided that PII to PBI by uploading files containing that data to PBI's MOVEit Transfer server via PBI's "MOVEit administrative portal software."[110]

**G. Defendant TIAA Kaspick and TIAA knew it had duties to protect the Plaintiffs' and Class members' PII, and assured them that it would.**

288. In the ordinary course of its business, TIAA and TIAA Kaspick collect sensitive PII from consumers, including: names, gender, dates of birth, Social Security numbers, and addresses.

289. In the course of collecting PII from clients, TIAA and TIAA Kaspick promise to provide confidentiality and adequate security for client data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

290. TIAA Kaspick's Privacy Policy states:

> "We want you to know that we understand the privacy and security concerns associated with providing and maintaining private financial and other private personal data online."[111]

---

[107] Chris Beck, et al., *Does it ever make sense for firms to pay ransomware criminals?* (July 21, 2021), https://www.milliman.com/en/insight/does-it-ever-make-sense-for-firms-to-pay-ransomware-criminals.
[108] *Cyber risk – Growing threats demand a smart response*, Milliman, https://us.milliman.com/en/risk/cyber (last accessed Nov. 27, 2024).
[109] *Cyber risk – Growing threats demand a smart response*, Milliman, https://www.milliman.com/en/insurance/cyber (last accessed Nov. 27, 2024).
[110] PBI, *Global MOVEit Transfer Cyberattack*, https://www.pbinfo.com/faq-communication/ (last accessed Oct. 21, 2024).
[111] *Online Privacy Policy*, TIAA, https://www.kaspick.com/Privacy_Policy (last accessed Jan. 29, 2026).

291. TIAA's Privacy Notice provides that:

> TIAA protects the personal information you provide against unauthorized access, disclosure, alteration, destruction, loss, or misuse. Your personal information is protected by physical, electronic, and procedural safeguards in accordance with federal and state standards. These safeguards include appropriate procedures for access and use of electronic data, provisions for the secure transmission of sensitive personal information on our website, and telephone system authentication procedures. Additionally, we limit access to your personal information to those TIAA employees and agents who need access in order to offer and provide products or services to you. We also require our service providers to protect your personal information by utilizing the privacy and security safeguards required by law.[112]

292. Defendant TIAA Kaspick and TIAA provided Plaintiffs' and Class members' PII to PBI by uploading files containing that data to PBI's MOVEit Transfer server via PBI's "MOVEit administrative portal software."[113]

**H. Contrary to their statements touting their data security, Defendants failed to safeguard Plaintiffs' and Class members' PII.**

293. Contrary to their statements alleged above—touting the security of their systems and promising to safeguard sensitive information in their possession and/or control—Defendants failed to adequately secure and safeguard Plaintiffs' and Class members' PII and, instead, allowed it to be compromised in the Data Breach.

294. Specifically, PBI-Contracting Defendants (directly, in the case of Genworth Defendants, Milliman Defendants, and TIAA Kaspick, or indirectly through Milliman Inc. in the case of MLIC and Defendant TruStage) sent Plaintiffs' and Class members' sensitive PII to PBI without assuring that it would remain safe, which was inconsistent with their statements to the public that it would. As evidenced by the occurrence of the Data Breach, Plaintiffs' and Class

---

[112] *TIAA privacy notice*, TIAA, https://www.tiaa.org/public/support/privacy/privacy-notice (last updated Jan. 2024).
[113] PBI, *Global MOVEit Transfer Cyberattack*, https://www.pbinfo.com/faq-communication/ (last accessed Oct. 21, 2024).

members' sensitive PII was subsequently to PBI's MOVEit servers either when PBI-Contracting Defendants directly or indirectly sent the PII to PBI, or thereafter. PBI lacked adequate processes and policies to safeguard the PII in its possession—which had been provided by PBI-Contracting Defendants. All Defendants knew or should have known that Plaintiffs' and Class members' PII was being stored on PBI's MOVEit servers and that those servers were vulnerable to cyberattack and likely to be compromised.

### I. PBI, Longevity, and TwentyFirst Failed to Secure Plaintiffs' and Class members' PII and, instead, allowed it to be compromised in the Data Breach.

295. Because of the large volume of sensitive data they collect, store, and maintain on behalf of business clients, PBI, Longevity, and TwentyFirst are "a prime target for a group like the Cl0p ransomware gang."[114]

296. PBI "became aware of the MOVEit [Data Breach] on June 2, 2023[,]"[115] after Progress "publicly disclosed zero-day vulnerabilities that impacted its MOVEit Transfer software."[116]

297. PBI "launched an investigation, with the assistance of third-party cybersecurity specialists, to determine the potential impact of the vulnerabilities' presence on its MOVEit Transfer servers and on the data housed on the servers."[117]

---

[114] *What happened in the PBI data breach?*, Cloaked (June 20, 2024), https://www.cloaked.com/post/pbi-data-breach.
[115] PBI, *Global MOVEit Transfer Cyberattack*, https://www.pbinfo.com/faq-communication/ (last accessed Oct. 21, 2024).
[116] *Data Breach Notifications – Pension Benefit Information, LLC*, Office of the Maine Attorney General (July 11, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/14efac97-4a7c-4322-98eb-2e953884eb58/f135d329-507c-484c-9798-b46d470c5d96/Notice%20of%20Data%20Event%20-%20PBI%20-%20ME.pdf.
[117] *Data Breach Notifications – Pension Benefit Information, LLC*, Office of the Maine Attorney General (July 11, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-

298. PBI's "investigation determined that a threat actor exploiting a zero-day vulnerability, accessed one of PBI's MOVEit Transfer servers on May 29th, 2023, and May 30th, 2023, and exfiltrated certain data from that MOVEit Transfer server during that time. PBI subsequently undertook a time-consuming and detailed review of the data stored on the server at the time of the event to understand the contents of that data and to which business clients that data relates."[118]

299. PBI determined that the Data Breach "impact[ed] a small percentage of [its] clients who use the MOVEit administrative portal software resulting in access to private records."[119]

300. According to PBI, Cl0p "did not gain access to PBI's other systems – access was only gained to the MOVEit administrative portal subject to the vulnerability."[120]

301. PBI maintains that the Data Breach did not result in "access to PBI's core systems or software[,]"[121] and only affected PBI clients whose data was transferred using PBI's MOVEit Transfer administrative portal.[122]

---

a1252b4f8318/14efac97-4a7c-4322-98eb-2e953884eb58/f135d329-507c-484c-9798-b46d470c5d96/Notice%20of%20Data%20Event%20-%20PBI%20-%20ME.pdf.

[118] *Data Breach Notifications – Pension Benefit Information, LLC*, Office of the Maine Attorney General (July 11, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/14efac97-4a7c-4322-98eb-2e953884eb58/f135d329-507c-484c-9798-b46d470c5d96/Notice%20of%20Data%20Event%20-%20PBI%20-%20ME.pdf.

[119] PBI, *Global MOVEit Transfer Cyberattack*, https://www.pbinfo.com/faq-communication/ (last accessed Oct. 21, 2024).

[120] Bill Toulas, *MOVEit breach impacts Genworth, CalPERS as data for 3.2 million exposed*, BleepingComputer (updated June 24, 2023), https://www.bleepingcomputer.com/news/security/moveit-breach-impacts-genworth-calpers-as-data-for-32-million-exposed/.

[121] PBI, *Global MOVEit Transfer Cyberattack*, https://www.pbinfo.com/faq-communication/ (last accessed Oct. 21, 2024).

[122] *What happened in the PBI data breach?*, Cloaked (June 20, 2024), https://www.cloaked.com/post/pbi-data-breach.

302. The PBI MOVEit Transfer server that was targeted in the Data Breach was located within PBI's network environment and stored PII provided to PBI by the Defendants, including the PII of the Plaintiffs and Class members.

303. PBI claims that it "promptly patched its instance of MOVEit, assembled a team of cybersecurity and privacy specialists, notified federal law enforcement, and contacted impacted clients."[123]

304. On or about June 4, 2023, "PBI began to provide notice of [the Data Breach] to potentially affected business clients with an offer to provide notification services to potentially impacted individuals on their behalf and at their direction."[124]

305. PBI "conducted a manual review of [its] records to confirm the identities of individuals potentially affected by [the Data Breach] and their contact information to provide notifications."[125]

306. In notice letters sent to individual consumers on behalf of PBI's business clients, including the PBI-Contracting Defendants, PBI "encourage[d] [impacted individuals] to remain vigilant against incidents of identity theft and fraud by reviewing [their] account statements and monitoring [their] free credit reports for suspicious activity and to detect errors."[126]

---

[123] PBI, *Global MOVEit Transfer Cyberattack*, https://www.pbinfo.com/faq-communication/ (last accessed Oct. 21, 2024).
[124] *Data Breach Notifications – Pension Benefit Information, LLC*, Office of the Maine Attorney General (July 11, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/14efac97-4a7c-4322-98eb-2e953884eb58/f135d329-507c-484c-9798-b46d470c5d96/Notice%20of%20Data%20Event%20-%20PBI%20-%20ME.pdf.
[125] *Data Breach Notifications – Pension Benefit Information, LLC*, Office of the Maine Attorney General (July 11, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/14efac97-4a7c-4322-98eb-2e953884eb58/f135d329-507c-484c-9798-b46d470c5d96/Notice%20of%20Data%20Event%20-%20PBI%20-%20ME.pdf.
[126] *Data Breach Notifications – Pension Benefit Information, LLC*, Office of the Maine Attorney General (July 11, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-

307. Following the Data Breach, PBI assured its business clients that they could "continue to safely do business with PBI," because "PBI systems were not impacted, outside of the isolated MOVEit Transfer server."[127] PBI also told its business clients: "If you are hesitant to use MOVEit software at this time, we have other data transfer options or layers of optional security that can be added to further secure your data."[128] Despite these assurances, some of PBI's business clients elected to stop transmitting their customers' PII to PBI via MOVEit.[129]

**J. Genworth Defendants Failed to Secure Plaintiffs' and Class members' Sensitive PII and, instead, allowed it to be compromised in the Data Breach.**

308. PBI waited until June 16, 2023—two weeks after it first learned of the Data Breach—to inform Genworth Defendants "that specific Genworth files containing policyholder and agent information were compromised [in the Data Breach]."[130]

---

a1252b4f8318/14efac97-4a7c-4322-98eb-2e953884eb58/f135d329-507c-484c-9798-b46d470c5d96/Notice%20of%20Data%20Event%20-%20PBI%20-%20ME.pdf.

[127] PBI, *Global MOVEit Transfer Cyberattack*, https://www.pbinfo.com/faq-communication/ (last accessed Oct. 21, 2024).

[128] PBI, *Global MOVEit Transfer Cyberattack*, https://www.pbinfo.com/faq-communication/ (last accessed Oct. 21, 2024).

[129] *See, e.g.*, *PBI Data Security Incident*, Tennessee Consolidated Retirement System (July 10, 2023), https://treasury.tn.gov/Portals/0/Documents/Retirement/PBIIncidentFAQ.pdf ("[The Tennessee Consolidated Retirement System ('TCRS')] uses PBI to help identify member deaths and prevent overpayments. [ . . . ]. MOVEit Transfer is a managed file transfer software, utilized by PBI to receive data from companies like TCRS. [ . . . ]. TCRS has not transmitted any information via MOVEit since May 2023."); *Letter to the Office of the Maine Attorney General*, Milliman (August 14, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/903ecb46-93b2-4986-aae5-ec7e088625f8/31ce7f5a-a49a-48eb-a52b-33dd1d68bc1a/23.08.14%20ME%20AG%20Notification%20Letter.pdf ("Milliman has stopped transferring data to PBI pending further evaluation of PBI's information security practices.").

[130] *MOVEit Security Event*, Genworth (last updated Aug. 31, 2023), https://www.genworth.com/moveit#backgroundinfo.

309. Genworth Defendants waited over two weeks before they informed impacted individuals—such as Plaintiffs and Class members—that their sensitive PII was involved in the Data Breach.[131]

310. Genworth Defendants reported that "the personal information of a significant number of insurance policyholders or other customers of its life insurance businesses was unlawfully accessed [in the Data Breach][.]"[132]

311. Genworth Defendants' investigation subsequently confirmed that the PII of approximately 2.5 to 2.7 million customers and insurance agents was accessed and acquired by Cl0p in the Data Breach.[133]

312. Genworth Defendants' customers and insurance agents whose PII was exposed in the Data Breach were sent written data breach notice letters from both PBI and Genworth Defendants.[134] The PBI letters offered impacted individuals 24 months of free credit monitoring and identity restoration services.[135]

---

[131] *MOVEit Security Event*, https://www.genworth.com/moveit (Aug. 9, 2023 update).
[132] Genworth Financial, Inc. SEC Current Report (Form 8-K) (June 16, 2023), https://www.sec.gov/Archives/edgar/data/1276520/000119312523172549/d463993d8k.htm.
[133] *MOVEit Security Event – Who Was Affected*, Genworth (last updated Aug. 31, 2023), https://www.genworth.com/moveit#whoaffected (confirming that the PII of "a very significant portion of [Genworth's] customers across long-term care insurance, life insurance, and annuities" was exposed in the Data Breach); *see also* Bill Toulas, *MOVEit breach impacts Genworth, CalPERS as data for 3.2 million exposed*, BleepingComputer (June 23, 2023), https://www.bleepingcomputer.com/news/security/moveit-breach-impacts-genworth-calpers-as-data-for-32-million-exposed/; Zach Simas, *Unpacking the MOVEit Breach: Statistics and Analysis*, Emsisoft (last updated June 28, 2024), https://www.emsisoft.com/en/blog/44123/unpacking-the-moveit-breach-statistics-and-analysis/.
[134] *MOVEit Security Event – Background Information*, Genworth (last updated Aug. 31, 2023), https://www.genworth.com/moveit#backgroundinfo.
[135] *MOVEit Security Event – Background Information*, Genworth (last updated Aug. 31, 2023), https://www.genworth.com/moveit#backgroundinfo; *see also Template Letter for Impacted Living Massachusetts Residents*, PBI, https://a-us.storyblok.com/f/1008916/b7006ed03d/pbi-consumer-notice-ma.pdf (last accessed Oct. 26, 2024); *Template Letter for All States Except for*

313. According to Genworth Defendants, "PBI [] mail[ed] notification letters [to impacted Genworth customers and insurance agents] in batches through the month of August [2023][.]"[136]

314. For Genworth Defendants' customers, the PII compromised in the Data Breach includes: full names, dates of birth, Social Security numbers, states of residence, zip codes, policy numbers, the role of the individual (e.g., Annuitant, Joint Insured, Owner, etc.), and general product type. If deceased, the exposed PII also includes the city and date of death, along with the source of that information.[137]

315. For Genworth Defendants' insurance agents, the PII compromised in the Data Breach includes: full names, dates of birth, Social Security numbers, full addresses, and preferred full addresses. If deceased, the exposed PII also includes date of death and the source of that information.[138]

316. Genworth Defendants warned customers that the PII of their deceased family members who "had a policy/contract with Genworth, but passed away recently . . . may [also] have been affected by the [Data Breach]."[139] Genworth Defendants urged those customers to review

---

*Massachusetts for Impacted Living Individuals*, PBI, https://a-us.storyblok.com/f/1008916/4f74990acf/pbi-consumer-notice.pdf (last accessed Oct. 26, 2024).

[136] *MOVEit Security Event – Background Information*, Genworth (last updated Aug. 31, 2023), https://www.genworth.com/moveit#backgroundinfo.

[137] *MOVEit Security Event – Who Was Affected*, Genworth (last updated Aug. 31, 2023), https://www.genworth.com/moveit#whoaffected.

[138] *MOVEit Security Event – Who Was Affected*, Genworth (last updated Aug. 31, 2023), https://www.genworth.com/moveit#whoaffected.

[139] *MOVEit Security Event – Who Was Affected*, Genworth (last updated Aug. 31, 2023), https://www.genworth.com/moveit#whoaffected.

information contained in PBI's data breach notice letters "to protect the estate of your family member from identity fraud."[140]

317. Following the Data Breach, Genworth Defendants assured customers that Genworth Defendants had "implemented technical, physical, and process safeguards to maintain the confidentiality of [its] customer information. Further, [Genworth] require[s] third parties that receive and store the personal information of our customers to take similar steps, and [] work[s] to understand the measures they have taken."[141] Genworth Defendants further promised to "focus on and seek opportunities to improve how third parties protect the data of [its] customers."[142]

318. Genworth Defendants maintain that "none of its information systems or business operations were impacted as a result of [the Data Breach]."[143]

**K. Defendant TruStage, Milliman Inc., and MLIC Failed to Secure Plaintiffs' and Class members' Sensitive PII and, instead, allowed it to be compromised in the Data Breach.**

---

[140] *MOVEit Security Event – Who Was Affected*, Genworth (last updated Aug. 31, 2023), https://www.genworth.com/moveit#whoaffected; *see also Template Letter for Impacted Deceased Massachusetts Residents*, PBI, https://a-us.storyblok.com/f/1008916/af4e6e8c42/pbi-consumer-notice-ma-deceased.pdf (last accessed Oct. 26, 2024); *Template Letter for All States Except for Massachusetts for Impacted Deceased Individuals*, PBI, https://a-us.storyblok.com/f/1008916/746b913da7/pbi-consumer-notice-deceased.pdf (last accessed Oct. 26, 2024).
[141] *MOVEit Security Event – Background Information*, Genworth (last updated Aug. 31, 2023), https://www.genworth.com/moveit#backgroundinfo.
[142] MOVEit Security Event – Background Information, Genworth (last updated Aug. 31, 2023), https://www.genworth.com/moveit#backgroundinfo.
[143] *MOVEit Security Event – Background Information*, Genworth (last updated Aug. 31, 2023), https://www.genworth.com/moveit#backgroundinfo ("Genworth does not use the MOVEit (or similarly impacted GoAnywhere) software applications *on any company system*.") (emphasis added).

319. PBI waited until June 16, 2023—two weeks after it first learned of the Data Breach—to inform Milliman Defendants "that PBI experienced a data security incident affecting the data of [Milliman's] clients."[144]

320. Milliman Inc. reported to the Maine Attorney General as follows:

> Milliman Solutions provides risk assessment services to clients including life insurance companies. As part of those services, Milliman Solutions utilizes a third-party vendor, Pension Benefit Information, LLC ("PBI"), to conduct research on whether consumers have passed away. For that purpose, Milliman Solutions transferred data regarding its clients' consumers to PBI utilizing a secure and encrypted file transfer protocol. PBI recently notified Milliman Solutions that PBI experienced a data security incident affecting the data of Milliman Solutions' clients. Specifically, PBI disclosed that it utilized the "MOVEit Transfer" software provided by Progress Software Corporation ("Progress Software") for PBI's secure file transfer protocol ("SFTP") servers. PBI also indicated that it stored Milliman Solutions' clients' data on PBI's SFTP servers utilizing the MOVEit Transfer software.
>
> * * *
>
> PBI explained it [ ] conducted a manual review of its data to confirm the identities of individuals potentially affected by this event. PBI completed that review on June 16, 2023, and confirmed to Milliman Solutions at that time that the personal information of certain consumers of Milliman Solutions' clients were affected and Milliman Solutions, following reconciliation of the data, was able to recently inform its clients of the scope of individuals whose information may have been affected. The Milliman Solutions clients whose consumer data was affected by the incident include [MLIC] [145]

321. Although PBI's "manual review of its data to confirm the identities of individuals potentially affected" and Milliman Inc.'s subsequent "reconciliation of the data" was reportedly

---

[144] *Data Breach Notifications – Milliman Solutions LLC*, Office of the Maine Attorney General (July 17, 2023), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/a98d9ae9-b898-4aaa-8dde-de04551aaedb.shtml; *see also* Milliman, *Data Breach Notice* (July 17, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/a98d9ae9-b898-4aaa-8dde-de04551aaedb/af45f431-a61c-4c76-9d70-f31ab3236aa7/PBI%20-%20Sample%20Notification%20Letter.pdf.

[145] *Data Breach Notifications – Milliman Solutions LLC*, Office of the Maine Attorney General (June 16, 2023), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/a98d9ae9-b898-4aaa-8dde-de04551aaedb.shtml.

completed on June 16, 2023,[146] PBI and Milliman Defendants waited another month to begin notifying individual consumers of the Data Breach on July 17, 2023.[147]

322. Milliman Inc.'s submission to the Maine Attorney General explains that they possessed PII of Plaintiffs and Class members provided by Defendant TruStage and MLIC to Milliman Defendants, and transferred that PII to PBI, which was then subject to (and compromised in) the Data Breach.

323. Milliman, Inc. provided additional updates to the Office of the Maine Attorney General on August 14, 2023[148] and January 12, 2024.[149]

324. According to Milliman Inc.'s August 14, 2023 letter to the Office of the Maine Attorney General, PBI completed an additional "review on July 21, 2023, and confirmed to Milliman at that time that the personal information of certain [additional] consumers of Milliman's clients were affected and Milliman, following reconciliation of the data, was able to recently inform its clients of the scope of individuals whose information may have been affected."[150]

---

[146] *Data Breach Notifications – Milliman Solutions LLC*, Office of the Maine Attorney General (June 16, 2023), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/a98d9ae9-b898-4aaa-8dde-de04551aaedb.shtml.
[147] *See Data Breach Notifications – Milliman Solutions LLC*, Office of the Maine Attorney General (June 16, 2023), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/a98d9ae9-b898-4aaa-8dde-de04551aaedb.shtml (noting "Date(s) of consumer notification: **Starting 07/17/2023**) (emphasis in original); *see also PBI Sample Notification Letter*, Milliman (July 17, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/a98d9ae9-b898-4aaa-8dde-de04551aaedb/af45f431-a61c-4c76-9d70-f31ab3236aa7/PBI%20-%20Sample%20Notification%20Letter.pdf.
[148] *Data Breach Notifications – Milliman Solutions LLC*, Office of the Maine Attorney General (August 14, 2023), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/903ecb46-93b2-4986-aae5-ec7e088625f8.shtml.
[149] *Data Breach Notifications – Milliman Solutions LLC*, Office of the Maine Attorney General, (January 12, 2024), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/05d64329-7db7-4ece-baaa-3f98583b4eb6.shtml.
[150] *Letter to the Office of the Maine Attorney General*, Milliman (August 14, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/903ecb46-

325. In the same August 14, 2023 letter, Milliman Inc. reported that:

> PBI has advised [Milliman] that it immediately took steps to patch the vulnerability in its MOVEit Transfer software, and PBI is reviewing and enhancing its information security policies and procedures.
>
> Milliman has stopped transferring data to PBI pending further evaluation of PBI's information security practices. Milliman is also evaluating potential vendor management and security enhancements."[151]

326. According to Milliman Inc.'s January 12, 2024 letter to the Office of the Maine Attorney General, "[s]ince [its] initial August 14, 2023 notice, Milliman further assessed PBI's notification and, as a result, issued additional notifications, including for deceased individuals[.]"[152]

327. Milliman Defendants' clients' customers whose PII was exposed in the Data Breach—including, but not limited to, TruStage's and MLIC's customers—were sent written data

93b2-4986-aae5-ec7e088625f8/31ce7f5a-a49a-48eb-a52b-33dd1d68bc1a/23.08.14%20ME%20AG%20Notification%20Letter.pdf.

[151] *Letter to the Office of the Maine Attorney General*, Milliman (August 14, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/903ecb46-93b2-4986-aae5-ec7e088625f8/31ce7f5a-a49a-48eb-a52b-33dd1d68bc1a/23.08.14%20ME%20AG%20Notification%20Letter.pdf.

[152] *Data Breach Notifications – Milliman Solutions LLC*, Office of the Maine Attorney General (January 12, 2024), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/05d64329-7db7-4ece-baaa-3f98583b4eb6.shtml; *see also Letter to the Office of the Maine Attorney General*, Milliman (January 12, 2024), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/05d64329-7db7-4ece-baaa-3f98583b4eb6/b0258551-c4d0-4e10-9938-b3c24dccec18/24.01.12%20Notification%20Letter.pdf.

breach notice letters from PBI.[153] The PBI letters offered impacted individuals 12 or 24 months of free credit monitoring and identity restoration services.[154]

328. For Milliman Defendants' clients' customers, the PII compromised in the Data Breach includes: names, Social Security numbers, dates of birth, and mailing addresses.[155]

329. At least 1.3 million Milliman Defendants' clients' customers were impacted in the Data Breach.[156]

**L. Defendant TIAA Kaspick and TIAA Failed to Secure Plaintiffs' and Class members' Sensitive PII and, instead, allowed it to be compromised in the Data Breach.**

---

[153] *See, e.g.*, *PBI Sample Notification Letter*, Milliman (July 17, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/a98d9ae9-b898-4aaa-8dde-de04551aaedb/af45f431-a61c-4c76-9d70-f31ab3236aa7/PBI%20-%20Sample%20Notification%20Letter.pdf.; *Letter to the Office of the Maine Attorney General*, Milliman (August 14, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/903ecb46-93b2-4986-aae5-ec7e088625f8/31ce7f5a-a49a-48eb-a52b-33dd1d68bc1a/23.08.14%20ME%20AG%20Notification%20Letter.pdf ("PBI is providing written notification to those individuals on behalf of Milliman and its clients identified herein, which includes an offer for 24 months of cost-free credit monitoring. This notification will be sent to the impacted Maine residents via regular mail starting on August 14, 2023.").

[154] *See Letter to the Office of the Maine Attorney General*, Milliman (August 14, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/903ecb46-93b2-4986-aae5-ec7e088625f8/31ce7f5a-a49a-48eb-a52b-33dd1d68bc1a/23.08.14%20ME%20AG%20Notification%20Letter.pdf.

[155] *See Letter to the Office of the Maine Attorney General*, Milliman (August 14, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/903ecb46-93b2-4986-aae5-ec7e088625f8/31ce7f5a-a49a-48eb-a52b-33dd1d68bc1a/23.08.14%20ME%20AG%20Notification%20Letter.pdf.

[156] Zach Simas, *Unpacking the MOVEit Breach: Statistics and Analysis*, Emsisoft (last updated June 28, 2024), https://www.emsisoft.com/en/blog/44123/unpacking-the-moveit-breach-statistics-and-analysis/.

330. PBI waited until June 19, 2023—more than two weeks after it first learned of the Data Breach—to confirm "that certain named TIAA files had been exfiltrated"[157] from PBI's MOVEit Transfer server in the Data Breach.

331. TIAA reported to the Maine Attorney General as follows:

> TIAA utilizes Pension Benefit Information, LLC ("PBI") to assist with death claim and beneficiary processes. On June 9, 2023, TIAA learned from PBI that it was investigating whether PBI was impacted by the MOVEit Transfer software vulnerability announced by its owner, Progress Software, that could have exposed data to an unauthorized third-party. TIAA worked with PBI to promptly investigate the nature and scope of the event on TIAA participants. On June 19, 2023, PBI confirmed that there were indications that certain named TIAA files had been exfiltrated. TIAA then reconciled such files against [its] records and finished the analysis to determine which participants were impacted by the event; this analysis concluded on June 28, 2023.[158]

332. According to TIAA, PBI did not begin sending data breach notice letters to affected TIAA participants until July 14, 2023, and the letters were sent "on a rolling basis over the [following] three weeks[.]"[159]

333. TIAA's participants whose PII was exposed in the Data Breach were sent written data breach notice letters from PBI.[160] The PBI letters offered impacted individuals 24 months of

---

[157] *Notice of Data Security Incident*, TIAA (July 21, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/ed67df63-aced-4ecb-91ce-602c7e34c83a/573351f0-74fc-4e19-9a62-a51fb837a3bb/Regulator%20Notice%20-%20TIAA%20ME%20AG.pdf.

[158] *Notice of Data Security Incident*, TIAA (July 21, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/ed67df63-aced-4ecb-91ce-602c7e34c83a/573351f0-74fc-4e19-9a62-a51fb837a3bb/Regulator%20Notice%20-%20TIAA%20ME%20AG.pdf.

[159] *Notice of Data Security Incident*, TIAA (July 21, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/ed67df63-aced-4ecb-91ce-602c7e34c83a/573351f0-74fc-4e19-9a62-a51fb837a3bb/Regulator%20Notice%20-%20TIAA%20ME%20AG.pdf.

[160] *Notice of Data Security Incident*, TIAA (July 21, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/ed67df63-aced-4ecb-91ce-602c7e34c83a/573351f0-74fc-4e19-9a62-a51fb837a3bb/Regulator%20Notice%20-%20TIAA%20ME%20AG.pdf ("PBI also agreed to notify TIAA affected individuals through its vendor, Kroll, identifying itself as a TIAA vendor.").

free credit monitoring, fraud consulting and identity restoration services.[161]

334. For TIAA participants, the PII compromised in the Data Breach includes: names, Social Security numbers, dates of birth, addresses, and gender."[162]

335. More than 2.6 million TIAA participants were affected by the Data Breach.[163]

**M. Defendants Knew the Risks of Data Breaches and Had Duties to Plaintiffs' and Class members' PII, but Failed to do so.**

**1. Defendants knew they needed to protect the Plaintiffs' highly sensitive PII.**

336. Defendants were at all times fully aware of their obligations to protect the PII of their customers and policyholders, including the Plaintiffs and Class members.

337. Longevity, TwentyFirst, and PBI were at all times fully aware of their obligations to protect the highly sensitive consumer data that was entrusted to them by the PBI-Contracting Defendants.

338. Defendants were also aware of the significant repercussions that would result from their failure to protect the highly sensitive consumer data entrusted to them.

339. By obtaining, collecting, using, and deriving a benefit from the Plaintiffs' and Class members' PII, Defendants assumed legal and equitable duties and knew or should have known

---

[161] *Notice of Data Security Incident*, TIAA (July 21, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/ed67df63-aced-4ecb-91ce-602c7e34c83a/573351f0-74fc-4e19-9a62-a51fb837a3bb/Regulator%20Notice%20-%20TIAA%20ME%20AG.pdf.

[162] *Notice of Data Security Incident*, TIAA (July 21, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/ed67df63-aced-4ecb-91ce-602c7e34c83a/573351f0-74fc-4e19-9a62-a51fb837a3bb/Regulator%20Notice%20-%20TIAA%20ME%20AG.pdf.

[163] *Teachers Insurance and Annuity Association of America notifying 2,630,717 after PBI alerts them to MOVEit breach*, Dissent (July 22, 2023), https://databreaches.net/2023/07/22/teachers-insurance-and-annuity-association-of-america-notifying-2630717-after-pbi-alerts-them-to-moveit-breach/.

they were responsible for protecting the Plaintiffs' and Class members' PII from unauthorized access and disclosure.

340. As a regular and necessary part of their businesses, PBI-Contracting Defendants solicit and collect the highly sensitive PII of their customers and/or policyholders, such as Plaintiffs and Class mmbers.

341. Due to the nature of Defendants' businesses, they would be unable to engage in their regular business activities without collecting and aggregating PII they know and understand to be sensitive and confidential, such as Plaintiffs' and Class members' PII.

342. The Plaintiffs and Class members relied on the Defendants to implement and maintain adequate data security policies and protocols (including vetting, auditing, and monitoring vendors and software companies on which they relied) to keep their PII confidential and securely maintained, to use such PII (if at all) solely for business purposes, and to prevent unauthorized access and disclosure of their PII to unauthorized persons.

343. The Plaintiffs and Class members reasonably expected the Defendants would safeguard their highly sensitive information and keep that PII confidential.

***2.*** **Defendants knew the risks of transferring and storing sensitive information, including the risk of data breaches.**

344. Because of the highly sensitive and personal nature of the information Defendants transfer, solicit, acquire, store, and/or maintain with respect to customers, policyholders and/or users (referred to collectively herein as "consumers") and other individuals, Defendants promise to, among other things: keep PII private; comply with industry standards related to data security and PII, including FTC guidelines; inform consumers of their legal duties and comply with all federal and state laws protecting consumer PII; only use and release PII for reasons that relate to

the products and services the Plaintiffs and Class members obtain from the Defendants; and provide adequate notice to individuals if their PII is disclosed without authorization.

345. As sophisticated business entities handling highly sensitive and confidential consumer data, Defendants' data security obligations were particularly important, especially in light of the substantial increase in cyberattacks and data breaches in industries handling significant amounts of PII preceding the date of the Data Breach.

346. At all relevant times, Defendants knew or should have known that the Plaintiffs' and Class members' PII was a target for malicious actors. Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect the Plaintiffs' and Class members' PII from cyberattacks, including, but not limited to, adequately vetting, auditing, monitoring, testing, and patching the software applications they used to store, transfer, and/or otherwise control such PII.

347. Defendants also knew, or should have known, that the Plaintiffs' and Class members' PII was a target for malicious actors such as C10p.

348. Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect the Plaintiffs' and Class members' PII from cyberattacks, including, but not limited to, adequately vetting, auditing, and monitoring the third-party vendors they used to validate, update, store, and transfer such data (including PBI itself), and adequately vetting, auditing, and monitoring the software applications they used to transfer and receive such data.

349. In light of recent high profile data breaches—including breaches arising from previously exploited vulnerabilities in other file transfer applications (e.g., Accellion FTA, Fortra

GoAnywhere MFT)— Defendants knew or should have known that their electronic records and consumers' PII would be targeted by cybercriminals and ransomware attack groups.

350. Indeed, Defendants knew or should have known that "[t]hird-party software security risks are on the rise, and so are the significant cyber attacks they facilitate. According to a CrowdStrike report, 45% of surveyed organizations said they experienced at least on software supply chain attack in 2021."[164]

351. Cyberattacks and data breaches of financial services companies or companies storing financial data are also especially problematic because of the potentially permanent disruption they cause to the daily lives of their customers. Stories of identity theft and fraud abound, with hundreds of millions of dollars lost by everyday consumers every year as a result of internet-based identity theft attacks.[165]

352. The U.S. Government Accountability Office found that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[166]

353. As highly sophisticated parties that handle sensitive PII, Defendants failed to establish and/or implement appropriate administrative, technical and/or physical safeguards to ensure the security and confidentiality of the Plaintiffs' and Class members' PII.

354. The ramifications of Defendants' failures to keep the Plaintiffs' and Class members' PII secure are severe and long-lasting. To avoid detection, identity thieves often hold stolen data

---

[164] Edward Kost, *Third-Party Risk Management: How to Identify Vulnerable Third-Party Software (Quickly)*, UpGuard (last updated Sept. 4, 2023), https://www.upguard.com/blog/how-to-identify-vulnerable-third-party-software.

[165] Albert Khoury, *Scam alert: 5 most costly data breaches (plus 5 states most targeted)* (July 27, 2022), https://www.komando.com/security-privacy/most-costly-data-breaches/847800/.

[166] *See* U.S. Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, Report to Congressional Requesters (June 2007), https://www.gao.gov/assets/a262904.html.

for months or years before using it. Also, the sale of stolen information on the "dark web" may take months or more to reach end-users, in part because the data can be sold in small batches to multiple buyers as opposed to in bulk to a single buyer. Thus, the Plaintiffs and Class members must vigilantly monitor their financial accounts, and are at an increased risk of fraud and identity theft, for many years into the future.

355. Thus, Defendants knew, or should have known, the importance of safeguarding the PII entrusted to them and of the foreseeable consequences if their systems were breached. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring or from mitigating the consequences of the Data Breach.

**3. Longevity, TwentyFirst, and PBI had an obligation to carefully audit Progress's MOVEit Transfer software and cybersecurity practices.**

356. Longevity, TwentyFirst, and PBI knew, or should have known, the importance of safeguarding the PII entrusted to them by the PBI-Contracting Defendants (including Plaintiffs' and Class members' PII), and of the foreseeable consequences if such data were to be disclosed. These consequences include the significant costs that would be imposed on affected individuals as a result of a data breach. Longevity, TwentyFirst, and PBI therefore owed a duty to the Plaintiffs and Class members to implement and maintain reasonable and adequate data security measures to secure, protect, and safeguard the PII entrusted to them.

357. Longevity, TwentyFirst, and PBI should have used their resources to implement and maintain adequate data security procedures and practices.

358. At the time of the Data Breach, there were known and available steps Longevity, TwentyFirst, and PBI could have taken to prevent or mitigate the impact of the cyberattack. For example, PBI should have run a script that would scan for when files were done uploading on

PBI's "MOVEit administrative portal," and then moved those files off the MOVEit server and over to a storage location the MOVEit file transfer software could not access. "That way, if the file transfer application is ever compromised by a zero day that allows for arbitrary code execution that code can't access any data."[167]

359. Longevity, TwentyFirst, and PBI breached their duties to the Plaintiffs and Class members by, among other things, failing to employ adequate vendor screening and vetting, including of Progress and its MOVEit Transfer software.

360. Longevity, TwentyFirst, and PBI knew or should have known that Progress (a) employed poorly written, outdated, and insecure code in its MOVEit software; (b) failed to update outdated code; and (c) failed to check for known or newly discovered vulnerabilities.

361. Longevity, TwentyFirst, and PBI should have but did not vet Progress or its MOVEit Transfer software, and as a result, failed to prevent or detect the Data Breach.

362. Longevity, TwentyFirst, and PBI failed to ensure Progress employed and maintained adequate cybersecurity measures to prevent the Data Breach from occurring.

363. Longevity, TwentyFirst, and PBI also had obligations arising under the FTC Act, Gramm-Leach-Bliley Act, industry standards, common law, and its own promises and representations made to the PBI-Contracting Defendants, and to the Plaintiffs and Class members to keep their PII confidential and protected from unauthorized access and disclosure.

[167] Zach Simas, *Unpacking the MOVEit Breach: Statistics and Analysis*, Emsisoft (last updated June 28, 2024), https://www.emsisoft.com/en/blog/44123/unpacking-the-moveit-breach-statistics-and-analysis/.

**4. PBI-Contracting Defendants had obligations to carefully vet and audit their third-party vendors, including PBI.**

364. The PBI-Contracting Defendants knew, or should have known, the importance of safeguarding the PII entrusted to them by the Plaintiffs and Class members, and of the foreseeable consequences if such data were to be disclosed. These consequences include the significant costs that would be imposed on affected individuals as a result of a data breach.

365. PBI-Contracting Defendants therefore owed a duty to the Plaintiffs and Class members to implement and maintain reasonable and adequate data security measures to secure, protect, and safeguard the PII entrusted to them by the Plaintiffs and Class members.

366. PBI-Contracting Defendants should have used their resources to implement and maintain adequate data security procedures and practices.

367. PBI-Contracting Defendants breached their duties to the Plaintiffs and Class members by, among other things, failing to employ adequate screening and vetting of their third-party vendors, including PBI.

368. PBI-Contracting Defendants knew or should have known that Longevity, TwentyFirst, and PBI used Progress's MOVEit software to transfer and store their customers' and/or policyholders' PII.

369. PBI-Contracting Defendants breached their duties to the Plaintiffs and Class members by, among other things, failing to employ adequate screening and vetting of the software used by Longevity, TwentyFirst, and PBI to transfer and store their customers' and/or policyholders' PII.

370. PBI-Contracting Defendants knew or should have known that Progress: (a) employed poorly written, outdated, and insecure code in its MOVEit software; (b) failed to update outdated code; and (c) failed to check for known or newly discovered vulnerabilities.

371. Longevity, TwentyFirst, and PBI should have but did not vet Progress or its MOVEit Transfer software, and as a result, failed to prevent or detect the Data Breach. PBI-Contracting Defendants should have but did not vet Longevity, TwentyFirst, and PBI or the MOVEit Transfer software used by PBI to transfer and store their customers' and/or policyholders' PII. As a result, the PBI-Contracting Defendants failed to prevent or detect the Data Breach.

372. Longevity, TwentyFirst, and PBI failed to ensure Progress employed and maintained adequate cybersecurity measures to prevent the Data Breach from occurring. PBI-Contracting Defendants failed to ensure Longevity, TwentyFirst, and PBI employed and maintained adequate cybersecurity measures to prevent the Data Breach from occurring.

373. Longevity, TwentyFirst, and PBI had obligations arising under the FTC Act, industry standards, common law, and their own promises and representations made to the PBI-Contracting Defendants and to the Plaintiffs and Class members to keep their PII confidential and protected from unauthorized access and disclosure. PBI-Contracting Defendants also had obligations arising under the FTC Act, Gramm-Leach-Bliley Act, industry standards, common law, and their own promises and representations made to the Plaintiffs and Class members to keep their PII confidential and protected from unauthorized access and disclosure.

**N. Defendants could have prevented the Data Breach.**

374. Several best practices have been identified that, at a minimum, Defendants should have implemented as companies that handle highly sensitive and confidential PII in the regular

course of their business operations. Yet, Defendants failed to do so. These best practices include, but are not limited to:

a. educating all employees about data security practices and procedures;

b. requiring strong passwords;

c. implementing multi-layer security—including firewalls, anti-virus, and anti-malware software;

d. adequately securing encryption keys;

e. multi-factor authentication;

f. backup data; and

g. limiting which employees can access sensitive data.

375. Other standard cybersecurity practices that Defendants should have implemented, but failed to do so, include:

a. installing appropriate malware detection software;

b. monitoring and limiting the network ports;

c. protecting web browsers and email management systems;

d. setting up network systems such as firewalls, switches and routers;

e. monitoring and protection of physical security systems;

f. protection against any possible communication system; and

g. training staff regarding critical points.

376. By virtue of the fact that the Data Breach occurred and resulted in millions of individuals' PII being compromised thereby, Defendants failed to meet the foregoing minimum standards, and/or of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are

all established standards in reasonable cybersecurity readiness and should have been implemented and followed by the Defendants, yet they failed to do so.

377. These foregoing frameworks are existing and applicable industry standards, and Defendants failed to comply with these accepted standards, thereby opening the door to Cl0p and causing the Data Breach.

**1. Had Longevity, TwentyFirst, and PBI complied with applicable security standards, they would have determined that the MOVEit software was not safe to use and prevented the Data Breach**

378. Longevity, TwentyFirst, and PBI are responsible for protecting the PII they solicit and collect from attacks and breaches that result from weaknesses in third-party systems and software.

379. Longevity, TwentyFirst, and PBI failed to safeguard the Plaintiffs' and Class members' PII when they failed to adopt and enforce reasonable and available data security practices and procedures to prevent and/or mitigate the known risk of a cyberattack.

380. Prior to the Data Breach, Longevity, TwentyFirst, and PBI should have, but did not, implement and maintain reasonable and necessary data security policies and procedures, which would have mitigated or avoided the Data Breach.

381. There are numerous known and available steps that Longevity, TwentyFirst, and PBI could have taken to mitigate or even prevent the Data Breach.

382. Longevity, TwentyFirst, and PBI could have prevented or mitigated against the risk of the Data Breach through implementation of security-standard data management, software review, data mapping, risk management, employment of zero-trust policies, and diligence concerning Progress's software.

383. Data security practices that could and should have been implemented by PBI to prevent the MOVEit Data Breach include:

a. Auditing of third-party software, including the MOVEit Transfer software;

b. Vetting and periodic auditing of third-party vendors, including Progress;

c. Restricting MOVEit transfers to pre-approved IP addresses ("whitelisting");

d. Limiting the specific types of files that can be uploaded;

e. Conducting basic monitoring of web servers;

f. Using web application firewalls ("WAFs"); and

g. Employing supply chain security.

Each of the foregoing is explained in greater detail below.

**i. Auditing Third-Party Software.**

384. Security audits of third-party software enable companies to identify vulnerabilities, monitor access to sensitive data, and discover and remediate any unauthorized data access.[168] Here, had Longevity, TwentyFirst, and PBI conducted security auditing of the MOVEit Transfer software, they could have prevented the Data Breach. The methods for conducting security audits of third-party software are well-known and widely available.[169] Security audits can detect security vulnerabilities, including SQL injection susceptibility. Longevity, TwentyFirst, and PBI therefore could and should have employed companies that conduct security audits of third-party software.[170]

**ii. Vetting Vendors.**

---

[168] *6 Security Tips for Third Party* Software, Cybersecurity Insiders, https://www.cybersecurity-insiders.com/6-security-tips-for-third-party-software/ (last visited May 20, 2024).
[169] Edward Kost, *Third-Party Risk Management: How to Identify Vulnerable Third-Party Software (Quickly)*, UpGuard (updated Sept. 4, 2023), https://www.upguard.com/blog/how-to-identify-vulnerable-third-party-software.
[170] Davit Asatryan, *Third-Party Applications Audit: Complete Guide*, Spin.ai (Nov. 4, 2021, updated Apr. 19, 2024), https://spinbackup.com/blog/third-party-applications-audit/.

385. In addition to auditing third-party software, had Longevity, TwentyFirst, and PBI engaged in proper vetting and routine audits of vendors' data security practices, including vetting of Progress's cybersecurity practices, they could have prevented the Data Breach. Vendor risk assessments or security questionnaires are "one of the best methods for extracting deep cybersecurity insights about any aspects of a vendor's attack surface."[171] Industry-standard risk assessments and security questionnaires designed to help companies discover vulnerabilities in third-party web applications and software are widely available,[172] and can be used to assess the security of third-party software against common attack vectors, including SQL injection susceptibility.[173]

**iii. Whitelisting.**

386. Had Longevity, TwentyFirst, and PBI restricted MOVEit transfers to pre-approved IP addresses—a cybersecurity practice referred to as "whitelisting"—they could also have prevented the Data Breach. A whitelist is an administrator-defined register of entities pre-approved for authorized access or to perform specific actions. Whitelisting enhances the security of a system or network by ensuring that only pre-approved users or devices have access to sensitive data or systems. Whitelisting thus denies access by default, providing authorization only to a vetted, pre-approved list of IP addresses, applications, email addresses, and/or users. PBI should have been

---

[171] Edward Kost, *Third-Party Risk Management: How to Identify Vulnerable Third-Party Software (Quickly)*, UpGuard (updated Sept. 4, 2023), https://www.upguard.com/blog/how-to-identify-vulnerable-third-party-software ("Risk assessments can either be framework-based to identify security control deficiencies against popular security standards or custom-designed for focused investigations about specific third-party risks.").
[172] Edward Kost, *Third-Party Risk Management: How to Identify Vulnerable Third-Party Software (Quickly)*, UpGuard (updated Sept. 4, 2023), https://www.upguard.com/blog/how-to-identify-vulnerable-third-party-software.
[173] Edward Kost, *Third-Party Risk Management: How to Identify Vulnerable Third-Party Software (Quickly)*, UpGuard (updated Sept. 4, 2023), https://www.upguard.com/blog/how-to-identify-vulnerable-third-party-software.

able to implement a whitelist, as there were a limited number of users who needed to upload files to its MOVEit server. Blacklisting, in contrast, requires that known threats be specifically identified and blocked, while everything else is permitted. In a situation involving exploitation of a Zero-Day vulnerability, like the one Cl0p exploited in the MOVEit Data Breach, whitelisting is the preferred method. NIST Special Publication 800-167: *Guide to Application Whitelisting* provides specific guidance to companies on how to implement whitelisting.[174]

**iv. Limiting Specific File Types.**

387. Had Longevity, TwentyFirst, and PBI limited the specific types of files that could be uploaded via FTP, they could also have prevented the Data Breach. After exploiting the MOVEit vulnerability via SQL injection, Cl0p uploaded the LEMURLOOT web shell, which masqueraded as a legitimate file[175] and allowed the threat actor to execute commands, download files, extract system settings, and create/insert/delete users.[176]

388. Proper data security dictates that only those files that are needed and expected to be uploaded should be allowed. This typically includes document file types such as .doc, .docx, .pdf, .xls, etc. Only web site administrators with whitelisted IP addresses should have been allowed

[174] U.S. Dept. of Commerce, NIST Special Publication 800-167, *Guide to Application Whitelisting*, (Oct. 2015), https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-167.pdf.

[175] Kunal Modasiya, *Progress MOVEit Transfer Vulnerability Being Actively Exploited*, Qualys Blog (last updated Aug. 7, 2023), https://blog.qualys.com/vulnerabilities-threat-research/2023/06/07/progress-moveit-transfer-vulnerability-being-actively-exploited; *see also* Jonathan Reed, *The MOVEit breach impact and fallout: How can you respond?*, Security Intelligence (July 19, 2023), https://securityintelligence.com/news/the-moveit-breach-impact-and-fallout-how-can-you-respond/.

[176] U.S. Cybersecurity & Infrastructure Security Agency, Cybersecurity Advisory AA23-158A, *StopRansomware: CL0P Ransomware Gang Exploits CVE-2023-34362 MOVEit Vulnerability* (June 7, 2023), https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-158a.

to upload web page files, such as .aspx. Had PBI implemented that policy, the Data Breach could have been avoided.

**v. Adequate Logging, Monitoring, and Auditing.**

389. "Logging, monitoring, and auditing procedures help an organization prevent incidents and provide an effective response when they occur."[177] These tools can detect SQL injection attempts and prevent breaches like the Data Breach.

390. Forensic examinations of the Data Breach have confirmed that indicators of compromise were found in the logs of targeted organizations,[178] verifying that effective log monitoring would have mitigated or even prevented the Data Breach. Accordingly, Longevity, TwentyFirst, and PBI could and should have utilized commonly available tools that monitor logs automatically and provide alerts of unusual activity to administrators.

391. "Several different logs record details of activity on systems and networks. For example, firewall logs record details of all traffic that the firewall blocked. By monitoring these logs, it's possible to detect incidents. Some automated methods of log monitoring automatically detect potential incidents and report them right after they've occurred."[179]

392. Here, had Longevity, TwentyFirst, and PBI adequately logged and maintained log monitoring, it could have prevented the Data Breach because such logs would have shown clear indicators of compromise and/or malicious activity. SQL injection attempts, successful or not, will

---

[177] Mike Chapple, et al., (ISC)2 CISSP Certified Information Systems Security Professional Official Study Guide (9th ed. 2021).
[178] Scott Downie, et al., *Transfer Vulnerability (CVE-2023-34362) Since 2021*, Kroll (June 8, 2023), https://www.kroll.com/en/insights/publications/cyber/clop-ransomware-moveit-transfer-vulnerability-cve-2023-34362.
[179] Darril Gibson, CompTIA Security+ Get Certified Get Ahead: SY0-501 Study Guide at p. 73 (2017).

appear in such logs. But even extensive logging is insufficient without adequate monitoring of said logs.

393. The U.S. National Institute of Standards and Technology (NIST) publishes a Cybersecurity Framework that emphasizes continuous monitoring of systems.[180] The NIST SP 800-92 Guide to Computer Security Log Management further defines how to manage logs,[181] and there are a number of widely available tools that can monitor logs automatically and provide alerts to administrators when there is unusual activity.

394. Had Longevity, TwentyFirst, and PBI monitored web server logs for new files—as recommended in NIST SP 800-12[182] as a widely accepted cybersecurity practice[183]—they would have promptly detected the new files introduced during the cyberattack and prevented the Data Breach. Web server monitoring would have specifically allowed Longevity, TwentyFirst, and PBI to detect the new files introduced to the web server root (human.aspx and human2.aspx) that enabled Cl0p to perpetrate the MOVEit Data Breach. Even basic monitoring of PBI's web servers

---

[180] U.S. Dept. of Commerce, *The NIST Cybersecurity Framework (CSF) 2*.0, Nat'l Inst. of Standards and Tech. (Feb. 26, 2024), https://nvlpubs.nist.gov/nistpubs/CSWP/NIST.CSWP.29.pdf.

[181] U.S. Dept. of Commerce, NIST Special Publication 800-92, *Guide to Computer Security Log Management*, (Sept. 2006), https://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication800-92.pdf.

[182] U.S. Dept. of Commerce, NIST Special Publication 800-12 rev.1, *An Introduction to Information Security*, (June 2017), https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-12r1.pdf.

[183] *Monitor web server directories for changed / new files*, https://serverfault.com/questions/1145284/monitor-web-server-directories-for-changed-new-files (last visited May 20, 2024); *Gateway Script to monitor directory for new files*, Ignition, https://forum.inductiveautomation.com/t/gateway-script-to-monitor-directory-for-new-files/16124/5 (last visited May 20, 2024).

could therefore have prevented the Data Breach because it would have revealed the backdoor Cl0p introduced to the web server.[184]

395. In addition to file system monitoring to identify new files, the InfoSec institute recommends: (a) network monitoring to identify rogue IP addresses which may be performing malicious activities such as brute-force or fuzzing; (b) authentication monitoring to identify unusual logins or login attempts; (c) file change monitoring to identify changes to sensitive files within the file system; and (d) process monitoring to identify rogue processes that might be malicious.[185] Had Longevity, TwentyFirst, and PBI implemented these steps, they could have prevented the Data Breach.

396. Beyond monitoring activity, the actual data transferred via MOVEit could and should have been monitored by Longevity, TwentyFirst, and PBI. Most legitimate interactions utilizing MOVEit only upload or download relatively small amounts of data at a given time, but Cl0p was able to exfiltrate large amounts of consumer data in the Data Breach. Had Longevity, TwentyFirst, and PBI been adequately monitoring data transfers, any attempt to exfiltrate large amounts of data (significantly varying from normal usage) would have triggered an alert.

**vi. WAFs**

---

[184] Tyler Lioi, *MOVEit Transfer Investigations*, CrowdStrike Blog (June 5, 2023), https://www.crowdstrike.com/blog/identifying-data-exfiltration-in-moveit-transfer-investigations/.

[185] Lester Obbayi, *Web server protection: Web server security monitoring*, InfoSec (May 4, 2020), https://www.infosecinstitute.com/resources/network-security-101/web-server-protection-web-server-security-monitoring/.

397. Longevity, TwentyFirst, and PBI could have implemented and maintained properly configured web application firewalls ("WAFs"), which could also have prevented the Data Breach.[186]

**vii. Supply Chain Security**

398. Supply chain security is another common method of ensuring that all items in the supply chain, including third-party software like MOVEit, are secure.[187]

399. The NIST explicitly discusses vulnerabilities in third party software[188] and provides three supply chain security principles[189] that, if applied, would have mitigated or prevented the MOVEit breaches:

---

[186] *See, e.g.*, *Web Application Firewall*, Imperva, https://www.imperva.com/products/web-application-firewall-waf/ (last visited Apr. 26, 2024); *How Does WAF Detect SQL Injection, XSS, and PHP Injection Attacks?*, Huawei Cloud, (Sept. 6, 2023), https://support.huaweicloud.com/intl/en-us/waf_faq/waf_01_0457.html.

[187] U.S. Department of Commerce, NIST Conference Materials, *Best Practices in Cyber Supply Chain Risk Management*, https://csrc.nist.gov/CSRC/media/Projects/Supply-Chain-Risk-Management/documents/briefings/Workshop-Brief-on-Cyber-Supply-Chain-Best-Practices.pdf (last visited May 20, 2024).

[188] U.S. Department of Commerce, NIST Conference Materials, *Best Practices in Cyber Supply Chain Risk Management*, https://csrc.nist.gov/CSRC/media/Projects/Supply-Chain-Risk-Management/documents/briefings/Workshop-Brief-on-Cyber-Supply-Chain-Best-Practices.pdf (last visited May 20, 2024).

[189] U.S. Department of Commerce, NIST Conference Materials, *Best Practices in Cyber Supply Chain Risk Management*, https://csrc.nist.gov/CSRC/media/Projects/Supply-Chain-Risk-Management/documents/briefings/Workshop-Brief-on-Cyber-Supply-Chain-Best-Practices.pdf (last visited May 20, 2024).

**Figure 1**

**Cyber Supply Chain Security Principles:**

1. **Develop your defenses based on the principle that your systems will be breached.** When one starts from the premise that a breach is inevitable, it changes the decision matrix on next steps. The question becomes not just how to prevent a breach, but how to mitigate an attacker's ability to exploit the information they have accessed and how to recover from the breach.
2. **Cybersecurity is never just a technology problem, it's a people, processes and knowledge problem.** Breaches tend to be less about a technology failure and more about human error. IT security systems won't secure critical information and intellectual property unless employees throughout the supply chain use secure cybersecurity practices.
3. **Security is Security.** There should be no gap between physical and cybersecurity. Sometimes the bad guys exploit lapses in physical security in order to launch a cyber attack. By the same token, an attacker looking for ways into a physical location might exploit cyber vulnerabilities to get access.

### viii. Windows Security Feature

400. Companies utilizing Windows have an additional protection modality. The Windows security system has ransomware protection, which allows the user to designate any folder as protected. Any attempt to add new files or change existing files in that folder would then have to be approved. Because LEMURLOOT masqueraded as a legitimate file that was then used as a backdoor, having the folder \inetpub\wwwroot\ protected from alterations would have prevented these files from being uploaded.

401. In addition to the foregoing data security practices, which, if adopted by Longevity, TwentyFirst, and PBI, could have prevented the Data Breach, there are a number of common security techniques and mechanisms that should be a part of any standard data security policy and could have limited the scope of damage from a data breach. These security techniques and practices include:

a. Limiting access by employing a "least privileges" policy;

b. Implementing "Zero Trust" security frameworks;

c. Encrypting data at rest and adequately securing the encryption keys so that the data cannot be decrypted by unauthorized users; and

d. Immediately applying patches once they were made available.

402. A "least privileges" policy can limit an attacker who exploits a vulnerability from accessing large volumes of data. Limiting access via policies such as least privileges means that, even if a threat actor is able to exploit a vulnerability or even use a legitimate login to access the system, access to sensitive data will be limited. The large volume of records accessed and exfiltrated from PBI's MOVEit Transfer server in the Data Breach indicates that this was not done, because it is highly unlikely that any login would have legitimate access to that amount of sensitive data.

403. "Zero Trust" is a security model and set of system design principles that emphasize security verification in network environments. The core principle of Zero Trust is "never trust, always verify." Thus, unlike traditional security models that assume everything inside a network is safe, Zero Trust assumes threats can exist both inside and outside the network.

404. Zero Trust security frameworks require all users, whether inside or outside the organization's network, to be authenticated, authorized, and continuously validated for security configuration and posture before being granted access to applications and data.[190] Numerous standards provide guidelines to organizations implementing Zero Trust security frameworks, including NIST SP 800-207,[191] NIST SP 800-205,[192] and the CISA zero trust maturity model.[193]

---

[190] *See, e.g.*, *Zero Trust, A revolutionary approach to Cyber or just another buzz word?*, Deloitte (2021), https://www2.deloitte.com/content/dam/Deloitte/de/Documents/risk/deloitte-cyber-zero-trust.pdf; *see also* Venu Shastri, *Zero Trust Architecture*, CrowdStrike (June 28, 2023), https://www.oracle.com/security/what-is-zero-trust; https://www.crowdstrike.com/cybersecurity-101/zero-trust-security.

[191] U.S. Department of Commerce, NIST Special Publication 800-207, *Zero Trust Architecture*, CSRC (Aug. 2020), https://csrc.nist.gov/pubs/sp/800/207/final.

[192] U.S. Department of Commerce, NIST Special Publication 800-205, *Attribute Considerations for Access Control Systems*, CSRC (June 2019), https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-205.pdf.

[193] U.S. Cybersecurity & Infrastructure Security Agency, *Zero Trust Maturity Model* (Apr. 2023), https://www.cisa.gov/sites/default/files/2023-04/CISA_Zero_Trust_Maturity_Model_Version_2_508c.pdf.

405. Two aspects of Zero Trust are particularly applicable to the Data Breach. The first is the network is segmented into smaller, secure zones to maintain separate access for different parts of the network. This reduces the lateral movement of attackers within the network. The second is continuously monitoring the security posture of all hardware and software on the network. This helps to detect and respond to threats in real time.

406. The United States Cybersecurity & Infrastructure Security Agency published recommendations for mitigating the MOVEit vulnerability by "[g]rant[ing] admin privileges and access only when necessary, [and] establishing a software allow list that only executes legitimate applications."[194]

407. Following Progress's announcement of the first MOVEit vulnerability on May 31, 2023,[195] PBI should have, but did not, immediately begin taking security measures. PBI's failure to adequately safeguard the Plaintiffs' and Class members' PII resulted in that information being accessed or obtained by third-party cybercriminals.

**2. Longevity, TwentyFirst, and PBI failed to follow Progress's recommendations regarding secure configuration of the MOVEit software, which further contributed to the Data Breach.**

408. The MOVEit software offers secure configurations that any customer could implement to make the system more secure and to mitigate the ultimate impact of this Breach.

[194] U.S. Cybersecurity & Infrastructure Security Agency, Cybersecurity Advisory AA23-158A, *StopRansomware: CL0P Ransomware Gang Exploits CVE-2023-34362 MOVEit Vulnerability* (June 7, 2023), https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-158a.
[195] *MOVEit Transfer Critical Vulnerability (May 2023) (CVE-2023-34362)*, Progress (last updated June 15, 2023), https://community.progress.com/s/article/MOVEit-Transfer-Critical-Vulnerability-31May2023.

409. Progress made several additional recommendations to users of the MOVEit software (listed below), yet—by virtue of the occurrence of the Data Breach— Longevity, TwentyFirst, and PBI clearly failed to implement:

a. Using consistency check and tamper check utilities to validate consistency and the audit log.

b. Review audit logs for any anomalous behavior. Such anomalous behavior includes:

   i. Sign-ons from specific IP addresses

   ii. APIs used

   iii. Modification of settings

c. Limiting administrative privileges[196]

d. IP and user lockout policies[197]

e. Whitelisting so only specific IP addresses and users could login remotely.[198]

410. Longevity, TwentyFirst, and PBI could and should have turned on whitelisting, as depicted below:

---

[196] *Progress Documentation: MOVEit Transfer 2022 Administrator Guide*, Progress (updated Apr. 6, 2022), https://docs.progress.com/bundle/moveit-transfer-web-admin-help-2022/page/Permissions_3.html.
[197] *Progress Documentation: MOVEit Automation Web Admin Help – IP/User Lockout Policy*, Progress (updated Feb. 21, 2022), https://docs.progress.com/bundle/moveit-automation-web-admin-help-2022/page/IPUser-Lockout-Policy.html.
[198] *MOVEit Transfer – Whitelist IP for Specific Users Accounts*, Progress: Community (Oct. 14, 2020), https://community.progress.com/s/article/moveit-transfer-whitelist-ip-for-specific-users-accounts.

**Figure 2**




411. Generating reports in MOVEit is also a simple process, as depicted below:

**Figure 3**




412. There are a number of security reports built into the MOVEit software:

**Figure 4**




**Figure 5**




413. MOVEit users can also customize the view of logs:

**Figure 6**




414. A number of additional security policies can be set with a simple point and click:

**Figure 7**




415. Data loss prevention rules could and should have been enabled to prevent exfiltration of data:

**Figure 8**




**Figure 9**



**Figure 10**




416. It is unclear which, if any, of these security measures were implemented by Longevity, TwentyFirst, and PBI.

**3. Had PBI-Contracting Defendants complied with applicable security standards, they would have determined that the MOVEit software was not safe to use and prevented the Data Breach.**

417. The PBI-Contracting Defendants are responsible for protecting the PII they solicit and collect from attacks and breaches that result from weaknesses in third-party systems and software.

418. The PBI-Contracting Defendants failed to safeguard the Plaintiffs' and Class members' PII when they failed to adopt and enforce reasonable and available data security practices and procedures to prevent and/or mitigate the known risk of a cyberattack.

419. Prior to the Data Breach, the PBI-Contracting Defendants should have, but did not, implement and maintain reasonable and necessary data security policies and procedures, which would have mitigated or avoided the Data Breach.

420. There are numerous known and available steps that the PBI-Contracting Defendants could have taken to mitigate or even prevent the Data Breach.

421. Data security practices that could and should have been implemented by the PBI-Contracting Defendants to prevent the MOVEit Data Breach include:

a. Vetting and periodic auditing of third-party vendors, including PBI and Progress;

b. Auditing of third-party software, including the MOVEit Transfer software; and

c. Employing supply chain security.

Each of these three measures—and the PBI-Contracting Defendants' failure to utilize them—are explained in greater detail below:

**i. Auditing Third-Party Vendors and Software**

422. Security audits of third-party vendors and third-party software enable companies to identify vulnerabilities, monitor access to sensitive data, and discover and remediate any unauthorized data access.[199]

423. The PBI-Contracting Defendants should have but did not properly vet or audit their third-party vendors (or their intermediaries with such vendors in the case of MLIC), including Longevity, TwentyFirst, and PBI.

---

[199] *6 Security Tips for Third Party Software*, Cybersecurity Insiders, https://www.cybersecurity-insiders.com/6-security-tips-for-third-party-software/ (last visited May 20, 2024).

424. The PBI-Contracting Defendants knew or should have known that Longevity, TwentyFirst, and PBI used the MOVEit Transfer software to transfer and/or store their customers' and policyholders' PII.

425. Security auditing of Longevity, TwentyFirst, and PBI and the MOVEit Transfer software could have prevented the Data Breach as to the PBI-Contracting Defendants.

426. The methods for conducting security audits of third-party vendors and software are well-known and widely available.[200]

427. The PBI-Contracting Defendants therefore could and should have employed companies that conduct security audits of third-party vendors and third-party software.[201]

**ii. Vetting Vendors**

428. PBI-Contracting Defendants could have prevented the Data Breach by engaging in the standard industry practice of vetting vendors (or, in the case of TruStage and MLIC, their intermediaries' vendors)—such as PBI—that they transferred highly sensitive PII to.

429. Had PBI-Contracting Defendants done so, they would have discovered the vulnerability used by C10p and prevented the Data Breach. They failed to do so.

430. Vendor risk assessments or security questionnaires are "one of the best methods for extracting deep cybersecurity insights about any aspects of a vendor's attack surface."[202] Industry-

---

[200] Edward Kost, *Third-Party Risk Management: How to Identify Vulnerable Third-Party Software (Quickly)*, UpGuard (updated Sept. 4, 2023), https://www.upguard.com/blog/how-to-identify-vulnerable-third-party-software.

[201] Davit Asatryan, *Third-Party Applications Audit: Complete Guide*, Spin.ai (Nov. 4, 2021, updated Apr. 19, 2024), https://spinbackup.com/blog/third-party-applications-audit/.

[202] Edward Kost, *Third-Party Risk Management: How to Identify Vulnerable Third-Party Software (Quickly)*, UpGuard (updated Sept. 4, 2023), https://www.upguard.com/blog/how-to-identify-vulnerable-third-party-software ("Risk assessments can either be framework-based to identify security control deficiencies against popular security standards or custom-designed for focused investigations about specific third-party risks.").

standard risk assessments and security questionnaires designed to help companies discover vulnerabilities in third-party web applications and software are widely available,[203] and can be used to assess the security of third-party software against common attack vectors, including SQL injection susceptibility.[204] Proper vetting and routine audits of vendors' data security practices, including vetting of Longevity, TwentyFirst, and PBI's and Progress's cybersecurity practices, could have prevented the Data Breach. Longevity, TwentyFirst, and PBI and the PBI-Contracting Defendants chose to use the MOVEit software (or to allow the MOVEit software to be used) to transfer sensitive information despite its security flaws, and failed to take the simple, industry-standard step of vetting the MOVEit service before using it to transfer millions of pieces of highly sensitive PII.

431. Further, by failing to take the various steps alleged above (including thoroughly vetting the MOVEit software), Longevity, TwentyFirst, and PBI and the PBI-Contracting Defendants enriched themselves by saving the costs they reasonably should have expended on adequate data security measures to secure the Plaintiffs' and Class members' PII.

432. Instead of providing a reasonable level of security that would have prevented the Data Breach, Longevity, TwentyFirst, and PBI and the PBI-Contracting Defendants instead calculated to avoid their data security obligations at the expense of the Plaintiffs and Class members by utilizing cheaper, ineffective security measures. The Plaintiffs and Class members, on

---

[203] Edward Kost, *Third-Party Risk Management: How to Identify Vulnerable Third-Party Software (Quickly)*, UpGuard (updated Sept. 4, 2023), https://www.upguard.com/blog/how-to-identify-vulnerable-third-party-software.
[204] Edward Kost, *Third-Party Risk Management: How to Identify Vulnerable Third-Party Software (Quickly)*, UpGuard (updated Sept. 4, 2023), https://www.upguard.com/blog/how-to-identify-vulnerable-third-party-software.

the other hand, suffered as a direct and proximate result of the Defendants' failures to provide the requisite security.

**O. Longevity, TwentyFirst, and PBI's failure to comply with laws and industry standards mandating that they act as quickly as possible in response to the Data Breach led to additional losses.**

433. Longevity, TwentyFirst, and PBI's failures were compounded by its inadequate response to the Data Breach.

434. According to PBI, Cl0p accessed and downloaded data from one of its MOVEit Transfer servers—which housed highly-sensitive consumer information entrusted to PBI by the PBI-Contracting Defendants—on May 29, 2023, and May 30, 2023.[205]

435. Longevity, TwentyFirst, and PBI "became aware of the MOVEit [Data Breach] on June 2, 2023,"[206] but failed to promptly notify the PBI-Contracting Defendants of the Breach.

436. Longevity, TwentyFirst, and PBI claim to understand "the importance of notifying individuals who may have had their sensitive personally identifiable information acquired by an unauthorized [third party],"[207] but waited at least two weeks after first learning of the Data Breach to begin notifying the PBI-Contracting Defendants that their customers' PII may have been stolen in the Data Breach.[208] After PBI notified the PBI-Contracting Defendants of the Data Breach, it

---

[205] *Data Breach Notifications – Pension Benefit Information, LLC*, Office of the Maine Attorney General (July 11, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/14efac97-4a7c-4322-98eb-2e953884eb58/f135d329-507c-484c-9798-b46d470c5d96/Notice%20of%20Data%20Event%20-%20PBI%20-%20ME.pdf.

[206] PBI, *Global MOVEit Transfer Cyberattack*, https://www.pbinfo.com/faq-communication/ (last accessed Oct. 21, 2024).

[207] PBI, *Privacy Principles*, https://www.pbinfo.com/privacy-principles/ (last accessed Oct. 18, 2024).

[208] *See, e.g.*, *MOVEit Security Event*, Genworth (last updated Aug. 31, 2023), https://www.genworth.com/moveit#backgroundinfo; *Data Breach Notifications – Milliman Solutions LLC*, Office of the Maine Attorney General (July 17, 2023),

took PBI and each of the PBI-Contracting Defendants several additional weeks to begin notifying impacted individuals that their Private Information had been stolen by Cl0p.

437. PBI waited until June 16, 2023 to notify Genworth Financial about the Data Breach,[209] and waited another two months to begin notifying the 2.5 to 2.7 million Genworth Defendants' customers and insurance agents whose PII was stolen by Cl0p in the Data Breach.[210] According to Genworth Financial, "PBI [] mail[ed] notification letters [to impacted Genworth customers and insurance agents] in batches through the month of August [2023][.]"[211]

438. PBI also waited until June 16, 2023, to notify Milliman Inc. about the Data Breach,[212] and waited another month to begin notifying the 1.3 million Milliman Defendants' customers whose PII was stolen from PBI's MOVEit Transfer server.[213] According to Milliman Inc., Milliman Defendants' clients' customers were not notified of the Data Breach until July 17, 2023—nearly seven weeks after their highly-sensitive data had fallen into the hands of cybercriminals.[214] Some Milliman Defendants' customers were notified even later, after PBI

---

https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/a98d9ae9-b898-4aaa-8dde-de04551aaedb.shtml.

[209] *See MOVEit Security Event*, Genworth (last updated Aug. 31, 2023), https://www.genworth.com/moveit#backgroundinfo.

[210] *MOVEit Security Event – Background Information*, Genworth (last updated Aug. 31, 2023), https://www.genworth.com/moveit#backgroundinfo.

[211] *MOVEit Security Event – Background Information*, Genworth (last updated Aug. 31, 2023), https://www.genworth.com/moveit#backgroundinfo.

[212] *Data Breach Notifications – Milliman Solutions LLC*, Office of the Maine Attorney General (July 17, 2023), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/a98d9ae9-b898-4aaa-8dde-de04551aaedb.shtml; *see also* Milliman, *Data Breach Notice* (July 17, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/a98d9ae9-b898-4aaa-8dde-de04551aaedb/af45f431-a61c-4c76-9d70-f31ab3236aa7/PBI%20-%20Sample%20Notification%20Letter.pdf.

[213] *Data Breach Notifications – Milliman Solutions LLC*, Office of the Maine Attorney General, (June 16, 2023), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/a98d9ae9-b898-4aaa-8dde-de04551aaedb.shtml.

[214] *See Data Breach Notifications – Milliman Solutions LLC*, Office of the Maine Attorney General, (June 16, 2023), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-

completed an additional "review on July 21, 2023, and confirmed to Milliman Defendants at that time that the personal information of certain [additional] consumers of Milliman Defendants' clients were affected[.]"[215] PBI did not begin notifying those individuals until August 14, 2023—more than two and a half months after their highly-sensitive information was stolen in the Data Breach.[216]

439. PBI waited until June 19, 2023, to confirm that "TIAA files had been exfiltrated"[217] from one of its MOVEit Transfer servers in the Data Breach. In turn, TIAA and TIAA Kaspick did not confirm which customers were impacted by the Breach until June 28, 2023.[218] According to TIAA, PBI did not begin sending data breach notice letters to the 2.6 million TIAA participants whose PII was stolen by Cl0p until July 14, 2023, and the letters were sent "on a rolling basis over the [following] three weeks[.]"[219]

---

8792-a1252b4f8318/a98d9ae9-b898-4aaa-8dde-de04551aaedb.shtml (noting "Date(s) of consumer notification: **Starting 07/17/2023**) (emphasis in original); *see also PBI Sample Notification Letter*, Milliman (July 17, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/a98d9ae9-b898-4aaa-8dde-de04551aaedb/af45f431-a61c-4c76-9d70-f31ab3236aa7/PBI%20-%20Sample%20Notification%20Letter.pdf.

[215] *Letter to the Office of the Maine Attorney General*, Milliman (August 14, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/903ecb46-93b2-4986-aae5-ec7e088625f8/31ce7f5a-a49a-48eb-a52b-33dd1d68bc1a/23.08.14%20ME%20AG%20Notification%20Letter.pdf.

[216] *Data Breach Notifications – Milliman Solutions LLC*, Office of the Maine Attorney General (August 14, 2023), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/903ecb46-93b2-4986-aae5-ec7e088625f8.shtml.

[217] *Notice of Data Security Incident*, TIAA (July 21, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/ed67df63-aced-4ecb-91ce-602c7e34c83a/573351f0-74fc-4e19-9a62-a51fb837a3bb/Regulator%20Notice%20-%20TIAA%20ME%20AG.pdf.

[218] *Notice of Data Security Incident*, TIAA (July 21, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/ed67df63-aced-4ecb-91ce-602c7e34c83a/573351f0-74fc-4e19-9a62-a51fb837a3bb/Regulator%20Notice%20-%20TIAA%20ME%20AG.pdf.

[219] *Notice of Data Security Incident*, TIAA (July 21, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/ed67df63-

440. PBI's delayed disclosure of the MOVEit Data Breach prevented its business clients, including the PBI-Contracting Defendants, from taking prompt action, including discontinuing use of PBI's MOVEit administrative portal as a "secure" file transfer application.

441. Following the Data Breach, PBI reassured its business clients, including the PBI-Contracting Defendants, that they could "continue to safely do business with PBI" because "PBI systems were not impacted[.]"[220]

442. But the zero-day vulnerability that was exploited by Cl0p in the Data Breach was not the only critical vulnerability in the MOVEit Transfer software. In the months following Progress's May 31, 2023 announcement of CVE-2023-34362,[221] Progress disclosed six additional SQL injection vulnerabilities, each of which would allow a malicious threat actor to access and exfiltrate sensitive data from MOVEit Transfer servers.[222]

---

aced-4ecb-91ce-602c7e34c83a/573351f0-74fc-4e19-9a62-a51fb837a3bb/Regulator%20Notice%20-%20TIAA%20ME%20AG.pdf.

[220] PBI, *Global MOVEit Transfer Cyberattack*, https://www.pbinfo.com/faq-communication/ (last accessed Oct. 21, 2024).

[221] U.S. Department of Commerce, NIST, *Progress MOVEit Transfer SQL Injection Vulnerability (CVE-2023-34362) Detail*, Nat'l Vulnerability Database (updated Apr. 25, 2024), https://nvd.nist.gov/vuln/detail/CVE-2023-34362.

[222] See, e.g., Threat Brief – MOVEit Transfer SQL Injection Vulnerabilities: CVE-2023-34362, CVE-2023-35036 and CVE-2023-34362, CVE-2023-35036 and CVE-2023-35708, Unit 42 (updated Oct. 4, 2023), https://unit42.paloaltonetworks.com/threat-brief-moveit-cve-2023-34362/; NIST, Progress MOVEit Transfer SQL Injection Vulnerability (CVE-2023-35036) Detail, Nat'l Vulnerability Database (updated Apr. 25, 2024), https://nvd.nist.gov/vuln/detail/CVE-2023-35036; NIST, Progress MOVEit Transfer SQL Injection Vulnerability (CVE-2023-35708) Detail, Nat'l Vulnerability Database (updated Apr. 25, 2024), https://nvd.nist.gov/vuln/detail/CVE-2023-35708; NIST, Progress MOVEit Transfer SQL Injection Vulnerability (CVE-2023-36934) Detail, Nat'l Vulnerability Database (updated Apr. 25, 2024), https://nvd.nist.gov/vuln/detail/CVE-2023-36934 (CVE-2023-36934 is a critical, unauthenticated SQL injection vulnerability); NIST, Progress MOVEit Transfer SQL Injection Vulnerability (CVE-2023-36932) Detail, Nat'l Vulnerability Database (updated Apr. 25, 2024), https://nvd.nist.gov/vuln/detail/CVE-2023-36932 (CVE-2023-36932 is a high-severity SQL injection vulnerability that could allow authenticated attackers to gain access to the MOVEit Transfer database).

443. Still, PBI failed to advise its business clients, including the PBI-Contracting Defendants, to discontinue use of its MOVEit administrative portal as a "secure" file transfer application.

444. Instead, PBI "encourage[d]"—but did not require—"[its] customers to encrypt files prior to uploading"[223] them to PBI's MOVEit Transfer server.

445. On August 14, 2023, more than two and a half months after the Data Breach, Milliman Inc. reported that Milliman Defendants "ha[d] stopped transferring data to PBI pending further evaluation of PBI's information security practices."[224]

446. Genworth Defendants and TIAA and TIAA Kaspick continued to transfer their customers' highly sensitive PII to PBI, and that information continued to be stored on PBI's MOVEit Transfer server, even after PBI learned of the critical vulnerabilities in the MOVEit Transfer code.

447. PBI's delayed disclosure of the MOVEit Data Breach to the PBI-Contracting Defendants, and the further delayed notifications to the PBI-Contracting Defendants' customers, prevented the Plaintiffs and Class members from taking prompt action to protect themselves from the fallout of the Data Breach.

448. PBI and the PBI-Contracting Defendants failed to comply with legal and regulatory requirements to promptly notify impacted individuals following a data breach, including the laws

---

[223] PBI, *Global MOVEit Transfer Cyberattack*, https://www.pbinfo.com/faq-communication/ (last accessed Oct. 21, 2024).

[224] *Letter to the Office of the Maine Attorney General*, Milliman (August 14, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/903ecb46-93b2-4986-aae5-ec7e088625f8/31ce7f5a-a49a-48eb-a52b-33dd1d68bc1a/23.08.14%20ME%20AG%20Notification%20Letter.pdf.

of several states, which mandate that timely notices be sent to consumers following a data breach "in the most expedient time and manner possible and without unreasonable delay[.]"[225]

449. The Plaintiffs and Class members were not notified of the Data Breach until at least seven weeks—and in some cases, several months—after their PII had been stolen by Cl0p.

450. The Defendants' failures to disclose the Data Breach in a timely and accurate manner was misleading and deceptive, because the Plaintiffs and Class members reasonably believed their PII was adequately secured by the PBI-Contracting Defendants and PBI, due to the sensitive nature of the data, the nature of their relationship with the PBI-Contracting Defendants, and the explicit promises made by PBI and the PBI-Contracting Defendants concerning their data security practices and safeguards.

451. As victims of the MOVEit Data Breach, the Plaintiffs and Class members faced immediate and significant harms.

452. The delayed notice letters that PBI sent to the Plaintiffs and Class members, on behalf of the PBI-Contracting Defendants, indicate that Longevity, TwentyFirst, and PBI and the PBI-Contracting Defendants recognize the present and continuing risk of identity theft and fraud that the Plaintiffs and Class members face as a result of the Data Breach.

453. In the notice letters sent to individual consumers on behalf of Longevity, TwentyFirst, and PBI's business clients, including the PBI-Contracting Defendants, PBI "encourage[d] [impacted individuals] to remain vigilant against incidents of identity theft and

---

[225] California Civil Code § 1798.82(a); *see also Data Breach Notification Laws by State*, IT Governance USA, https://www.itgovernanceusa.com/data-breach-notification-laws (last accessed Nov. 1, 2024).

fraud by reviewing [their] account statements and monitoring [their] free credit reports for suspicious activity and to detect errors."[226]

454. Had the Defendants not delayed in notifying the Plaintiffs and Class members about the Data Breach, Plaintiffs and Class members could have immediately taken these and other precautions to protect their identities and mitigate the harms of the Data Breach.

455. Instead, the Plaintiffs and Class members were entirely unaware that their PII had fallen into the hands of cybercriminals for several weeks or months after the Data Breach.

456. The Plaintiffs and Class members have already suffered harms caused by the fraudulent or attempted misuse of their PII, and remain at an imminent and ongoing risk of additional future harm from identity theft and fraud.

457. The Defendants' unreasonable delays in notifying affected individuals following the Data Breach compounded the harms suffered by the Plaintiffs and Class members.

**P. Defendants Failed to Comply with FTC Guidelines.**

458. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Additionally, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

---

[226] *Data Breach Notifications – Pension Benefit Information, LLC*, Office of the Maine Attorney General (July 11, 2023), https://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/14efac97-4a7c-4322-98eb-2e953884eb58/f135d329-507c-484c-9798-b46d470c5d96/Notice%20of%20Data%20Event%20-%20PBI%20-%20ME.pdf.

459. In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

460. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

461. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

462. These FTC enforcement actions include actions against financial institutions, like Defendants GLICNY, GNA, GLIC, and TruStage.

463. As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of their vendors' data

security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

464. Defendants were at all times fully aware of their obligation to protect the PII of their customers yet failed to comply with such obligations. Defendants were also aware of the significant repercussions that would result from their failure to do so.

**Q. Defendants GNA, GLICNY, BLIC, TruStage, and TIAA Kaspick Failed to Comply with the Gramm-Leach Bliley Act.**

465. Genworth Defendants, Milliman Defendants, TIAA and TIAA Kaspick are financial institutions, as that term is defined by Section 509(3)(A) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A), and thus are subject to the GLBA.

466. The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

467. Defendants GNA, GLICNY, BLIC, TruStage, and TIAA Kaspick collect nonpublic personal information, as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period, GNA, GLICNY, BLIC, TruStage, and TIAA Kaspick were subject to the requirements of the GLBA, 15 U.S.C. §§ 6801.1, *et seq*., and are subject to numerous rules and regulations promulgated on the GLBA statutes.

468. The GLBA Privacy Rule became effective on July 1, 2001. *See* 16 C.F.R. Part 313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the CFPB became responsible for implementing the Privacy Rule. In December 2011, the CFPB restated the implementing regulations in an interim final rule that established the Privacy of Consumer Financial Information,

Regulation P, 12 C.F.R. § 1016 ("Regulation P"), with the final version becoming effective on October 28, 2014.

469. Accordingly, GNA, GLICNY, BLIC, TruStage, and TIAA Kaspick's conduct is governed by the Privacy Rule prior to December 30, 2011, and by Regulation P after that date.

470. Both the Privacy Rule and Regulation P require financial institutions to provide customers with an initial and annual privacy notice. These privacy notices must be "clear and conspicuous." 16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. "Clear and conspicuous means that a notice is reasonably understandable and designed to call attention to the nature and significance of the information in the notice." 16 C.F.R. § 313.3(b)(1); 12 C.F.R. § 1016.3(b)(1). These privacy notices must "accurately reflect[] [the financial institution's] privacy policies and practices." 16 C.F.R. § 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. They must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for nonpublic personal information. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6.

471. These privacy notices must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9. As alleged herein, Defendants GNA, GLICNY, BLIC, TruStage, and TIAA Kaspick violated the Privacy Rule and Regulation P.

472. Defendants GNA, GLICNY, BLIC, TruStage, and TIAA Kaspick failed to provide annual privacy notices to customers after the customer relationship ended, despite retaining these customers' PII and storing that PII on their network systems as well as those of their vendors.

473. Defendants GNA, GLICNY, BLIC, TruStage, and TIAA Kaspick failed to adequately inform their customers that they were storing and/or sharing, or would store and/or share, the customers' PII on an insecure platform, accessible to unauthorized parties from the internet, and would do so after the customer relationship ended.

474. The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified by risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 and 314.4.

475. As alleged herein, Defendants GNA, GLICNY, BLIC, TruStage, and TIAA Kaspick violated the Safeguards Rule.

476. Defendants GNA, GLICNY, BLIC, TruStage, and TIAA Kaspick failed to assess reasonably foreseeable risks to the security, confidentiality, and integrity of customer information and failed to monitor the systems of their vendors or verify the integrity of those systems.

477. Defendants GNA, GLICNY, BLIC, TruStage, and TIAA Kaspick violated the GLBA and their own policies and procedures by sharing the PII of Plaintiffs and Class members with a non-affiliated third party without providing Plaintiffs and Class members: (a) an opt-out notice, and (b) a reasonable opportunity to opt out of such disclosure.

**R. Damages Sustained by Plaintiffs and the Class members.**

478. Plaintiffs and Class members have suffered injury and damages, including, but not limited to: (i) a substantially increased risk of identity theft and medical theft—a risk that justifies expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; and/or (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face.

479. For all of the foregoing reasons set forth in detail above, Longevity, TwentyFirst, and PBI are directly liable to every member of the Class and faces substantial exposure—both individually and via joint and several liability—as the primary defendants in the claims stemming from PBI's use of MOVEit and the Data Breach that impacted PBI. PBI and Defendants Longevity and TwentyFirst are able to satisfy actual or potential judgments on behalf of the Class. PBI and Defendants Longevity and TwentyFirst further face actual and potential indemnification/contribution claims from all users of its services, including but not limited to all PBI-VCE and PBI-VCEC defendants (including but not limited to those listed in Ex. A, ECF No. 1161-1, at 4-6 (beneath the header "Vendor: Pension Benefit Information").

## VI. CLASS ALLEGATIONS

480. Plaintiffs bring this action on behalf of themselves and, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) as representatives of the following classes:

> PBI Nationwide Class: All persons whose PII was compromised on PBI's platform and/or systems in the MOVEit Data Breach.
>
> > PBI California Class: All residents of California whose PII was compromised on PBI's platform and/or systems in the MOVEit Data Breach.
> >
> > PBI Florida Class: All residents of Florida whose PII was compromised on PBI's platform and/or systems in the MOVEit Data Breach.
> >
> > PBI Illinois Class: All residents of Illinois whose PII was compromised on PBI's platform and/or systems in the MOVEit Data Breach.
> >
> > PBI New Jersey Class: All residents of New Jersey whose PII was compromised on PBI's platform and/or systems in the MOVEit Data Breach.
> >
> > PBI New York Class: All residents of New York whose PII was compromised on PBI's platform and/or systems in the MOVEit Data Breach.
> >
> > PBI Pennsylvania Class: All residents of Pennsylvania whose PII was compromised on PBI's platform and/or systems in the MOVEit Data Breach.
> >
> > PBI Texas Class: All residents of Texas whose PII was compromised on PBI's platform and/or systems in the MOVEit Data Breach.
> >
> > PBI Vermont Class: All residents of Vermont whose PII was compromised on PBI's platform and/or systems in the MOVEit Data Breach.

The foregoing state-specific classes are collectively referred to as the "PBI State Classes."

481. Additionally, Plaintiffs Gilbert Hale, Hauser, and Hernandez (collectively, "Genworth Plaintiffs") bring this action on behalf of themselves against GNA and BLIC, and, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) as representatives of the following classes:

> Genworth Nationwide Class: All persons whose PII was compromised in the MOVEit Data Breach where such PII was obtained from or hosted by Genworth Defendants.

Genworth California Class: All residents of California whose PII was compromised in the MOVEit Data Breach where such PII was obtained from or hosted by Genworth Defendants.

Genworth Florida Class: All residents of Florida whose PII was compromised in the MOVEit Data Breach where such PII was obtained from or hosted by Genworth Defendants.

Genworth New York Class: All residents of New York whose PII was compromised in the MOVEit Data Breach where such PII was obtained from or hosted by Genworth Defendants.

Genworth Texas Class: All residents of Texas whose PII was compromised in the MOVEit Data Breach where such PII was obtained from or hosted by Genworth Defendants.

The foregoing state-specific Genworth Defendants classes are collectively referred to as the "Genworth State Classes."

482. Plaintiff Gilbert Hale brings this action on behalf of himself against GLICNY and, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) as representative of the following class:

GLICNY New York Class: All residents of New York whose PII was compromised in the MOVEit Data Breach where such PII was obtained from or hosted by GLICNY.

483. Additionally, Plaintiff Soto brings this action on behalf of himself and, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) as representative of the following classes:

TruStage Nationwide Class: All persons whose PII was compromised in the MOVEit Data Breach where such PII was obtained from or hosted by TruStage.

MLIC Florida Class: All residents of Florida whose PII was compromised in the MOVEit Data Breach where such PII was obtained from or hosted by MLIC.

484. Additionally, Plaintiffs Checchia, Phelan, Uhrich, Teppler, and Marshall (collectively, "TIAA Plaintiffs") bring this action against TIAA Kaspick on behalf of themselves, and, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) as representatives of the following classes:

> TIAA Nationwide Class: All persons whose PII was compromised in the MOVEit Data Breach where such PII was obtained from or hosted by TIAA Kaspick.
>
> > TIAA Florida Class: All residents of Florida whose PII was compromised in the MOVEit Data Breach where such PII was obtained from or hosted by TIAA Kaspick.
> >
> > TIAA Illinois Class: All residents of Illinois whose PII was compromised in the MOVEit Data Breach where such PII was obtained from or hosted by TIAA Kaspick.
> >
> > TIAA New Jersey Class: All residents of New Jersey whose PII was compromised in the MOVEit Data Breach where such PII was obtained from or hosted by TIAA Kaspick.
> >
> > TIAA Pennsylvania Class: All residents of Pennsylvania whose PII was compromised in the MOVEit Data Breach where such PII was obtained from or hosted by TIAA Kaspick.
> >
> > TIAA Vermont Class: All residents of Vermont whose PII was compromised in the MOVEit Data Breach where such PII was obtained from or hosted by TIAA Kaspick.

The foregoing state-specific TIAA Kaspick classes are collectively referred to as the "TIAA State Classes."

485. All of the foregoing classes are referred to herein, collectively, as the "Class." The "[Defendant] Nationwide Class[es]" listed above are collectively referred to as the "Nationwide Classes," and the "[Defendant] State Classes" are collectively referred to as the "State Classes"

486. Excluded from the Class are: (1) the judges presiding over the action, Class Counsel, and members of their families; (2) the Defendants, their subsidiaries, parent companies, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and their current or former officers and directors; (3) persons who properly opt out; and (4) the successors or assigns of any such excluded persons.

487. **Numerosity**: Class members are so numerous that their individual joinder is impracticable, as the proposed Class includes at least 40 million members who are geographically dispersed.[227]

488. **Typicality**: Plaintiffs' claims are typical of Class members' claims. Plaintiffs and all Class members were injured through Defendants' uniform misconduct, and Plaintiffs' claims are identical to the claims of the Class members they seek to represent.

489. **Adequacy**: Plaintiffs' interests are aligned with the Class members they seek to represent, and Plaintiffs have retained counsel with significant experience prosecuting complex class action cases, including cases involving alleged privacy and data security violations. Plaintiffs and their counsel intend to prosecute this action vigorously. The Class's interests are well-represented by Plaintiffs and undersigned counsel.

490. **Superiority**: A class action is the superior—and only realistic—mechanism to fairly and efficiently adjudicate Plaintiffs' and Class members' claims. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for Class members individually to effectively redress Defendants' wrongdoing. Even if Class members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management

[227] *PBI Data Breach: What & How It Happened?*, Twingate (June 14, 2024), https://www.twingate.com/blog/tips/pbi-data-breach.

difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

491. **Commonality and Predominance:** The following questions common to all Class members predominate over any potential questions affecting individual Class members:

a. Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and Class members' PII from unauthorized access and disclosure;

b. Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiffs' and Class members' PII;

c. Whether Defendants breached their duties to protect Plaintiffs' and Class members' PII;

d. Whether Defendants violated the statutes alleged herein;

e. Whether Plaintiffs and all other Class members are entitled to damages and the measure of such damages and relief.

492. Given that the Defendants engaged in a common course of conduct as to Plaintiffs and Class members, similar or identical injuries and common law violations are involved, and common questions outweigh any potential individual questions.

## VII. CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### Negligence
*(Brought on behalf of the Nationwide Classes or, in the alternative, the State Classes)*

493. Plaintiffs reallege and incorporate by reference all previous paragraphs.

494. Plaintiffs bring this claim against Longevity and TwentyFirst on behalf of the PBI Nationwide Class or, in the alternative, the PBI State Classes. In addition, Plaintiffs Gilbert Hale, Hauser, Hernandez, and Pasquarelli bring this claim against GNA and BLIC on behalf of the Genworth Nationwide Class or, in the alternative, the Genworth State Classes. Plaintiff Gilbert Hale brings this claim against GLICNY on behalf of the GLICNY New York Class. Plaintiffs Checchia, Marshall, Phelan, Teppler, and Uhrich bring this claim against TIAA Kaspick on behalf

of the TIAA Nationwide Class or, in the alternative, the TIAA State Classes. Plaintiff Soto brings this claim against TruStage on behalf of the TruStage Nationwide Class or, in the alternative, the MLIC Florida Class.

495. Defendants owed non-delegable duties to Plaintiffs and all other Class members to exercise reasonable care in safeguarding and protecting their PII in Defendants' possession, custody, or control, including non-delegable duties to safeguard that PII.

496. In addition to those duties, Genworth Defendants, TruStage, and TIAA Kaspick each had additional, independent, non-delegable duties to audit, monitor, control, and/or otherwise secure all environments into which they placed Plaintiffs' and Class members' PII, and to ensure that those environments were used, configured, monitored, and/or otherwise maintained in such a way as to ensure the security and safety of Plaintiffs' and Class members' PII. Specifically, as alleged in greater detail, in the ordinary course of their business: (a) TIAA and Defendant TIAA Kaspick provided approximately 2.3-2.6 million individuals' highly sensitive PII to PBI; (b) Genworth Defendants provided approximately 2.5-2.7 million individuals' highly sensitive PII to PBI; (c) Milliman Defendants provided 1.28-1.325 million individuals' highly sensitive PII to PBI; and (d) Defendant TruStage and MLIC provided approximately 1 million individuals' highly sensitive PII to PBI. By doing so, PBI-Contracting Defendants had non-delegable duties to Plaintiffs and Class members to ensure that the millions of pieces of their highly sensitive PII that PBI-Contracting Defendants transmitted to PBI would remain secure. PBI-Contracting Defendants could not delegate those independent duties to their vendors and/or business associates, such as PBI or Progress.

497. Thus, every Defendant owed independent, non-delegable duties to Plaintiffs and Class members to exercise reasonable care in obtaining, securing, safeguarding, storing, and

protecting their PII within Defendants' control from being compromised, lost, stolen, accessed, and/or misused by unauthorized persons such as Cl0p. Further, every Defendant owed independent, non-delegable duties of care to provide security consistent with industry standards and best practices to ensure the safety and security of Plaintiffs' and Class members' PII.

498. Defendants knew—or should have known—the risks of collecting, storing, transmitting, and/or otherwise maintaining Plaintiffs' and Class members' PII and the importance of maintaining adequate security processes and ensuring their vendors and business associates with whom Defendants shared consumers' PII—such as PBI itself and/or Progress—had secure services, processes, and/or procedures in place to safeguard that PII. Indeed, as alleged in greater detail, Genworth Defendants, Milliman Defendants, and TIAA Kaspick each transferred Plaintiffs' and Class members' PII compromised in the Data Breach to PBI – and Defendant TruStage and MLIC transferred that PII to Milliman Defendants which, in turn, transferred it to PBI – such that PBI-Contracting Defendants should have ensured that PBI had adequate processes and protections in place to safeguard Plaintiffs' and Class members' PII, yet they failed to do so. Further, Defendants knew of the many data breaches that targeted information such as Plaintiffs' and Class members' PII, especially Social Security numbers, in recent years.

499. Given the nature of Defendants' businesses, the sensitivity and value of the millions of individuals' PII they collect, store, transmit, and/or otherwise maintain in the ordinary course of their businesses (and the vast resources at Defendants' disposal), Defendants should have taken steps to prevent the Data Breach from occurring.

500. Defendants breached their non-delegable duties in numerous ways including (but not limited to) by:

a. Failing to exercise reasonable care and to implement adequate security systems, protocols, and practices sufficient to protect Plaintiffs' and Class members' PII;

b. Failing to comply with applicable industry standards and best practices regarding data security during the period of the Data Breach;

c. Failing to comply with regulations protecting the PII at issue during the period of the Data Breach;

d. Failing to recognize in a timely manner that Plaintiffs' and Class members' PII had been compromised; and

e. Failing to timely and adequately disclose that Plaintiffs' and Class members' PII had been improperly acquired or accessed.

501. In addition to subparts (a) – (e) above, PBI-Contracting Defendants further breached the following non-delegable duties that they each owed to Plaintiffs and Class members:

a. Failing to adequately monitor and audit the data security systems of their vendor/business associates to whom they transmitted PII, including but not limited to PBI; and

b. Failing to adequately monitor, evaluate, and ensure the security of PBI's network and systems.

502. It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII—including PBI-Contracting Defendants' failure to adequately monitor and audit PBI's systems and use of the MOVEit Transfer service—would result in the Data Breach and unauthorized release, disclosure, and dissemination of Plaintiffs' and Class members' PII to unauthorized individuals.

503. But for Defendants' negligent conduct and breach of the above-described duties owed to Plaintiffs and Class members, the Data Breach would not have occurred, and their PII would not have been compromised thereby. Therefore, Defendants' breaches of their duties directly and proximately caused Plaintiffs' and Class members' harm and damages.

504. As a direct and proximate result of Defendants' above-described wrongful actions, inactions, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and Class members have suffered, and will continue to suffer, economic damages and

other injuries and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft—a risk that justifies expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; (v) lost value of the unauthorized access to their PII permitted by Defendants; (vi) the value of long-term credit monitoring and identity theft protection products necessitated by the Data Breach; and/or (vii) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face.

## SECOND CLAIM FOR RELIEF
### Negligence Per Se
*(Brought on behalf of the Nationwide Classes or, in the alternative, the State Classes)*

505. Plaintiffs reallege and incorporate by reference all previous paragraphs.

506. Plaintiffs bring this claim against Longevity and TwentyFirst on behalf of the PBI Nationwide Class or, in the alternative, the PBI State Classes. In addition, Plaintiffs Gilbert Hale, Hauser, Hernandez, and Pasquarelli bring this claim against GNA and BLIC on behalf of the Genworth Nationwide Class or, in the alternative, the Genworth State Classes. Plaintiff Gilbert Hale brings this claim against GLICNY on behalf of the GLICNY New York Class. Plaintiffs Checchia, Marshall, Phelan, Teppler, and Uhrich bring this claim against TIAA Kaspick on behalf of the TIAA Nationwide Class or, in the alternative, the TIAA State Classes. Plaintiff Soto brings this claim against TruStage on behalf of the TruStage Nationwide Class or, in the alternative, the MLIC Florida Class.

507. Defendants' duties arise from, *inter alia*, Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as

interpreted by the FTC, the unfair act or practice by a business, such as Defendants, of failing to employ reasonable measures to protect and secure PII.

508. Defendants violated Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiffs' and Class members' PII and not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII they obtain and store, and the foreseeable consequences of a data breach involving PII including, specifically, the substantial damages that would result to Plaintiffs and Class members.

509. Furthermore, Genworth Defendants, TruStage, and TIAA Kaspick have additional duties arising from, *inter alia*, the Gramm-Leach-Bliley Act (defined as "GLBA"), including duties to protect Plaintiffs' and Class members' PII by:

a. ensuring the security and confidentiality of customer records and information;

b. protecting against any anticipated threats or hazards to the security or integrity of such records; and

c. protecting against unauthorized access to or use of such records or information which could result in substantial harm or inconvenience to any customer.

15 U.S.C. § 6801(b).

510. In order to satisfy their obligations under the GLBA, Genworth Defendants, TruStage, and TIAA Kaspick were also required to "develop, implement, and maintain a comprehensive information security program that is [1] written in one or more readily accessible parts and [2] contains administrative, technical, and physical safeguards that are appropriate to [its] size and complexity, the nature and scope of [its] activities, and the sensitivity of any customer information at issue." *See* 16 C.F.R. § 314.4.

511. In addition, under the Interagency Guidelines Establishing Information Security Standards, 12 C.F.R. pt. 225, App. F., Genworth Defendants, TruStage, and TIAA Kaspick had

affirmative duties to "develop and implement a risk-based response program to address incidents of unauthorized access to customer information in customer information systems." *See id*.

512. Further, when Genworth Defendants, TruStage, and TIAA Kaspick became aware of "unauthorized access to sensitive customer information," they had a duty to promptly "conduct a reasonable investigation to promptly determine the likelihood that the information has been or will be misused" and "notify the affected customer[s] as soon as possible." *See id*.

513. Genworth Defendants, TruStage, and TIAA Kaspick violated the GLBA by failing to "develop, implement, and maintain a comprehensive information security program" with "administrative, technical, and physical safeguards" that were "appropriate to [its] size and complexity, the nature and scope of [its] activities, and the sensitivity of any customer information at issue." This includes, but is not limited to, Genworth Defendants', TruStage's, and TIAA Kaspick's (a) failure to implement and maintain adequate data security practices to safeguard Plaintiffs' and Class members' PII; (b) failing to detect the Data Breach in a timely manner; and (c) Genworth Defendants', TruStage's, and TIAA Kaspick's failure to disclose that their data security practices were inadequate to safeguard Plaintiffs' and Class members' PII.

514. Genworth Defendants, TruStage, and TIAA Kaspick also violated the GLBA by failing to "develop and implement a risk-based response program to address incidents of unauthorized access to customer information in customer information systems." This includes, but is not limited to, Genworth Defendants', TruStage's, and TIAA Kaspick's failure to notify appropriate regulatory agencies, law enforcement, and the affected individuals themselves of the Data Breach in a timely and adequate manner.

515. Genworth Defendants, TruStage, and TIAA Kaspick also violated the GLBA by failing to notify affected customers as soon as possible after they became aware of unauthorized access to sensitive customer information.

516. Plaintiffs and Class members were foreseeable victims of Genworth Defendants', TruStage's, and TIAA Kaspick's violations of the GLBA. Genworth Defendants, TruStage, and TIAA Kaspick knew or should have known that their failure to take reasonable measures to prevent a breach of their data security systems—and/or that of their vendors such as PBI—and failure to timely and adequately notify the appropriate regulatory authorities, law enforcement, and Class members themselves would cause damages to Class members.

517. Defendants' violations of Section 5 of the FTCA and Genworth Defendants', TruStage's, and TIAA Kaspick's violations of the GLBA constitute negligence per se.

518. Plaintiffs and Class members are within the class of persons that Section 5 of the FTCA and the GLBA were intended to protect.

519. The harm occurring as a result of the Data Breach is the type of harm Section 5 of the FTCA and the GLBA were intended to guard against.

520. It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII—including Genworth Defendants', TruStage's, and TIAA Kaspick's failure to adequately monitor and audit PBI's systems and use of the MOVEit Transfer service—would result in the Data Breach and unauthorized release, disclosure, and dissemination of Plaintiffs' and Class members' PII to unauthorized individuals.

521. The injury and harm that Plaintiffs and Class members suffered was the direct and proximate result of Defendants' violations of Section 5 of the FTCA and Genworth Defendants',

TruStage's, and TIAA Kaspick's violations of the GLBA. Plaintiffs and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft—a risk justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; and/or (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face.

**THIRD CLAIM FOR RELIEF**
**Breach of Implied Contract**
*(Brought on behalf of the Nationwide Classes or, in the alternative, the State Classes)*

522. Plaintiffs reallege and incorporate by reference all previous paragraphs.

523. Plaintiffs bring this claim against Longevity and TwentyFirst on behalf of the PBI Nationwide Class or, in the alternative, the PBI State Classes. In addition, Plaintiffs Gilbert Hale, Hauser, Hernandez, and Pasquarelli bring this claim against GNA and BLIC on behalf of the Genworth Nationwide Class or, in the alternative, the Genworth State Classes. Plaintiff Gilbert Hale brings this claim against GLICNY on behalf of the GLICNY New York Class. Plaintiffs Checchia, Marshall, Phelan, Teppler, and Uhrich bring this claim against TIAA Kaspick on behalf of the TIAA Nationwide Class or, in the alternative, the TIAA State Classes. Plaintiff Soto brings this claim against TruStage on behalf of the TruStage Nationwide Class or, in the alternative, the MLIC Florida Class.

524. Genworth Defendants, TruStage, and TIAA Kaspick (collectively, "PBI-VCE/VCEC Defendants") required Plaintiffs and Class members to entrust them with their PII, directly or indirectly, in connection with PBI-VCE/VCEC Defendants' provision of services to Plaintiffs and Class members.

525. In turn, and through internal policies set forth herein, PBI-VCE/VCEC Defendants agreed to safeguard and not disclose to unauthorized persons the PII they collected from Plaintiffs and Class members, directly or indirectly.

526. Plaintiffs and Class members accepted PBI-VCE/VCEC Defendants' offers by providing PII to them—either directly or through certain Defendants—in exchange for PBI-VCE/VCEC Defendants' services.

527. Implicit in the parties' agreement was that PBI-VCE/VCEC Defendants would adequately safeguard the PII entrusted to them and would provide Plaintiffs and Class members with prompt and adequate notice of all unauthorized access and/or theft of their PII.

528. Plaintiffs and Class members would not have entrusted their PII to PBI-VCE/VCEC Defendants in the absence of such an agreement.

529. PBI-VCE/VCEC Defendants materially breached the contract(s) they had entered into with Plaintiffs and Class members by failing to safeguard such PII and failing to notify them promptly of the intrusion into their computer systems that compromised such information. PBI-VCE/VCEC Defendants further breached the implied contracts with Plaintiffs and Class members by:

a. Failing to properly safeguard and protect Plaintiffs and Class members' PII;

b. Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement; and

c. Failing to ensure the confidentiality and integrity of electronic PII that PBI-VCE/VCEC Defendants created, received, maintained, and transmitted.

530. The damages sustained by Plaintiffs and Class members as described above were the direct and proximate result of PBI-VCE/VCEC Defendants' material breaches of their implied agreement(s).

531. Plaintiffs and Class members have performed as required under the relevant agreements, or such performance was waived by the conduct of PBI-VCE/VCEC Defendants.

532. The covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

533. Subterfuge and evasion—such as that of PBI-VCE/VCEC Defendants, as alleged in greater detail herein—violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

534. PBI-VCE/VCEC Defendants knew or should have known that Plaintiffs and Class members reasonably understood that Defendants would safeguard the PII that PBI-VCE/VCEC Defendants required Plaintiffs and Class members to disclose in order to provide PBI-VCE/VCEC Defendants' services to them. Despite Plaintiffs and Class members' reasonable expectations, PBI-VCE/VCEC Defendants failed to implement appropriate cybersecurity protocols to protect the PII on their systems from the Data Breach.

535. In addition, PBI-VCE/VCEC Defendants failed to advise Plaintiffs and Class members of the Data Breach promptly and sufficiently. PBI-VCE/VCEC Defendants' own websites and other statements promised Plaintiffs and Class members that PBI-VCE/VCEC Defendants would keep their PII safe and promptly notify them of any data breaches. PBI-

VCE/VCEC Defendants, however, failed to do so, having waited multiple months before notifying Plaintiffs and Class members of the Data Breach.

536. In these and other ways, PBI-VCE/VCEC Defendants violated their duties of good faith and fair dealing.

537. Plaintiffs and Class members have sustained injury and damages because of PBI-VCE/VCEC Defendants' breaches of their agreements, including breaches thereof through violations of the covenant of good faith and fair dealing, including, without limitation: unauthorized disclosure of their PII and publication onto the Dark Web; monetary losses; lost time; anxiety, and emotional distress; loss of the opportunity to control how their PII is used; diminution in value of their PII; compromise and continuing publication of their PII; out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud; lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud; delay in receipt of tax refund monies; unauthorized use of stolen PII; continued risk to their PII, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake the appropriate measures to protect the PII in their possession; increased risk of harm; and lost benefit of the bargain.

**FOURTH CLAIM FOR RELIEF**
**Breach of Third-Party Beneficiary Contract**
*(Brought on behalf of the Nationwide Classes or, in the alternative, the State Classes)*

538. Plaintiffs reallege and incorporate by reference all previous paragraphs.

539. Plaintiffs bring this claim against Longevity and TwentyFirst on behalf of the PBI Nationwide Class or, in the alternative, the PBI State Classes. In addition, Plaintiffs Gilbert Hale, Hauser, Hernandez, and Pasquarelli bring this claim against GNA and BLIC on behalf of the

Genworth Nationwide Class or, in the alternative, the Genworth State Classes. Plaintiff Gilbert Hale brings this claim against GLICNY on behalf of the GLICNY New York Class. Plaintiffs Checchia, Marshall, Phelan, Teppler, and Uhrich bring this claim against TIAA Kaspick on behalf of the TIAA Nationwide Class or, in the alternative, the TIAA State Classes. Plaintiff Soto brings this claim against TruStage on behalf of the TruStage Nationwide Class or, in the alternative, the MLIC Florida Class.

540. Defendants entered into contracts with their government and corporate customers to provide services to them using MOVEit; services that included data security practices, procedures, and protocols sufficient to safeguard the PII that was entrusted to Defendants. Those contracts entered into by Defendants were made expressly for the benefit of Plaintiffs and Class members—namely to provide services that kept their PII secure—as it was their PII that Defendants agreed to receive, store, utilize, transfer, and protect through their services. Thus, the benefit of collection and protection of the PII belonging to Plaintiffs and Class members was the direct and primary objective of the contracting parties and Plaintiffs and Class members were direct and express beneficiaries of such contracts.

541. Defendants knew or should have known that if they were to breach these contracts, Plaintiffs and Class members would be harmed.

542. Defendants breached their contracts by, among other things, failing to adequately secure Plaintiffs and Class members' PII, and, as a result, Plaintiffs and Class memberswere harmed by Defendants' failure to secure their PII.

543. As a direct and proximate result of Defendants' breach, Plaintiffs and Class members are at a current and ongoing risk of identity theft, and Plaintiffs and Class members sustained incidental and consequential damages including: (i) financial "out of pocket" costs

incurred mitigating the materialized risk and imminent threat of identity theft; (ii) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (iii) financial "out of pocket" costs incurred due to actual identity theft; (iv) loss of time incurred due to actual identity theft; (v) loss of time due to increased spam and targeted marketing emails; (vi) diminution of value of their PII; (vii) future costs of identity theft monitoring; (viii) and the continued risk to their PII, which remains in Defendants' control, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiffs and Class members' PII.

544. Plaintiffs and Class members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

545. Plaintiffs and Class members are also entitled to injunctive relief requiring Defendants to: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class members.

**FIFTH CLAIM FOR RELIEF**
**Violation of Massachusetts General Laws, Chapter 93A**
*(Brought on behalf of the Nationwide Classes or, in the alternative, the State Classes)*

546. Plaintiffs reallege and incorporate by reference all previous paragraphs.

547. Plaintiffs bring this claim against Longevity and TwentyFirst on behalf of the PBI Nationwide Class or, in the alternative, the PBI State Classes. In addition, Plaintiffs Gilbert Hale, Hauser, Hernandez, and Pasquarelli bring this claim against GNA and BLIC on behalf of the Genworth Nationwide Class or, in the alternative, the Genworth State Classes. Plaintiff Gilbert Hale brings this claim against GLICNY on behalf of the GLICNY New York Class. Plaintiffs Checchia, Marshall, Phelan, Teppler, and Uhrich bring this claim against TIAA Kaspick on behalf of the TIAA Nationwide Class or, in the alternative, the TIAA State Classes. Plaintiff Soto brings

this claim against TruStage on behalf of the TruStage Nationwide Class or, in the alternative, the MLIC Florida Class.

548. M.G.L. ch. 93A §§ 2 and 9. M.G.L. ch. 93A § 2 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." M.G.L. ch. 93A § 9 permits any consumer injured by a violation of M.G.L. ch. 93A § 2 to bring a civil action, including a class action, for damages and injunctive relief.

549. Plaintiffs allege that Defendants committed unfair business acts and/or practices in violation of M.G.L. ch. 93A §§ 2 and 9.

550. Defendants knew or should have known of the inherent risks in experiencing a data breach if they failed to maintain adequate systems and processes for keeping Plaintiffs and Class members' PII safe and secure. Only Defendants were in a position to ensure that their systems were sufficient to protect against harm to Plaintiffs and Class members resulting from a data security incident such as the Data Breach; instead, they failed to implement such safeguards.

551. Defendants' own conduct also created a foreseeable risk of harm to Plaintiffs and Class members and their PII. Defendants' misconduct included failing to adopt, implement, and maintain the systems, policies, and procedures necessary to prevent the Data Breach.

552. Defendants acknowledge their conduct created actual harm to Plaintiffs and Class members because Defendants instructed them to monitor their accounts for fraudulent conduct and identity theft.

553. Defendants knew, or should have known, of the risks inherent in disclosing, collecting, storing, accessing, and transmitting PII and the importance of adequate security because of, *inter alia*, the prevalence of data breaches.

554. Defendants failed to adopt, implement, and maintain fair, reasonable, or adequate security measures to safeguard Plaintiffs and Class members' PII, failed to recognize the Data Breach in a timely manner, and failed to notify Plaintiffs and Class members in a timely manner that their PII was accessed in the Data Breach.

555. These acts and practices are unfair in material respects, offend public policy, are immoral, unethical, oppressive and unscrupulous and violate 201 CMR 17.00 and M.G.L. ch. 93A § 2.

556. As a direct and proximate result of Defendants' unfair acts and practices, Plaintiffs and Class members have suffered injury and/or will suffer injury and damages, including, but not limited to: (i) the loss of the opportunity to determine for themselves how their PII is used; (ii) the publication and/or fraudulent use of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest and recover from unemployment and/or tax fraud and identity theft; (v) costs associated with placing freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their PII, which remains in Defendants' possession (and/or to which Defendants continue to have access) and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in their continued possession; and, (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of disclosed PII.

557. Neither Plaintiffs nor Class members contributed to the Data Breach.

558. Based on the foregoing, Plaintiffs and Class members are entitled to all remedies available pursuant to M.G.L ch. 93A, including, but not limited to, refunds, actual damages, or statutory damages in the amount of twenty-five dollars per violation, whichever is greater, double or treble damages, attorneys' fees and other reasonable costs.

559. Pursuant to M.G.L. ch. 231, § 6B, Plaintiffs and Class members are further entitled to pre-judgment interest as a direct and proximate result of Defendants' wrongful conduct. The amount of damages suffered as a result is a sum certain and capable of calculation and Plaintiffs and Class members are entitled to interest in an amount according to proof.

**SIXTH CLAIM FOR RELIEF**
**Violation of Minnesota Uniform Deceptive Trade Practices Act**
**Minn. Stat. §§ 325D.43, *et seq*.**

*(Brought on behalf of the Nationwide Classes or, in the alternative, the State Classes)*

560. Plaintiffs reallege and incorporate by reference all previous paragraphs.

561. Plaintiffs bring this claim against Longevity and TwentyFirst on behalf of the PBI Nationwide Class or, in the alternative, the PBI State Classes. In addition, Plaintiffs Gilbert Hale, Hauser, Hernandez, and Pasquarelli bring this claim against GNA and BLIC on behalf of the Genworth Nationwide Class or, in the alternative, the Genworth State Classes. Plaintiff Gilbert Hale brings this claim against GLICNY on behalf of the GLICNY New York Class. Plaintiffs Checchia, Marshall, Phelan, Teppler, and Uhrich bring this claim against TIAA Kaspick on behalf of the TIAA Nationwide Class or, in the alternative, the TIAA State Classes. Plaintiff Soto brings this claim against TruStage on behalf of the TruStage Nationwide Class or, in the alternative, the MLIC Florida Class.

562. By engaging in deceptive trade practices in the course of their businesses and vocations, directly or indirectly affecting the people of Minnesota, Defendants violated Minn. Stat. § 325D.44, including the following provisions:

a. Representing that their goods and services had characteristics, uses, and benefits that they did not have, in violation of Minn. Stat. § 325D.44(1)(5);

b. Representing that goods and services are of a particular standard or quality when they are of another, in violation of Minn. Stat. § 325D.44(1)(7);

c. Advertising goods and services with intent not to sell them as advertised, in violation of Minn. Stat. § 325D.44(1)(9); and

d. Engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding, in violation of Minn. Stat. § 325D.44(1)(13).

563. Defendants' deceptive practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs and Class members' PII, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs and Class members' PII, including duties imposed by the FTCA, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiffs and Class members' PII, including by implementing and maintaining reasonable security measures and ensuring their vendors and business associates maintained reasonable security measures;

e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs and Class members' PII, including duties imposed by the FTCA, 15 U.S.C. § 45;

f. Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiffs and Class members' PII or ensure their vendors and business associates reasonably or adequately secured such information; and

g. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs and Class members' PII, including duties imposed by the FTCA, 15 U.S.C. § 45.

564. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of their data security and ability to protect the confidentiality of consumers' PII.

565. Defendants intended to mislead Plaintiffs and Class members and induce them to rely on their misrepresentations and omissions.

566. Had Defendants disclosed to Plaintiffs and Class members that their data systems were not secure and, thus, vulnerable to attack, Defendants would have been unable to continue in business and they would have been forced to use vendors and business associates with reasonable data security measures and comply with the law. Instead, Defendants received, maintained, and compiled Plaintiffs and Class members' PII as part of the services they provided without advising Plaintiffs and Class members that Defendants' data security practices were insufficient to maintain the safety and confidentiality of Plaintiffs and Class members' PII. Accordingly, Plaintiffs and Class members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

567. Defendants acted intentionally, knowingly, and maliciously to violate Minnesota's Uniform Deceptive Trade Practices Act, and recklessly Plaintiffs and Class members' rights. Defendants' past data breaches and/or knowledge of past data breaches in their respective industries put them on notice that their security and privacy protections were inadequate and/or susceptible to being targeted for a data breach.

568. As a direct and proximate result of Defendants' deceptive trade practices, Plaintiffs and Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to

monitoring their financial accounts for fraudulent activity; loss of value of their PII; and an increased, imminent risk of fraud and identity theft.

569. Plaintiffs and Class members seek all relief allowed by law, including injunctive relief and reasonable attorneys' fees and costs.

**SEVENTH CLAIM FOR RELIEF**
**Violations of the California Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*.**

*(Brought on behalf of the Genworth California Class and PBI California Class)*

570. Plaintiffs reallege and incorporate by reference all previous paragraphs.

571. Plaintiffs bring this claim against Genworth Defendants on behalf of the Genworth California Class, and Longevity and TwentyFirst on behalf of the PBI California Class.

572. GNA is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

573. BLIC is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

574. Longevity is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

575. TwentyFirst is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

576. Cal. Bus. & Prof. Code § 17204 provides that "a person who has suffered injury in fact and has lost money or property as a result of the unfair competition" may file suit.

577. GNA, BLIC, Longevity, and TwentyFirst violated Cal. Bus. & Prof. Code § 17200 *et seq*. ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

578. GNA, BLIC, Longevity, and TwentyFirst's "unfair" acts and practices include:

a. Failure to implement and maintain reasonable security measures to protect Plaintiffs' and California Class Members' PII from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Data Breach, Plaintiffs' and California Class Members' PII being compromised, and subsequent harms caused to Plaintiffs and California Class Members.

b. Failure to identify foreseeable security risks, including in their third-party vendor, Progress, remediate identified security risks, and adequately improve

security following previous cybersecurity incidents and known coding vulnerabilities in the industry;

c. Failure to implement and maintain reasonable security measures also was contrary to legislatively-declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate security measures. These policies are reflected in laws, including the FTCA, 15 U.S.C. § 45; California's Consumer Records Act, Cal. Civ. Code § 1798.81.5; and California's Consumer Privacy Act, Cal. Civ. Code § 1798.150; and

d. Failure to implement and maintain reasonable security measures also led to substantial consumer injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because consumers could not know of GNA, BLIC, Longevity, and TwentyFirst's inadequate security practices and policies, consumers could not have reasonably avoided the harms that GNA, BLIC, Longevity, and TwentyFirst caused.

579. GNA, BLIC, Longevity, and TwentyFirst have also engaged in unlawful business practices by violating the California Consumer Records Act, Cal. Civ. Code § 1798.81.5, and/or the California Consumer Privacy Act, Cal. Civ. Code § 1798.150, as well as the common law.

580. GNA, BLIC, Longevity, and TwentyFirst's deceptive acts and practices include:

a. Misrepresenting that they would protect the privacy and confidentiality of Plaintiffs' and California Class Members' PII, including by implementing and maintaining reasonable security measures;

b. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and California Class Members' personal information, including duties imposed by the FTCA, 15 U.S.C. § 45, California's Customer Records Act, Cal. Civ. Code §§ 1798.80, *et seq.*, California's Consumer Privacy Act, Cal. Civ. Code § 1798.150; and the common law;

c. Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiffs' and California Class Members' PII; and

d. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and California Class Members' PII, including duties imposed by the FTCA, 15 U.S.C. § 45, California's Customer Records Act, Cal. Civ. Code §§ 1798.80, *et seq.*, California's Consumer Privacy Act, Cal. Civ. Code § 1798.150, and the common law.

581. GNA, BLIC, Longevity, and TwentyFirst's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of GNA, BLIC, Longevity, and TwentyFirst's respective data security policies and practices and ability to protect the confidentiality of consumers' personal information.

582. Had GNA, BLIC, Longevity, and TwentyFirst disclosed to consumers and the public that they were not complying with industry standards or regulation or that its data systems were not secure and, thus, were vulnerable to attack, they would have been unable to continue in business and they would have been forced to adopt reasonable data security measures and comply with the law.

583. Accordingly, Plaintiffs and California Class Members acted reasonably in relying on GNA, BLIC, Longevity, and TwentyFirst's misrepresentations and omissions, the truth of which they could not have discovered.

584. GNA, BLIC, Longevity, and TwentyFirst were entrusted, either directly or indirectly, with sensitive and valuable PII regarding millions of consumers, including Plaintiffs and California Class Members. GNA, BLIC, Longevity, and TwentyFirst accepted the critical responsibility of protecting the data but kept the inadequate state of its security controls secret from the public.

585. As a direct and proximate result of GNA, BLIC, Longevity, and TwentyFirst's unfair, unlawful, and/or fraudulent acts and practices, Plaintiffs and California Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including, but not limited to, fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their PII;

overpayment for products and services; loss of the value of access to their PII; and the value of identity and credit protection and repair services made necessary by the Data Breach.

586. GNA, BLIC, Longevity, and TwentyFirst's violations were, and are, willful, deceptive, unfair, and unconscionable.

587. Plaintiffs and California Class Members have lost money and property as a result of GNA, BLIC, Longevity, and TwentyFirst's conduct in violation of the UCL, as stated herein and above.

588. By deceptively, unfairly, and unlawfully storing, collecting, and disclosing their personal information, GNA, BLIC, Longevity, and TwentyFirst have taken money or property from Plaintiffs and California Class Members. GNA, BLIC, Longevity, and TwentyFirst acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiffs' and California Class Members' rights.

589. GNA, BLIC, Longevity, and TwentyFirst knew or should have known that their data security was insufficient to guard against cyberattacks, particularly, given the size of their databases and the sensitivity of the PII therein.

590. Plaintiffs and California Class Members seek all monetary and nonmonetary relief allowed by law, including restitution of all profits stemming from GNA, BLIC, Longevity, and TwentyFirst's unfair, unlawful, and fraudulent business practices or use of their personal information; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief, including public injunctive relief.

**EIGHTH CLAIM FOR RELIEF**
**Declaratory Relief**
**28 U.S.C. § 2201**

*(Brought on behalf of the Nationwide Classes or, in the alternative, the State Classes)*

591. Plaintiffs reallege and incorporate by reference all previous paragraphs.

592. The Plaintiffs bring this claim against each Defendant on behalf of the Class.

593. An actual controversy has arisen and exists between the Plaintiffs and Class members, on the one hand, and Defendants on the other hand, concerning the Data Breach and Defendants' failure to protect Plaintiffs and Class members' PII, including with respect to the issue of whether Defendants took adequate measures to protect that information. Plaintiffs and Class members are entitled to judicial determination as to whether Defendants have performed and are adhering to all data privacy obligations as required by law or otherwise to protect Plaintiffs and Class members' PII from unauthorized access, disclosure, and use.

594. A judicial determination of the rights and responsibilities of the parties regarding Defendants' privacy policies and whether they failed to adequately protect PII is necessary and appropriate to determine with certainty the rights of Plaintiffs and Class members, and so that there is clarity between the parties as to Defendants' data security obligations with respect to PII going forward, in view of the ongoing relationships between the parties.

## VIII. PRAYER FOR RELIEF

595. Plaintiffs, individually and on behalf of the Class, respectfully request that the Court grant the following relief:

a. Certify this case as a class action pursuant to Fed. R. Civ. P. 23, and appoint Plaintiffs as Class Representative and undersigned counsel as Class Counsel;

b. Find in favor of Plaintiffs and the Class on all counts asserted herein;

c. Award Plaintiffs and the Class actual, statutory, and/or punitive monetary damages to the maximum extent as allowed by law;

d. Award Plaintiffs and the Class compensatory, consequential, general, and/or nominal monetary damages in an amount to be proven at trial;

e. Award Plaintiffs and the Class restitution and all other applicable forms of equitable monetary relief;

f. Award Plaintiffs and the Class equitable relief by enjoining Longevity and TwentyFirst from engaging in the wrongful conduct complained of herein regarding the misuse or disclosure of the private information of Plaintiffs and Class members, and by requiring Longevity and TwentyFirst to issue prompt, complete, and accurate disclosure to Plaintiffs and Class members;

g. Award Plaintiffs and the Class injunctive relief as permitted by law or equity to assure that they have an effective remedy, and to protect the interests of Plaintiffs and Class members, including, but not limited to, an order:

i. requiring PBI to protect from unauthorized disclosure all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws, including by adequate encryption of all such data and by preventing unauthorized access to decryption keys;

ii. requiring PBI to delete, destroy, and purge any personal identifying information of Plaintiffs and Class members in its possession unless PBI can provide to the Court reasonable justification for the retention and use of such information when weighted against the privacy interests of Plaintiffs and Class members;

iii. requiring PBI to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on PBI's systems on a periodic basis, and ordering PBI to promptly correct any problems or issues detected by such third-party security auditors;

iv. requiring PBI to engage independent third-party security auditors and internal personnel to run automated security monitoring including, but not limited to, regular database scanning and securing checks;

v. requiring PBI to audit, test, and train its security personnel regarding any new or modified procedures;

vi. requiring PBI to segment data by, among other things, creating firewalls and access controls so that if one area of PBI network is compromised, hackers cannot gain access to other portions of PBI's systems;

vii. requiring PBI to establish for all PBI employees an information security training program that includes annual training, with additional training to be provided as appropriate;

viii. requiring PBI to establish for all PBI security personnel a security training program that includes regularly scheduled internal training and education to inform PBI's internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

ix. requiring PBI to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with PBI's policies, programs, and systems for protecting personal identifying information;

x. requiring PBI to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor PBI's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xi. requiring PBI to provide notice to Plaintiffs and all Class members regarding the full nature and extent of the Data Breach and the disclosure of Private Information to unauthorized persons, including the threat posed as a result of the disclosure of their confidential personal information, and educating Plaintiffs and Class members regarding steps affected individuals should take to protect themselves;

xii. requiring PBI to implement logging and monitoring programs sufficient to track traffic to and from PBI's servers;

xiii. requiring, for a period of 10 years, the appointment of a qualified and independent third-party assessor to conduct an annual SOC 2 Type 2 attestation to evaluate PBI's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any deficiencies with compliance of the Court's final judgment;

xiv. requiring PBI to implement multi-factor authentication requirements, if not already implemented; and

xv. requiring PBI employees to employ passwords consistent with best security practices and to change their passwords on a timely and regular basis.

h. Award disgorgement and restitution of all earnings, profits, compensation, and benefits received by Longevity and TwentyFirst as a result of its unlawful acts;

i. Order Longevity and TwentyFirst to purchase or provide funds for lifetime credit monitoring and identify theft insurance to Plaintiffs and Class members;

j. Order Longevity and TwentyFirst to pay all costs necessary to notice Class members about the judgment and all costs necessary to administer a court approved claims process.

k. Award Plaintiffs and the Class pre-judgment and post-judgment interest to the maximum extent allowed by law;

l. Grant Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced during the course of this case;

m. Award Plaintiffs and the Class reasonable attorneys' fees, costs, and expenses, as allowable;

n. Where necessary, distribute any monies recovered from Longevity and TwentyFirst on behalf of Class members or the general public via fluid recovery or cy pres recovery as applicable to prevent Longevity and TwentyFirst from retaining benefits of its wrongful conduct;

o. Award Plaintiffs and the Class such other favorable relief as allowable under law or at equity;

p. Award any other and further relief as may be just and proper; and

q. Conduct a trial by jury on all issues so triable.

Dated: May 22, 2026

/s/ Kristen A. Johnson
Kristen A. Johnson (BBO# 667261)
HAGENS BERMAN SOBOL SHAPIRO LLP
1 Faneuil Hall Square, 5th Floor
Boston, MA 02109
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
kristenj@hbsslaw.com

Daniel J. Kurowski (pro hac vice)
Whitney K. Siehl (pro hac vice)
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
dank@hbsslaw.com
whitneys@hbsslaw.com

*Liaison & Coordinating Counsel*

By: /s/ E. Michelle Drake
E. Michelle Drake
BERGER MONTAGUE, PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 594-5933
Facsimile: (612) 584-4470
emdrake@bm.net

By: /s/ Gary F. Lynch
Gary F. Lynch
LYNCH CARPENTER, LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
Facsimile: (412) 231-0246
Gary@lcllp.com

By: /s/ Douglas J. McNamara
Douglas J. McNamara
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, 8th Floor
Washington, DC 20005
Telephone: (202) 408-4600
dmcnamara@cohenmilstein.com

By: /s/ Karen H. Riebel
Karen H. Riebel
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue S, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

khriebel@locklaw.com

By: /s/ Charles E. Schaffer
Charles E. Schaffer
LEVIN SEDRAN & BERMAN LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Telephone: (215) 592-1500
Facsimile: (215) 592-4663
cshaffer@lfsblaw.com

*Lead Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that, on this date, the foregoing document was filed electronically via the Court's CM/ECF system, which will send notice of the filing to all counsel of record.

Dated: May 22, 2026

/s/ Kristen A. Johnson
Kristen A. Johnson